UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RAYONIER ADVANCED MATERIALS INC., et al.,<br><br>Defendants. | Civil Action No. 3:17-cv-01167<br><br><u>CLASS ACTION</u><br><br>The Honorable Aleta A. Trauger |

**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiffs ..... 6

B. Defendants ..... 6

IV. SUBSTANTIVE ALLEGATIONS ..... 8

A. Background of RYAM and Its Products ..... 8

B. RYAM Was the Dominant Player in Specialties ..... 10

C. RYAM's Revenue Depends on Long-term Relationships with a Few Key Customers ..... 11

D. RYAM Undertakes Massive Expansion of Its Specialties Infrastructure with the Goal of Becoming a Specialties-Only Business ..... 12

E. Just as RYAM Completes the CSE, the Company Faces Significant Headwinds and Deteriorating Relationships with Top Customers ..... 14

F. RYAM Is Spun-off from Rayonier, Inc. and Boynton Leaves His Position as Rayonier, Inc.'s CEO to Become RYAM's CEO ..... 17

G. From RYAM's Inception, Defendants Mislead Investors About RYAM's Business and Financial Condition, Customer Relationships, and Prospects ..... 18

H. After Executing the Spin-off, Defendants Begin to Reveal that the Company's Specialties Business Was Deteriorating ..... 20

I. The Dispute with Eastman Intensifies, While Defendants Continue Misleading Investors About that Deteriorating Relationship and Its Effects on RYAM's Prospects ..... 21

J. Defendants Undertake a "Strategic Repositioning" to Retreat from Its Failed Specialties Expansion ..... 23

K. Revealing Defendants' Fraud, Eastman Sues RYAM, and RYAM Loses Nearly Half Its Value in a Single Day ..... 24

L. RYAM Conceals the Pricing Terms It Acquiesces to with Eastman, and the Stock Continues to Fall as RYAM Reports Weak Financial Results ..... 25

## TABLE OF CONTENTS

**Page**


M. Numerous Facts Support Defendants' Scienter ....26

1. The Nature of the Company's Contractual Agreements and Timing of Customer Negotiations Confirms that Defendants Knew that Specialties Volumes Would Decrease, Rather than Increase, in 2014 and 2015 ....28

2. Eastman's Complaint in the Tennessee Action Confirms that, During the Class Period, Defendants Knew of Eastman's Demands for Price Concessions and Invocation of the Meet & Release Provision ....29

3. Defendants Were Motivated to Provide a Positive Perception of Their Newly Spun-off Company ....30

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS, OMISSIONS, AND PARTIAL REVELATIONS DURING THE CLASS PERIOD ....31

A. Defendants Materially Misrepresent the Company's Specialties Business in Public Filings Regarding the Spin-off from Rayonier, Inc. ....34

B. Investors Begin to Learn the True Extent of Problems with the Company's Specialties Business, but Defendants Continue to Mislead the Market ....37

1. Second Quarter 2014 Financial Results ....38

2. KeyBanc Capital Markets Basic Materials & Packaging Conference ....43

3. Third Quarter 2014 Financial Results ....44

4. Fourth Quarter and Fiscal Year 2014 Financial Results ....47

5. First Quarter 2015 Financial Results ....52

6. Announcement of Strategic Repositioning and Second Quarter 2015 Financial Results ....54

C. Defendants Reveal Litigation with Their Largest Customer, Eastman, over Contractual Terms Jeopardizing All of the Company's Eastman Business ....57

VI. POST-CLASS PERIOD REVELATIONS ....61

VII. LOSS CAUSATION ....63

VIII. PRESUMPTION OF RELIANCE ....66

IX. NO SAFE HARBOR ....69

X. LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ....70

By and through their undersigned counsel, Lead Plaintiffs Michigan Carpenters' Pension Fund and Local 295 IBT Employer Group Pension Trust Fund ("Lead Plaintiffs") bring this federal class action against Defendants Rayonier Advanced Materials Inc. ("RYAM" or "Company"), Paul G. Boynton ("Boynton"), Frank A. Ruperto ("Ruperto"), and Benson K. Woo ("Woo") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by RYAM and other related non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review and analysis of securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties; and (d) interviews with factual sources, including individuals formerly employed by the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. Lead Plaintiffs bring this action on behalf of themselves and all persons or entities that purchased or acquired the common stock of RYAM between June 30, 2014 and August 18, 2015, inclusive ("Class Period") and who were damaged thereby ("Class"). Lead Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

2. RYAM produces cellulose products for sale to a select group of manufacturers.[1] The

[1] Cellulose is an organic compound found in plants. It is the most abundant organic polymer on earth. For example, cotton fibers are comprised of 90% cellulose, and wood is comprised of 40 to 50% cellulose.

Company produces some fungible commodity cellulose ("Commodities"), but its more lucrative product has always been cellulose specialties ("Specialties" or "CS"), which are expensive, highly-specialized cellulose products tailored to manufacturers' specific needs. Specialties are used in the production of a host of products, including, cigarette filters, cosmetics, impact resistant plastics, and pharmaceuticals.

3. Prior to and after its spin-off from Rayonier, Inc., the vast majority of RYAM's business was Specialties.[2] The Company held itself out as the "global leader" in producing Specialties, which it claimed was driven by its 80-plus years of history and its development of proprietary methods for creating a superior product. Moreover, significant barriers to entry in the Specialties market enabled RYAM to obtain its status as the dominant player and to command a price premium.

4. As such, RYAM was historically able to rely on long-term relationships with a handful of key customers to provide the vast majority of its stable, profitable business. In 2013, prior to the spin-off, the Company's top four customers – Eastman Chemical Company ("Eastman"), Nantong Cellulose Fibers Co., Ltd. ("Nantong"), Celanese Acetate, LLC ("Celanese"), and Daicel Corporation ("Daicel") – comprised 67% of the Company's net sales.

5. In particular, Eastman, the Company's top customer (with whom RYAM had done business for over 80 years), accounted for 21% of RYAM's net sales in 2013. Thus, the Company's relationship with Eastman was of paramount importance.

---

[2] As detailed below, *see* ¶¶49-50, RYAM was formed in June 2014 when Rayonier, Inc. – a forest products and real estate company – spun-off its "Performance Fibers" business, which manufactured cellulose-based products. Rayonier, Inc. continues to operate as a timber and real estate company, whereas RYAM has continued the Performance Fibers business, manufacturing the products giving rise to this action. For consistency purposes, "RYAM" refers to the pre-spin-off Performance Fibers business, as well as the post-spin-off standalone company that committed the fraud described herein. When reporting its pre-2014 financials, the Company itself relies on the financials from Rayonier, Inc.'s Performance Fibers business.

6. Relying heavily on this relationship with Eastman, the Company embarked on an expansion of its Specialties business ("Cellulose Specialties Expansion" or "CSE"), which would convert its low-margin Commodities line into a Specialties line and increase Specialties capacity by 39%. Eastman contracted to purchase a set minimum amount of the additional Specialties. Through the CSE, moreover, the Company sought to transition RYAM's business solely to Specialties – poising it for success in a high-margin, low-competition sector. The price for this expansion was steep – the CSE ultimately cost $385 million to complete.

7. Soon after the CSE was completed in July 2013, the Company was faced with significant headwinds, including the emergence of new competitors who offered an increased supply of comparable Specialties products at cheaper prices. Unknown to the market, however, was the significant negative impact these headwinds were having on the Company's operations, customer relationships, and future financial prospects. Indeed, at the end of 2013, RYAM lost Celanese (its third largest customer, accounting for an average of 15% of net sales ($146,000,000)) to a competitor. And, as Defendants knew but concealed, the Company's relationship with Eastman (RYAM's largest customer) had fundamentally changed. Eastman had confronted RYAM with competitors' offers of comparable products at better prices and demanded that RYAM respond to declines in market prices. Those competing offers were of great importance given a provision in the parties' contract (a provision that was hidden from investors) which required RYAM to meet lower prices or release Eastman from certain purchase obligations. This dispute posed potentially catastrophic consequences for RYAM, forcing it to make enormous price concessions or risk losing its No. 1 customer.

8. Against this backdrop, on the first day of the Class Period (June 30, 2014), RYAM effectuated its spin-off from Rayonier, Inc. Defendants were motivated to present their newly

formed Company as having strong fundamentals, weathering market headwinds, and possessing solid customer relationships. Therefore, rather than disclose the significant challenges faced by RYAM, Defendants provided investors with an information statement ("Information Statement") that painted a rosy but materially misleading picture of the Company's future prospects, highlighting RYAM's unmatched products, ability to command a price premium, and long-term relationships. The Information Statement also led the market to believe that the Company would achieve an increase in Specialties volumes in 2014 and reiterated RYAM's plan to phase out Commodities and sell only Specialties by 2018.

9. As soon as the spin-off was effectuated, RYAM's deteriorating financial condition forced Defendants to make a series of partial disclosures on July 30, 2014; October 29, 2014; and January 28, 2015. Those partial disclosures revealed the Company's increased competition and oversupply, as well as the Company's resulting inability to sell increased volumes or capitalize on the CSE. However, Defendants continued to mislead the market and conceal RYAM's massive rift with Eastman, which continued to grow as Eastman demanded that RYAM meet competitors' prices or release it from its obligations under the parties' multi-year contract. RYAM refused, and despite a business relationship spanning more than 80 years, Eastman sued the Company in August of 2015. The consequences were severe, posing no beneficial solution. RYAM would either acquiesce to unwanted terms or lose Eastman's current and/or future business. To protect itself, RYAM was forced to file a countersuit against Eastman.

10. On August 18, 2015, Defendants made their first disclosures about the long-brewing dispute with Eastman. Defendants disclosed that the meet or release provision existed, that Eastman had received competing offers from competitors, that Eastman wanted out of the contract or a price match, and that the parties had initiated competing lawsuits. The market was shocked by the news of

the severe chasm in RYAM's relationship with Eastman, which the Company had carefully hidden from investors. In response, RYAM's stock price suffered a massive 44% decline on August 19, 2015, followed by an additional 13.9% drop on August 20, 2015, resulting in millions of dollars in investor losses.

11. Following the Class Period, RYAM was ultimately forced to reconcile with Eastman. However, the reconciliation came at a tremendous cost. RYAM had provided substantial concessions, causing drastic declines in 2016 net sales from Eastman and company-wide.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because RYAM transacts business in this District, Woo maintains a residence in this District, all Defendants were co-conspirators as to the conduct and violations alleged herein, and many of the acts and practices complained of herein occurred in substantial part in this District. Defendants issued their false and misleading statements through written and oral means, which were widely disseminated to investors, including investors in this District.

14. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

15. Michigan Carpenters' Pension Fund and Local 295 IBT Employer Group Pension Trust Fund were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated November 13, 2017 [ECF No. 22]. As shown in the certifications filed contemporaneously herewith and incorporated herein, Michigan Carpenters' Pension Fund and Local 295 IBT Employer Group Pension Trust Fund each purchased or otherwise acquired RYAM common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of RYAM common stock.[3]

### B. Defendants

16. Defendant RYAM is a Delaware corporation with its principal place of business located in Jacksonville, Florida.

17. Defendant Boynton is, and at all relevant times was, Chairman, President, and Chief Executive Officer ("CEO") of RYAM.

18. Defendant Woo was Senior Vice President and Chief Financial Officer ("CFO") of RYAM until his resignation on November 30, 2014.

19. Defendant Ruperto was Senior Vice President Human Resources, Corporate Development and Strategic Planning of RYAM until November 28, 2014, when he became CFO and Senior Vice President, Finance and Strategy of RYAM. He continues to serve in that role.

20. Defendants Boynton, Woo, and Ruperto are collectively referred to herein as the "Individual Defendants."

---

[3] *See* Certification of Local 295 IBT Employer Group Pension Trust Fund, attached hereto as Exhibit A; Certification of Michigan Carpenters' Pension Fund, attached hereto as Exhibit B.

21. During and prior to the Class Period, the Individual Defendants, as senior executive officers of RYAM, were privy to confidential and proprietary information concerning RYAM. Because of their positions with RYAM, the Individual Defendants had access to non-public information about the Company's business operations, financial condition, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. As such, the Individual Defendants had access to material adverse non-public information concerning the financial condition and prospects of the Company's Specialties business, as discussed in detail below. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22. The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about RYAM and its business, which were issued or adopted by the Company, materially false and misleading.

23. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and

had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

24. As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Company's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of RYAM common stock, causing Lead Plaintiffs and other members of the Class to purchase RYAM common stock at artificially inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of RYAM and Its Products

26. Prior to and following a spin-off in June 2014, RYAM produced two types of cellulose-based products: (a) Specialties (a.k.a. CS) and (b) Commodities.

27. Specialties – which are comprised of more than 95% cellulose – are natural polymers used as raw materials in the manufacturing of an assortment of consumer products. RYAM produced Specialties for various companies (primarily chemical companies) that, in turn, used the Specialties in manufacturing products such as cigarette filters, liquid crystal displays, impact-resistant plastics, thickeners for food products, pharmaceuticals, cosmetics, tires, industrial hoses, food casings, paints, and lacquers. Because each of RYAM's customers had specific, unique needs, RYAM custom engineered the Specialties to each customer's specifications.

28. RYAM also produced two types of Commodities, which are comprised of less than 95% cellulose: (a) commodity viscose and (b) absorbent materials (a.k.a. "fluff fibers" or "fluff"). Commodity viscose is a dissolving wood pulp used in manufacturing woven products such as textiles for clothing and in non-woven products such as baby/cosmetic wipes and mattress ticking. Fluff is used as an absorbent material in various products such as disposable baby diapers, feminine hygiene products, incontinence pads, convalescent bed pads, industrial towels and wipes, and non-woven fabrics.

29. Commodities are largely fungible, posing limited opportunities for differentiation in terms of product performance.[4] In contrast, Specialties have higher cellulose content and are more specialized and crafted for each customer's particular needs. Specialties can be used to meet demand for Commodities, but Commodities cannot be used to meet demand for Specialties. Accordingly, Specialties earn higher margins than Commodities.

---

[4] In general, commodities are basic goods that are interchangeable with other commodities of the same type. In other words, the quality of the same commodity is essentially uniform across producers. RYAM's cellulose-based Commodities had those characteristics.

**B. RYAM Was the Dominant Player in Specialties**

30. Drawing from over 80 years of experience in producing Specialties, RYAM repeatedly touted that it was "the global leader in the production of [Specialties]" and possessed an unrivaled capability to produce a superior product catered to each customer's needs.

31. According to RYAM, the Company had the flexibility to use both hardwood and softwood to create Specialties, unlike its competitors, and the capability to use both a craft process and a sulfite process, whereas its competitors used only a single process. RYAM further claimed that, over its lengthy history, it had developed other proprietary processes for meeting distinct customer needs. Because of its purportedly unmatched product performance for customers, therefore, RYAM repeatedly conveyed to investors that it could continually command a premium price, and RYAM consistently reported "nearly double the sales of the next largest competitor." Indeed, RYAM possessed over 50% of the world's capacity for the production of Specialties.

32. Moreover, according to RYAM, significant challenges unique to the Specialties industry generally prevented new competitors from emerging. The Company emphasized that producing Specialties tailored to each customer's distinct requirements required a significant amount of intellectual property, capital investment, technical expertise, and experience, given that each Specialties customer had exacting specifications and parameters for purity, viscosity, brightness, reactivity, and other physical properties. For example, RYAM stated that some smokers could actually taste the difference in the Specialties used in cigarette filters, which were the largest end market for Specialties. Accordingly, Specialties had to be precisely crafted to a customer's needs, and even when dealing with an experienced producer such as RYAM, it took six to twelve months for each customer to review and qualify (*i.e.*, approve) the product. As such, RYAM claimed that a new company could not enter the Specialties market without a substantial initial investment to

establish a production line, as well as substantial annual capital for ongoing maintenance costs of that line.

### C. RYAM's Revenue Depends on Long-term Relationships with a Few Key Customers

33. Historically, RYAM was able to maintain long-term customer relationships and could purportedly command premium prices due to its experience, proprietary processes, and ability to produce high-quality Specialties that satisfied its customers exacting needs. RYAM had a deep history with its key customers, with an average relationship of 38 years among its top 10 customers and a striking relationship spanning more than 80 years with its largest customer – Eastman.

34. However, a small pool of customers comprised most of the Company's business. As of 2013, RYAM's five largest customers accounted for approximately 70% of its total net sales. Of those top customers, RYAM publicly identified only the top four, each of which commanded a whopping 13% to 21% of the Company's ***total*** net sales:[5]

| | 2012 | 2013 |
|---|---|---|
| **Eastman Chemical Company** | 21% | 21% |
| **Celanese Acetate, LLC** | 14% | 14% |
| **Nantong Cellulose Fibers Co., Ltd.** | 17% | 19% |
| **Daicel Corporation** | 14% | 13% |

35. Allaying any concerns about its lack of diversified customers, RYAM repeatedly reassured investors that it maintained fruitful long-term relationships with its top – and vital – customers. With those customers, the Company typically had three to five-year volume contracts with annual negotiations for price. According to Defendants, those contracts meant that volumes with the top customers were "locked in." Moreover, the annual pricing negotiations would typically

[5] Based on the numbers reported by RYAM, its No. 5 customer would have accounted for approximately 3% of net sales in 2013, and its remaining customers would have each accounted for even less.

conclude in the fourth quarter, locking in the prices for the upcoming year. Accordingly, by January of each year, Defendants had a clear picture of Specialties volumes and prices for the entire year and could guide the market accordingly.

**D. RYAM Undertakes a Massive Expansion of Its Specialties Infrastructure with the Goal of Becoming a Specialties-Only Business**

36. As of 2011, RYAM had two production facilities – one in Jesup, Georgia, and one in Fernandina Beach, Florida – with a collective annual production capacity of 745,000 metric tons, consisting of 485,000 metrics tons of Specialties and 260,000 metric tons of Commodities. The Fernandina Beach facility produced only Specialties, whereas the Jesup facility produced both Specialties and Commodities.

37. In May 2011, RYAM decided to transform its business by transitioning to selling Specialties only, with the eventual phase-out of all Commodities sales. This decision was monumental for RYAM. The Company would effectively rebrand itself to operate exclusively in the high-end, high-margin, low-competition space of Specialties, ignoring the lower-quality, lower-margin, higher-competition Commodities sector.

38. To that end, RYAM began a significant expansion project called the "cellulose specialties expansion" or "CSE." The CSE involved the conversion of a Commodities manufacturing line in the Jesup facility into a Specialties manufacturing line. That conversion would add 190,000 metric tons of annual Specialties capacity, raising RYAM's total annual Specialties capacity by 39% from 485,000 to 675,000 metric tons. And the conversion would position RYAM to eliminate its 260,000 metric tons of Commodities, completing RYAM's transition to selling Specialties only.

39. The Company's relationship with its No. 1 customer Eastman played an integral role in the CSE. Indeed, on June 15, 2011, RYAM and Eastman entered into a new contract – the

Chemical Cellulose Agreement ("Eastman Agreement"),[6] which set forth the parties' expectations for the CSE and established the associated volume and pricing structure. The Eastman Agreement made clear that it was being undertaken by the parties because, in substantial part, Eastman desired for RYAM to expand its Specialties capacity and increase sales to Eastman.[7] Critically, the Eastman Agreement explicitly stated that the implementation of the CSE involved a "large capital investment" by RYAM and that, by agreeing to purchase a set "CSE volume" under the terms and conditions set forth, Eastman was providing "substantial inducement" for RYAM "to complete the CSE and [was] helping to facilitate the possible undertaking of the CSE."[8] In essence, by promising to purchase a substantial portion of the additional volumes, Eastman agreed to make the CSE worth RYAM's investment.

40. With the Eastman Agreement in hand, RYAM proceeded with the costly CSE. By February 2012 – one month after the Eastman Agreement's effective date – RYAM announced that it had obtained customer commitments to purchase 85% of the new 190,000 metric tons of annual Specialties volume.

41. In July 2013, RYAM completed the CSE. Exceeding the initial cost estimates by a substantial amount, the total cost for the CSE was $385 million. During that month, RYAM restarted the converted production line (*i.e.*, converted from Commodities to Specialties) and began

---

[6] *See* Complaint for Declaratory Judgment, *Eastman Chemical Co. v. Rayonier Advanced Materials, Inc.*, No. 15-cd-40024(c) (Tenn. Ch. Aug. 4, 2015), attached hereto as Exhibit C ("Eastman Complaint"). The Eastman Complaint includes two exhibits. "Ex. 1" is the Eastman Agreement, and "Ex. 2" is an Amendment to the Eastman Agreement. As discussed below, *see* ¶66, the Eastman Complaint (along with the Eastman Agreement and Amendment) were filed in litigation that Eastman initiated against RYAM in Tennessee. As filed in that litigation, those documents were heavily redacted. Additionally, the court in Tennessee sealed nearly all of the filings in that litigation.

[7] *See* Exhibit C at Ex. 1 (Eastman Agreement) ¶6(d).

[8] *See id.* Notably, these contractual terms were unique to Eastman; no such terms existed in the Company's publicly-filed agreements with other top customers such as Nantong and Daicel.

the lengthy qualification process for the new Specialties that would be produced on that line. RYAM expected that all of its customers would complete the qualification process in the first half of 2014.

### E. Just as RYAM Completes the CSE, the Company Faces Significant Headwinds and Deteriorating Relationships with Top Customers

42. In 2013, the Company began experiencing serious headwinds that were having a substantial negative impact on its operations and future financial prospects. Certain market forces were causing demand and pricing pressures for Specialties. Cigarette filters were one of the major global end products for Specialties, and Chinese cigarette demand acted as the primary market determinant of growth of Specialties acetate (a major type of Specialties). Because of enhanced smoking regulations in China, the global demand for Specialties acetate was contracting. That shrinking demand led to a destocking of Specialties acetate, creating a global excess of Specialties supply.[9] Additionally, certain of RYAM's competitors had added the capacity to produce more Specialties at cheaper prices. For example, one Brazilian competitor, Bracell, had developed a process to create cellulose using eucalyptus trees, which were predominant in South America and cheaper than the North American wood used by RYAM. Thus, raw material costs were lower, and Bracell could produce and offer Specialties at lower prices. Those collective headwinds (*i.e.*, competitors' increasing capacities and decreasing production costs coupled with customers' decreasing demand) caused market level decreases in Specialties prices going into 2014.

43. Although Defendants stated that the Specialties market was experiencing some decreasing pricing and increasing manufacturing capacity, Defendants misrepresented the specific consequences of those pressures on RYAM's current performance and future prospects. As

---

[9] In other words, customers would normally maintain a supply of Specialties acetate in stock, while also purchasing more. By destocking, those customers decided to use more of the Specialties acetate they already had in stock and, in turn, to limit their new purchases.

described below, *see* Section V, Defendants falsely portrayed that, despite those market factors, RYAM could maintain customer relationships, increase Specialties volumes, and convert to a Specialties-only business. In reality, Defendants were facing, but concealing, a deeper problem. RYAM's competitors were now capable of creating Specialties that satisfied the unique needs of RYAM's key customers, and those competitors were offering those Specialties at lower prices. RYAM's key customers, in turn, were willing to buy those Specialties from competitors instead of from RYAM. RYAM faced a real threat to its market position and could no longer charge price premiums for its Specialties. The Company faced a Hobson's choice – either lower prices substantially or lose top customers. The Company's bargaining power was waning, and the Company's pricing and volumes for Specialties were diminishing.

44. Indeed, as Defendants knew – but investors did not – the emergence of comparable Specialties from competitors was already pressuring RYAM's key customer relationships. At the end of 2013, RYAM's contract with its No. 3 customer, Celanese, expired, and Celanese declined to enter into a new agreement with RYAM. Celanese had received a better deal with one of RYAM's competitors. That loss was drastic. In 2010, 2011, 2012, and 2013, respectively, Celanese had accounted for 15%, 16%, 14%, and 14% of RYAM's sales. As of 2014, Defendants knew that RYAM would have none of that business – a loss of over $146,000,000 in net sales.[10]

---

[10] Notably, Defendants' public comments regarding the loss of Celanese were less than clear. Although Defendants disclosed to the market that a customer was backing off a commitment for approximately 50,000 metric tons of Specialties in 2014, Defendants did not explicitly state that the customer was Celanese or otherwise disclose that all sales to Celanese would cease as of 2014. Rather, Defendants' filings and statements continued to refer to Celanese in conjunction with references to RYAM's current top customers. As such, Defendants' statements were ambiguous, causing confusion about RYAM's relationship with Celanese. On October 9, 2014, for example, RBC Capital Markets publicly projected the volume of Specialties that RYAM would sell Celanese in 2014. On March 25, 2015, Morningstar Equity Research suggested that RYAM's Form 10-K filed in February 2015 was the ***first disclosure*** of the loss of Celanese: "Rayonier disclosed the complete loss of the Celanese contract in its Feb. 27, 2015, 10-K filing."

45. In the midst of losing its No. 3 customer (Celanese), RYAM was facing a deteriorating relationship with its No. 1 customer, Eastman. As later described by Eastman, "[b]eginning in 2013, Eastman received multiple offers for competing products with essentially the same specifications and performance characteristics at [RYAM]'s Chemical Cellulose from Rayonier's competitors."[11] Moreover, "Eastman [ ] informed [RYAM] of such competitors' pricing and [ ] requested that [RYAM] respond to declines in market pricing."[12] Thus, comparable Specialties were available to Eastman at lower prices, and Eastman wanted RYAM to meet such pricing.

46. Critically – and unbeknownst to the market – Eastman not only wanted price concessions from RYAM but also had a legal basis to obtain those prices. The multi-year Eastman Agreement contained a "Meet or Release Provision," under which Eastman could force RYAM to either: (a) meet a lower Specialties price offered by a competitor or (b) release Eastman from purchasing obligations under the Eastman Agreement.[13]

47. Hence, Eastman's requests for price concessions – coupled with the Meet or Release Provision – created the prospect of severe repercussions for RYAM's business. RYAM had already lost the entirety of Celanese's business, and in the wake of that loss, the Company needed to substantially increase its volumes to Eastman while keeping prices steady and increasing net sales. The situation was particularly critical, given that RYAM had depended on Eastman to purchase a

---

[11] *See* Exhibit C (Eastman Complaint) ¶20. Importantly, the market did not know any of these facts at the time. Rather, as described below, these facts first became public only after Eastman filed the Eastman Complaint in August 2015. *See* ¶¶66-69.

[12] *See id*. at ¶21.

[13] Although the Contract was publicly-filed with the SEC, it was redacted so as to conceal the Meet or Release Provision, meaning the market was unaware that Eastman could force price concessions or a cancellation of Rayonier, Inc.'s most significant contract. *See generally* Exhibit C at Ex. 1 (Eastman Agreement).

substantial portion of the excess Specialties capacity created through the $385 million CSE. Thus, the volumes and prices that Defendants negotiated with Eastman were inextricably intertwined with the success of the CSE and with RYAM's long-term plan to convert to a Specialties-only manufacturer.

48. Under those circumstances, Eastman had unchecked negotiating power over RYAM. Pursuant to the Meet or Release Provision and the lower prices for comparable Specialties offered by RYAM's competitors, Eastman had the ability to eliminate substantial (if not all) purchase obligations from RYAM through 2017 and to withhold agreement to any subsequent contract. In other words, Eastman could purportedly force significant price concessions from RYAM, and the dispute with Eastman rendered untenable the short-term and long-term prospects that Defendants delineated to investors. In short, RYAM was in a potentially catastrophic pricing dispute with its largest customer, and the market was in the dark.

### F. RYAM Is Spun-off from Rayonier, Inc. and Boynton Leaves His Position as Rayonier, Inc.'s CEO to Become RYAM's CEO

49. On January 27, 2014, Rayonier, Inc. announced that it would officially separate its Performance Fibers business into RYAM as a standalone company. Rayonier, Inc. explained that its Forest Resources and Real Estate businesses had evolved separately from its Performance Fibers business, such that there were now two distinct business and two distinct investment opportunities. The spin-off would solidify that distinction, allowing investors to choose the specific business in which they wanted to invest. At the outset, all Rayonier, Inc. investors would receive one share of RYAM for every three shares of Rayonier, Inc. held as of June 18, 2014.

50. As part of the spin-off, Boynton, who had been Rayonier, Inc.'s CEO, would leave Rayonier, Inc. and become RYAM's CEO. Four senior executives from Rayonier, Inc. would also join Boynton as senior executives at RYAM. On the surface, this transition by Boynton and his

team was reasonable – and largely innocuous – as Boynton had gained specialized experience as Rayonier, Inc.'s Senior Vice President of Performance Fibers from 2002 to 2008.[14] However, as detailed in Section IV.M. below, the transition was actually a conspicuously well-timed exit by Boynton, who was able to jump ship before a massive fraud was uncovered at Rayonier, Inc.

### G. From RYAM's Inception, Defendants Mislead Investors About RYAM's Business and Financial Condition, Customer Relationships, and Prospects

51. Eager to make a fresh start, Defendants portrayed RYAM as a strong company poised for inevitable growth. On June 18, 2014, Defendants published a final version of the Information Statement, through which they "invite[d] [future RYAM shareholders] to learn more about [RYAM] and our strategic initiatives." In the Information Statement, Defendants omitted RYAM's critical ongoing dispute with Eastman, while painting a rosy – and materially misleading – picture of RYAM's current condition and prospects.

52. First, Defendants stated that RYAM could still charge a "premium price" because of its "significant competitive advantage" from "[t]he quality and consistency of [its] [Specialties] and its premier research and development capabilities." As stated above, however, Defendants' negotiations with Eastman had confirmed that competitors were offering comparable Specialties at lower prices. Indeed, after more than 80 years of doing business with RYAM, Eastman was willing to purchase its Specialties elsewhere. Hence, RYAM no longer possessed the same competitive advantage, nor could the Company command a price premium.

53. Second, Defendants stated that they expected a 30,000 to 50,000 metric ton increase in 2014 Specialties volumes, with a total expectation of 520,000 to 540,000 metric tons compared to

---

[14] In the years preceding his departure, Boynton had worked at Rayonier, Inc. in various roles. From November 2, 2009 to September 30, 2010, he was the Executive Vice President of Forest Resources and Real Estate. From October 1, 2010, to December 31, 2011, he was the COO and President. From January 1, 2012, until the spin-off, he was the CEO and President.

the 486,000 metric tons sold in 2013. By the end of 2013 (approximately six months before the Information Statement was published), however, Defendants had concluded their contractual negotiations with their customers. The Information Statement itself confirmed that "a significant majority of [RYAM]'s cellulose specialty fibers are under long-term volume contracts that extend through 2014 to 2017," and "[t]he pricing provisions of these contracts are set in the fourth quarter in the year prior to the shipment." Because those negotiations concluded within the fourth quarter of each year, moreover, Defendants consistently provided full-year volume guidance in January.[15] By June 2014, therefore, Defendants knew that Celanese would make no purchases in 2014, and more importantly, Defendants knew the ***exact*** Specialties volumes that their remaining top customers had agreed to purchase. With that knowledge – as well as knowledge of the various industry headwinds – Defendants could not reasonably expect to increase volumes by 30,000 to 50,000 metric tons in 2014.

54. Finally, Defendants reiterated that RYAM would be able to capitalize on the CSE by increasing Specialties volumes and transitioning to a Specialties-only business by 2017/2018. Yet Defendants knew that Eastman – their top Specialties customer, whose anticipated purchases of CSE volumes had been a "substantial inducement for RYAM to complete the CSE," *see* ¶39 – now had alternate options and was demanding price concessions. RYAM would have to sell Specialties at lower prices or potentially lose Eastman. Moreover, given the influx of comparable Specialties at cheaper prices, other top customers could leave RYAM, just as Celanese had done. And the Specialties volumes that RYAM's customers had agreed to purchase in 2014 confirmed that volumes would decline, rather than increase, rendering the CSE superfluous. Additionally, lower prices made

[15] "Guidance" refers to a company's statements to investors of the company's expected results.

the CSE commercially inviable. Under those circumstances, Defendants knew that RYAM would need to increase, rather than phase out, the sale of Commodities in the coming quarters and years.

### H. After Executing the Spin-off, Defendants Begin to Reveal that the Company's Specialties Business Was Deteriorating

55. Only one month after touting RYAM's growth prospects, Defendants began to reveal the financial impact of the headwinds described above. On July 30, 2014 – only six weeks after promising to place increased volumes – Defendants stunned the market by announcing poor second quarter 2014 financials, including a sharp decline in EBITDA, and retracting the previous guidance of a 30,000 to 50,000 metric ton increase in Specialties volumes for 2014.

56. That announcement was detrimental. RYAM had just completed the $385 million CSE in order to ***increase*** Specialties volumes. And a few weeks prior, Defendants had reiterated that the Company was still planning a substantial increase in volumes in 2014 and a full transition to Specialties by 2017/2018. By unexpectedly announcing that 2014 volumes would be comparable to 2013 volumes, Defendants provided the first of many markers that the costly CSE was failing. As a result, RYAM's stock dropped 10.1%.

57. By October 29, 2014, Defendants reported third quarter 2014 results reflecting further problems for RYAM. RYAM's sales, net income, and cash flow were all down. RYAM was also facing an oversupply in the market, driven by competitors' expansions. Moreover, Defendants reported that RYAM was entering into some multi-year contracts to sell more Commodities using the Jesup manufacturing line that was converted through the CSE and that was supposed to be creating more Specialties. These results were additional indicators that the CSE was failing. As a result, the stock dropped 6.4%.

58. On February 27, 2015, Defendants reported full year 2014 results, stating that global Specialties markets were oversupplied, with global demand decelerating. RYAM had actually lost

Specialties volumes, decreasing from 486,000 metric tons in 2013 to 479,000 metric tons in 2014. In other words, the Company had sold ***none*** of the 190,000 metric ton increase in capacity created through the $385 million CSE, and the Company had lost over 2% of its pre-CSE volumes. Furthermore, Defendants announced that 2015 Specialties volumes would remain comparable to 2014 volumes, while prices would decrease an additional 7% to 8%. Hence, the costly CSE had yet to produce a single metric ton over RYAM's pre-CSE capacity, and 2015 would be no different. Meanwhile, the Company was increasing Commodities sales, despite the planned transition to Specialties only. This negative news caused a stock loss of approximately 5%.

59. As investors would later learn – and as described below in more detail – RYAM's souring relationship with Eastman drove, in large part, the CSE's failure. In undertaking the CSE, RYAM had expected that Eastman would purchase certain minimum volumes at minimum prices. But – unbeknownst to investors – the parties' relationship was breaking down, while Eastman had the benefit of the Meet or Release Provision in a Specialties market where competitors were now selling comparable Specialties for lower prices.

### I. The Dispute with Eastman Intensifies, While Defendants Continue Misleading Investors About that Deteriorating Relationship and Its Effects on RYAM's Prospects

60. Despite the factors described above – namely that Eastman was demanding substantial price concessions and positioned to obtain those concessions or leave RYAM – Defendants did not adequately respond to Eastman's requests. As a result, the parties' relationship reached a critical juncture in 2015. In a subsequent court filing, Eastman summarized the dispute as follows:

> For raw materials to be delivered in calendar year 2016, Eastman has received prices offered by competitors of Rayonier that represent [REDACTED BY EASTMAN];

* * *

> Eastman has informed [RYAM] that it desires to exercise its rights under the Meet or Release Provision, and notwithstanding the plain meaning of the Provision, Rayonier has insisted that Eastman's interpretation of the Contract is incorrect.
>
> The parties have attempted to negotiate in good faith to reach a mutually satisfactory resolution to their dispute regarding pricing; however the parties continue to disagree regarding a reasonable market price for [Specialties] and the interpretation of the Meet or Release Provision. Specifically, under the plain and unambiguous language of Article 6(b), ***Eastman can avail itself of the Meet or Release Provision due to [RYAM]'s failure to meet the reasonable market price for its Chemical Cellulose; and further, Eastman can purchase an unlimited amount of competing product under that Article from [RYAM] competitors*** provided that each competitor [REDACTED BY EASTMAN] and that the remaining conditions of the Meet or Release Provision are otherwise met. [RYAM] disagrees with Eastman's interpretation. Additionally, [RYAM] [REDACTED BY EASTMAN]. The effect of this interpretation essentially shields RYAM as the dominant producer of Chemical Cellulose and similar products from having to respond to changes in market conditions.[16]

61. In sum, Eastman sought to force RYAM to either grant enormous price concessions or release Eastman from the obligation to purchase any more Specialties pursuant to the Eastman Agreement. This dispute was monumental. After cultivating more than 80 years of fruitful business and goodwill with Eastman, RYAM stood to lose that vital relationship – a relationship that had accounted for 31% of RYAM's total sales in 2014.

62. Despite the materiality of this dispute with the Company's largest customer – and the threat of losing all of its business as of January 1, 2016, absent substantial price concessions – Defendants kept investors in the dark. Although analysts had explicitly asked Defendants about ongoing customer negotiations, Defendants declined to reveal any aspect of the Eastman dispute that had been escalating since 2013. On October 29, 2014, for example, Boynton stated that "***[o]ur discussions are good, they're healthy, they're ongoing. I really have no more flavor to add to it at this point***." Therefore, Defendants misled investors by concealing that Eastman had a Meet or Release Provision, was receiving lower priced offers from Specialties competitors, was requiring

[16] *See* Exhibit C (Eastman Complaint) ¶¶21, 23-24.

RYAM to meet those prices, and was threatening to end its contractual relationship with the Company.

**J. Defendants Undertake a "Strategic Repositioning" to Retreat from Its Failed Specialties Expansion**

63. By July 2015, Defendants were unable to capture the volumes for which the CSE had been undertaken and were in the midst of a heated contractual dispute with Eastman that could have a detrimental impact on the already diminishing Specialties pricing and volumes. On July 30, 2015, Defendants announced a "strategic repositioning," through which they would reduce Specialties capacity and increase Commodities capacity. Specifically, the Company was forced to expend $25 million – and to take a one-time non-cash write-off of $28 million in abandoned assets – in order to reduce Specialties capacity by 190,000 metric tons while increasing Commodities capacity to 245,000 metric tons. In other words, the Company was spending extra money to eliminate the entire Specialties capacity that had just been added through the $385 million CSE. In sum, Defendants wasted $438 million and years of work only to end up where they had started.

64. Contrary to their statements just one-year prior, moreover, Defendants had abandoned RYAM's entire long-term vision of selling only high-margin Specialties. Instead, the Company was increasing its focus on fungible, lower-margin Commodities. In other words, Defendants confirmed that the CSE-driven vision for RYAM's future was dead.

65. But what Defendants did not disclose was Eastman's role in the failed CSE or the additional potential long-term consequences of the ongoing dispute with Eastman. RYAM's material problems were not limited to changes in the larger cellulose market and could not be solved with a mere "repositioning." Rather, RYAM was cornered by a loss of negotiating power, a deteriorating relationship, and an escalating dispute with its most important customer. Defendants' announcement revealed none of those material facts. As such, investors still had no knowledge that

RYAM's largest customer would either cease all business, send certain volumes to a competitor, or force RYAM to grant massive price concessions.

### K. Revealing Defendants' Fraud, Eastman Sues RYAM, and RYAM Loses Nearly Half Its Value in a Single Day

66. On August 4, 2015 – just five days after the announced "strategic repositioning" – Eastman filed a declaratory judgment action against RYAM in state court in Tennessee ("Tennessee Action"). Eastman sought the following:

> Eastman is entitled to a declaration that the Contract contains a Meet or Release Provision that is not limited to a quantity in any particular year; such that, if Eastman receives an offer from a competitor of [RYAM] for a product that has essentially the same specifications and performance characteristics as [RYAM]'s Chemical Cellulose, Eastman can purchase as much of the related competing product as it requires.
>
> * * *
>
> Eastman is entitled to a declaration that if Eastman's interpretation of the Meet or Release Provision is not correct, then there was no mutual assent, or meeting of the minds, relative to the Meet or Release Provision at the time of contract formation. The Contract is, therefore, void and unenforceable.[17]

*See* Exhibit C (Eastman Complaint) ¶¶30, 37. On August 13, 2015, Rayonier, Inc. filed a competing declaratory judgment action in state court in Georgia ("Georgia Action").[18]

67. Finally, on August 18 and 19, 2015, Defendants provided investors with the first indication that there were any problems with Eastman. In two Forms 8-K, Defendants revealed that:

- the Eastman Agreement contained a Meet or Release Provision;
- Eastman intended to enforce that provision for the entirety of the volumes covered by the Eastman Agreement;
- the Tennessee and Georgia Actions had been filed regarding the scope of the Meet or Release Provision; and

---

[17] *See* Exhibit C (Eastman Complaint) ¶¶30, 37.

[18] The court filings in the Georgia Action and Tennessee Action are almost entirely sealed.

- if Eastman prevailed, then RYAM would have to either meet competitors' lower offers to Eastman or ***release Eastman from the Eastman Agreement***.

68. This news indicated to the market that RYAM was in a precarious situation, with no potential for a positive result. In response to the litigation, RYAM would be forced into one of three outcomes: (1) beginning in 2016, RYAM would make the enormous price concessions that Eastman required on all purchases from the Company; (2) beginning in 2016, RYAM would agree to some price concessions but not to the extent demanded by Eastman; or (3) Eastman would be relieved of the Eastman Agreement as of the beginning of 2016. Even under the first two possible outcomes, Eastman could still move on to a competitor after the Eastman Agreement expired at the end of 2017. And any price concessions to Eastman would set a new precedent affecting negotiations with RYAM's other customers.

69. Investors were shocked. RYAM's stock plummeted 44.1% from a $12.82 closing on August 18, 2015 to a $7.17 closing price on August 19, 2015, with a trading volume of 18,114,500 (the highest in the stock's history). On August 20, 2015, the stock fell an additional 13.9% on volume of 5,815,500. Investors suffered millions of dollars of losses.

### L. RYAM Conceals the Pricing Terms It Acquiesces to with Eastman, and the Stock Continues to Fall as RYAM Reports Weak Financial Results

70. After investors had suffered the enormous loss of value described above, RYAM was forced to make substantial concessions in order to reconcile with Eastman. As part of a November 2015 settlement to end the litigation, RYAM agreed to cancel the Eastman Agreement (which was meant to continue until December 31, 2017) and to enter into a new contract, effective January 1, 2016 to December 31, 2019. Under that new contract, RYAM's net sales to Eastman dropped approximately 17% from $263,480,000 in 2015 to $217,250,000 in 2016.

71. In turn, RYAM's financials continued to suffer. For 2016, Specialties pricing dropped by another 7% – following similar drops in 2014 and 2015. Volumes dropped to 456,000

metric tons – well below the pre-CSE capacity of 485,000 metric tons. Overall, net sales dropped from $941 million in 2015 to $869 million in 2016. In sum, the fallout with Eastman – which, unbeknownst to investors, had been brewing since 2013 – had long-lasting effects.

**M. Numerous Facts Support Defendants' Scienter**

72. Numerous facts support Defendants' knowledge of – or, at a minimum, severe recklessness as to – the materially false and misleading nature of their public statements and omissions during the Class Period. These facts include the work performed by the Individual Defendants in their executive roles, the indispensability of the customer contracts at the center of RYAM's fraud, the circumstances surrounding the negotiations and terms of those contracts, and the Individual Defendants' motives to commit fraud.

73. Each of the Individual Defendants (Boynton, Ruperto, and Woo) made public statements in which they discussed the performance of the Company's Specialties business, including trends in pricing, expected volumes, the status of the CSE, and customer relationships. The Individual Defendants echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period. These statements evidence the Individual Defendants' personal knowledge of such matters.

74. Moreover, RYAM's only business and source of profits was the sale of cellulose-based products. Specialties – which was the more refined and higher margin product that the Company aimed to sell exclusively – accounted for 88.1% of RYAM's net sales in 2014 and 81.5% of RYAM's net sales in 2015. Boynton (as CEO and President), Woo (as CFO and Senior Vice President), and Ruperto (as CFO and Senior Vice President of Finance and Strategy) were intimately involved with and knowledgeable as to this key component of RYAM's business. Accordingly, they would have been keenly aware of negative trends in Specialties pricing, Specialties volumes, and the material challenges facing the extremely costly CSE expansion.

75. This awareness was particularly vital for RYAM's relationships with top customers. The vast majority of the Company's sales were made to a small pool of Specialties customers – *i.e.*, as of June 2014, the Company stated that only five customers accounted for 70% of net sales. In particular, in 2013, Eastman and Celanese accounted for 35% of RYAM's net sales. And, in 2014 and 2015 – after RYAM had lost Celanese's business – Eastman, alone, accounted for 31% and 28% of RYAM's net sales. Because the Company's entire business was essentially tied to its sales to this handful of customers, Defendants were intimately aware of contractual agreements, disputes, and negotiations with those customers.

76. Of those top customers, the most important was Eastman, RYAM's largest customer. RYAM had done business with Eastman for over 80 years, and that relationship had contributed 21%, 31%, and 28% of RYAM's total sales in 2013, 2014, and 2015, respectively. Accordingly, Defendants would have been intimately aware of and involved with the serious dispute with Eastman, which challenged 31% of RYAM sales and culminated with the filing of dueling lawsuits. Indeed, as stated below, *see* ¶84, Boynton's affidavit filed in this lawsuit confirms that he was aware of the dispute with Eastman.

77. Similarly, the Individual Defendants' own statements throughout the Class Period support their investigation, analysis, and knowledge of RYAM's Specialties business and contractual relationships with top customers, including the statements set forth in Section V below.

78. In addition to those direct statements, numerous other factors demonstrate that Defendants had knowledge of, and in turn scienter as to, the false and misleading statements and omissions.

**1. The Nature of the Company's Contractual Agreements and Customer Negotiations Confirms that Defendants Knew that Specialties Volumes Would Decrease, Rather than Increase, in 2014 and 2015**

79. According to Defendants' explicit representations about customer contracts and negotiations, RYAM began each calendar year with certainty as to the Specialties prices and volumes contracted for the duration of that year. RYAM negotiated pricing on contracted volumes of its top customers (representing the vast majority of total business) on an annual basis, completing those negotiations by November or December of the preceding year. By January, therefore, RYAM would provide specific annual guidance as to its prices and volumes.

80. Boynton explicitly described this negotiation timeline to investors:

> **<u>September 9, 2014, Conference Call:</u>** So yes, do all our contracts reprice at calendar year end, and the answer is yes. They're calendar contracts on pricing. So, we're in the process of negotiations now with our customers. Started some time ago, and they will probably run these conversations anywhere to November, some even as late as December. . . . And then usually in January on our analysts call, at that point in time, our quarterly call, we will talk about where 2015 volume and the new year volume and the new year price will be at.

> **<u>May 1, 2015, Conference Call:</u>** Let me just say generally that, first of all, our CS volume is largely contracted for the year and there typically are contracts -- are volume contracts over many years and then pricing is negotiated on an annual basis and we have disclosed that before. So again, for 2015, our volumes are largely locked in and contracted.

81. Hence, by December of each year, Defendants knew the exact volumes and prices RYAM would receive from top customers such as Eastman, Nantong, and Daicel (which collectively accounted for 64% of net sales in 2014 and 60% of net sales in 2015). When making heady statements in June 2014 about increasing volumes by 30,000 to 50,000 metric tons and commanding premium prices for an unmatched product, Defendants knew that their contracted volume did not reflect an increase in volumes. Indeed, the contracted Specialties volumes in 2014 were actually

7,000 metric tons less than 2013 numbers. Defendants also knew that Eastman was complaining about better prices offered for a comparable product from competitors.

82. Thus, Defendants' own statements about the timeline and structure of contract negotiations confirm that Defendants had knowledge of the material facts that were misrepresented to investors.

### 2. Eastman's Complaint in the Tennessee Action Confirms that, During the Class Period, Defendants Knew of Eastman's Demands for Price Concessions and Invocation of the Meet or Release Provision

83. As confirmed by Eastman's Complaint filed in the Tennessee Action, Defendants were aware throughout the Class Period of Eastman's receipt of competing offers for comparable Specialties at lower prices, and Defendants were aware of Eastman's demands that RYAM meet those prices. Specifically, Eastman alleged that "[t]he parties have frequently met at Eastman's Kingsport, Tennessee location over the past decades to discuss issues related to the supply of the goods, and most recently the Contract."[19] Eastman also stated that it had informed RYAM about the comparable products and lower prices offered by competitors and asked RYAM to respond to those pricing declines as of 2013. *See, supra,* ¶¶45-46, 60. Prior to the initiation of the Tennessee Action on August 4, 2015, moreover, Eastman had negotiated with RYAM about triggering the Meet or Release Provision. *See id*.

84. Additionally, in a sworn statement filed in this litigation, Boynton confirmed that he personally met with Eastman's representatives:

> ***Before, during, and after the contract dispute***, I traveled on occasion to Tennessee to meet with representatives from Eastman. Those meetings took place primarily in

---

[19] *See* Exhibit C (Eastman Complaint) ¶6.

the Kingsport area-including all of the meetings and mediation sessions during the contract dispute (with the exception of one meeting in North Carolina).[20]

85. Thus, when making false and misleading statements in 2014 and 2015 about having unmatched product capable of commanding a premium price, Defendants knew – but did not disclose – that RYAM's No. 1 customer was willing and able to purchase comparable Specialties from competitors at lower prices and was exerting tremendous influence to gain price concessions or place its volumes elsewhere.

### 3. Defendants Were Motivated to Provide a Positive Perception of Their Newly Spun-off Company

86. Finally, the circumstances surrounding RYAM's June 2014 spin-off from Rayonier, Inc. reflect motive by Defendants to make misrepresentations to the market. Prior to the spin-off, Boynton was Rayonier, Inc.'s CEO. In that role, he was alleged to have presided over a massive fraud, which inflated Rayonier, Inc.'s financial results by concealing a systematic overharvesting of trees by an average of 44% above the sustainable harvest level.[21] That overharvesting and the accompanying inflated financials were doomed to crash and were beginning to unravel in late 2013 and early 2014. Before the fraud unraveled, however, Boynton made a well-timed exit from Rayonier, Inc. to become the CEO of RYAM in June of 2014. In so doing, Boynton secured a two-fold benefit.

87. First, he was able to leave Rayonier, Inc. on positive terms before the fraud was revealed. When Rayonier, Inc.'s new CEO uncovered the fraud in late 2014, Boynton was detached from the company and did not have to face a professionally-damning termination or resignation.

---

[20] *See* Affidavit of Paul G. Boynton [ECF No. 26-1] at ¶10.

[21] The fraud is the subject of *In re Rayonier, Inc. Securities Litigation*, Case No. 3:14-cv-01395-TJC (M.D. Fla. 2014). After the court denied the motions to dismiss the Amended Consolidated Class Action Complaint, the defendants settled the case for $73,000,000.00, with a final judgment approving the settlement entered on October 5, 2017. *See* ECF Nos. 84, 102, 146-2, 173.

88. Second, Boynton had a clean slate to secure higher compensation. By moving to RYAM, he obtained a $1,625,000 transfer bonus, and in 2015 and 2016, he earned 13.7% more in total compensation than he had earned at Rayonier, Inc. in 2012 and 2013.[22]

89. These facts collectively support a strong inference that Defendants knowingly made materially false and misleading public statements during the Class Period, which are discussed in detail in the following section. In addition, the cumulative knowledge of Boynton, Woo, and Ruperto and of other RYAM employees is imputed to RYAM and supports a finding of RYAM's corporate scienter.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS, OMISSIONS, AND PARTIAL REVELATIONS DURING THE CLASS PERIOD

90. Throughout the Class Period, Defendants made positive statements and projections concerning the Company's Specialties business, including growing sales volumes, stable relationships with long-term customers, and the ability to capitalize on a recent $385 million expansion of its Specialties manufacturing capacity. These statements and projections did not provide a full picture of the true circumstances at the Company, and many of them were explicitly and materially false and misleading. In reality, the Company's Specialties business was suffering badly as a result of fundamental changes affecting the business – increased competition and an oversupply of Specialties available on the market. These changes resulted in falling sales prices, reduced sales volume growth, an undisclosed dispute with the Company's largest customer, Eastman, threatening all of Eastman's business, and a "strategic repositioning" from Specialties to Commodities despite spending hundreds of million dollars to expand Specialties capacity.

---

[22] Moreover, on December 1, 2014 – in the midst of Defendants' Class Period misrepresentations and omissions – Woo abruptly resigned as CFO of the Company under highly suspicious circumstances, after serving less than six months in that position.

91. When Defendants elected to make such positive statements and projections, they were under a duty to disclose the full truth about the Company and its Specialties business that would have made such statements and projections not misleading. Specifically, they were under a duty to disclose the pervasive issues affecting the Company's Specialties business during the Class Period, including oversupply, weakened sales volume growth, increased pressure from competitors and customers to drop prices, and the Company's dispute with Eastman. Defendants violated this duty by failing to fully reveal this information and, instead, omitting and concealing it from investors. This information was material because it would have altered the total mix of information about the Company that was available to reasonable investors during the Class Period.

92. Further, Defendants violated Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303") based on their failure to disclose certain material information related to the Specialties business and Eastman Agreement. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii) & (b).

93. The SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties." SEC Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 19, 2003). Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> (1) Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is ***not reasonably likely to occur***, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the ***consequences of the known trend*** . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is ***not reasonably likely to occur***.

*See* Certain Investment Company Disclosures, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

94. The SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected ***impact*** that any such trends or uncertainties are expected to have on a company's prospective financial performance. The SEC has stated that "Item 303 ***require[s] disclosure of forward looking information***," including, at a minimum, disclosure of the "***reasonably likely material effects on operating results***." 1989 SEC Release at 22,428-29.

95. Here, Defendants violated Item 303 by failing to disclose a known uncertainty with respect to the Eastman dispute, whereby Eastman was pressuring the Company to lower prices and/or to allow Eastman to shift purchases to lower priced competitors, and the expected impact of that uncertainty. Defendants also failed to disclose a known uncertainty concerning the Company's ability to enforce and benefit from the Eastman Agreement in light of the dispute with Eastman, and the expected impact of that uncertainty. Further, Defendants failed to fully disclose known trends concerning pricing, supply/demand, and competitive pressures on the Company's CS business, and the impact of those trends, including declining sales volumes, deteriorating relationships with Eastman and other key customers, and the abandonment of the CSE.

96. Defendants' false and misleading statements and material omissions are further detailed throughout this section.

### A. Defendants Materially Misrepresent the Company's Specialties Business in Public Filings Regarding the Spin-off from Rayonier, Inc.

97. On January 27, 2014, Rayonier, Inc. issued a press release announcing that it intended to spin-off its Performance Fibers business into a separate independent company (RYAM) in mid-2014. On January 29, 2014, RYAM (then known as "Rayonier Holding Company") filed a Registration Statement on SEC Form 10 in connection with the spin-off, signed by Boynton on behalf of the Company. The Registration Statement included a preliminary Information Statement with business and financial information regarding RYAM. The Registration Statement was subsequently amended on March 31, April 23, May 13, and May 29, 2014.

98. On June 16, 2014, Rayonier, Inc. issued a press release announcing that the SEC had declared the Registration Statement effective and that the spin-off of RYAM was expected to close on June 27, 2014. Two days later, on June 18, 2014, RYAM filed an SEC Form 8-K attaching a final version of the Information Statement that was previously included in the Registration Statement in preliminary form. In a cover letter accompanying the final Information Statement, signed by Boynton on behalf of the Company, Boynton "invite[d] [future RYAM shareholders] to learn more about [RYAM] and our strategic initiatives by reading the attached information statement." The spin-off of RYAM subsequently closed on Friday, June 27, 2014 at 11:59 PM EST, and shares of RYAM first began trading on the NYSE on Monday, June 30, 2014.

99. RYAM's Information Statement omitted material facts and gave investors a misleading impression of the state of the Company's Specialties business and its future prospects. While the Company projected a 7% to 8% price decline in 2014 due to "market conditions," nowhere in the Information Statement did the Company disclose that this decline was caused by severe pressure from customers to lower prices, including an ongoing contractual dispute over pricing that jeopardized the business of its largest customer, Eastman. Nor did the Company

disclose the factors causing those customer issues – increased pressure from lower priced Specialties competitors and an oversupply of Specialties in the market. The Company also failed to disclose that, due to these factors, the Company was unable to sell a large volume of projected Specialties (30,000 metric tons), rendering useless the additional Specialties capacity resulting from the costly expansion project completed in 2013.

100. Instead, throughout the Information Statement, the Company repeatedly boasted of growing Specialties sales volume (including 30,000 to 50,000 additional metric tons projected in 2014) and the Company's ability to capitalize on the CSE by selling more Specialties and becoming an exclusive manufacturer of Specialties (instead of a mix of Specialties and Commodities). For example:

- In July 2013, [RYAM] restarted the converted production line [from the $385 million CSE] and began the qualification process for the line's production with its customers. . . . As cellulose specialties demand grows over the next several years, ***[RYAM] expects to increase its sales of cellulose specialties and complete its transition to a dedicated cellulose specialties supplier.***

- [RYAM] just completed 2014 price negotiations with its customers. . . . [RYAM] expects 2014 sales volumes of cellulose specialties of approximately 520,000 to 540,000 metric tons . . . . ***Overall, this is an increase of approximately 30,000 to 50,000 metric tons above 2013.***

- As demand for cellulose specialties grows, [RYAM] expects to increase sales of cellulose specialties and complete the transition to become a dedicated cellulose specialties supplier by 2017/2018. As production of cellulose specialties increases, ***[RYAM] anticipates an increase in total sales and operating income, assuming 2013 price levels, as higher prices received on the additional cellulose specialties volume more than offset expected cost increases and the net reduction in overall production capacity.***

101. The Company also boasted of its stable, long-term customer relationships, long-term volume contracts representing a significant majority of Specialties production, and low customer turnover, highlighting in particular its "five largest customers, who account for approximately 70% of sales," failing to disclose that relationships with two of those customers were permanently lost

(Celanese) or subject to a contractual dispute that led to contractual pricing and volume terms substantially less favorable to the Company (Eastman).

102. The Information Statement also touted the Company's "significant competitive advantage" allowing it to charge customers a "premium price (a price greater than competitors) for [RYAM's] products and driving strong profitability," when in reality the Company's competitive advantage had eroded and it could no longer command a premium price for Specialties.

103. The Company briefly acknowledged that "a few competitors" had announced Specialties capacity expansions, along with its own expansion through the CSE project, but misled the market by stating that these factors had no adverse impact on the Company's results in 2013.

104. Statements of fact made by Defendants in the Information Statement, as set forth in ¶¶100-103 above, were materially false and misleading and omitted material facts for the following reasons:

(a) Growth of the Company's Specialties sales was slowing due to increases in manufacturing capacity and supply of Specialties (¶¶42-44);

(b) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (*id.*);

(c) The Company was facing pressure from its customers to lower prices as a result of such increased competition and an increased supply of Specialties on the market (¶¶43-48, 60-61);

(d) The Company's Specialties expansion was a commercial failure because the Company was unable to sell additional Specialties available as a result of the expansion (¶48);

(e) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166); and

(f) The Company was engaged in an ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61).

105. In addition, opinion statements made by Defendants in the Information Statement, as set forth in ¶100 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions: Growth of Specialties sales was slowing due to increased manufacturing capacity and supply and the emergence of competitors offering comparable Specialties products, and therefore the Company's projections for increased sales volume growth had no reasonable basis (¶¶42-44).

106. On June 23, 2014, shortly after the final Information Statement was filed, RBC initiated coverage by assigning RYAM an "Outperform" rating and setting a stock price target of $46, citing "strong, sustainable EBITDA margins" and "leading market position in CS." RBC added: "As RYAM transitions its new 190,000 [metric tons] of capacity [resulting from the CSE] fully into CS by 2018, we expect stronger earnings . . . ."

**B. Investors Begin to Learn the True Extent of Problems with the Company's Specialties Business, but Defendants Continue to Mislead the Market**

107. Defendants could only conceal the truth for so long as the Company's Specialties business grew worse during the Class Period, damaging the Company's ability to grow Specialties sales at attractive prices, and in turn hurting the Company's net income, earnings, and margins. The Company's problems were ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's securities prices. The declines would have been swifter and

steeper, but Defendants failed to fully disclose the nature and extent of such problems: an oversupply of Specialties in the market, the encroachment of competitors selling comparable Specialties at cheaper prices, and a contractual dispute threatening all of the Company's Specialties business with Eastman, its largest customer. Instead, Defendants downplayed the negative news and continued to mislead the market with misrepresentations regarding the state of the Company's Specialties business. By continuing to mislead the market in this manner, Defendants kept the Company's securities prices artificially inflated throughout the remainder of the Class Period. This section details the partial revelations of truth regarding Defendants' fraud, the resulting RYAM securities price declines, and Defendants' continued misrepresentations and omissions that kept the Company's securities prices artificially inflated even as the truth began to leak out.

**1. Second Quarter 2014 Financial Results**

108. On July 30, 2014, the Company issued a press release announcing its financial results for 2Q14. In the press release, the Company also revealed that it was unable to sell 30,000 tons of Specialties, which, along with above-budget costs, caused the Company to be well below both its 2013 EBITDA and its previous guidance for 2014 EBITDA:

> Committed cellulose specialties sales volumes for 2014 remain consistent with 2013, despite the previously announced loss of volume from a 2013 customer. The Company continues to seek the previously targeted 30,000 tons of incremental cellulose specialties volumes, but intends to feather this into the market only as it is ready to be absorbed. Additionally, through the first half of 2014, costs have exceeded budgeted projections and will likely remain somewhat elevated through the remainder of the year. The higher costs and ***continued inability to place the incremental tons will cause the Company to be approximately 25 percent below 2013 segment EBITDA, or 10 percentage points below the previous guidance.***

109. The press release also disclosed the following financial declines in 2Q14 and throughout the first half of 2014:

- 2Q14 and first half 2014 ("1H14") sales of $213 million and $456 million, which were $42 million and $83 million below sales from first quarter 2013 ("2Q13") and 1H13, respectively.

- 2Q14 and 1H14 pro forma operating income of $43 million and $89 million, which were $32 million and $73 million below 2Q13 and 1H13, respectively, due in part to a decline in sales

- 2Q14 and 1H14 net income of $5 million and $36 million, which were $43 million and $93 million below 2Q13 and 1H13, respectively.

110. On the same day, the Company held a conference call to discuss the 2Q14 results. Boynton, Ruperto, and Woo participated in the call on behalf of the Company. Boynton provided the following additional detail on the Company's "continued inability" to sell 30,000 metric tons:

> As we stated in our June webcast, our 2014 guidance was based on exceeding 2013 specialty sales volumes by 30,000 tons. At that time we also communicated our cellulose specialty sales rate was consistent with 2013 levels.
>
> Today, as this incremental volume is still not contracted, it seems less likely that we will be able to sell this volume at acceptable terms. Instead, we will remain patient, and we will continue to utilize this capacity to produce commodity grades. The combination of the aforementioned higher cost and the comparable 2013 cellulose specialties volume will cause our full-year results to be approximately 25% below 2013 segment EBITDA, or 10 percentage points below previous guidance.

111. In the question-and-answer section that followed, Boynton also confirmed that issue was linked to falling sales prices: "Yes, I think it is safe to say that we don't feel we can place that 30,000 tons at our average price today, cellulose specialty price. And therefore, we just won't do that."

112. In response to this news, the Company's stock price fell sharply. After closing at $37.12 per share on July 29, 2014, the stock closed at $33.36 per share on July 30, 2014 (a decline of 10.1%), on unusually high trading volume of over four million shares.

113. The stock decline would have been greater had Defendants revealed the fundamental problems facing the Company with respect to the Specialties market. Instead, they made a number of false and misleading statements about the Specialties market. In the press release, Boynton reassured investors that "[g]oing forward, as the market grows, our newly converted line [to increase

Specialties capacity] positions us well to grow with future demand and diversify without additional investment."

114. In response to a separate question, Boynton expressed confidence that additional projected volume from the Specialties expansion would be absorbed into the marketplace and that the Company would achieve earnings growth as a result of the expansion:

> Yes, I think it is still -- we still feel very good about it. Again, we've said, and we've even said at the time, the near-term is going to be a little bit plus or minus here. But the midterm, the longer term, ***we feel there's a great opportunity to place this [CSE] volume out there.*** And again, that guidance was based on 2013 margins essentially and obviously, those will change a bit over time.
>
> But we still feel very confident that the market is growing in that 2% to 3% range, that's up to 50,000 tons per year. There's [a] limited number of players to serve that market. And some point, and whether it's using our numbers are using folks who track the market like Hawkins Wright, ***we believe that our capacity and others capacity will be absorbed into the marketplace. And we will achieve this -- the EBITDA growth that we have put out there as part of our CSE expansion.***

115. Boynton also stated that "we feel good that that [CSE] volume will get placed out there and will have an attractive . . . turn on that investment for our shareholders."

116. In addition, Woo misleadingly blamed reduced Specialties sales volumes on "the timing of customer shipments resulting from the Jesup plant['s] planned extended outage," without providing any information on the market oversupply or heightened competitive pressures that were hurting Specialties sales volumes, and indicated that Specialties sales volumes would be much greater in the second half of 2014 ("back half loaded").

117. Despite Defendants' attempts to put a positive spin on the disappointing results and projections, on July 31, 2014, analyst RBC issued a report titled, "Growing CS uncertainty moves us to the sidelines," downgrading the Company's stock from outperform to sector perform and reducing its price target from $46 to $37. RBC noted the Company's dramatically reduced EBITDA guidance for 2014 and that "[RYAM's] prior goal of 30K incremental CS tonnes this year has been largely (if

not entirely) pushed out to 2015. To put this in perspective, a year ago Rayonier was hoping for a 90K tonne increase in 2014, it lowered that to up 25-40K tonnes in October (as it appeared to lose 25K tonnes of Celanese's business) and then went to a guide of 30K incremental tonnes earlier this year before the latest call for flat." RBC also stated that "[w]e now expect CS prices to decline another 3% in 2015" and that, based on "our increased concern that major [CS] acetate pulp buyers may become more aggressive and push for pricing concessions (given challenging demand conditions in their own [CS] tow end-markets), further pricing downside is conceivable."

118. On August 5, 2014, RYAM filed a Form 10-Q with the SEC reporting its financial results for 2Q14, which had been discussed in the Company's press release and during its earnings call on July 30, 2014. The Form 10-Q incorporated by reference the Company's Specialties purchase agreements with customers Eastman, Nantong, and Daicel, which were attached to the Registration Statement filed on May 29, 2014, in connection with the spin-off of RYAM. However, the Form 10-Q failed to fully disclose the material omitted facts with respect to the adverse impacts of increased supply and competitive pressures on the Company's Specialties business, including the Company's ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices.

119. Moreover, the Form 10-Q misleadingly projected that production of Specialties would gradually increase manufacturing up to the full additional capacity resulting from the CSE (an additional 190,000 metric tons) when in fact the Company was unable to utilize any of the additional CSE capacity to sell Specialties.

120. Boynton and Woo signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were attached as exhibits to the Form 10-Q and stated, in relevant part:

1. I have reviewed this quarterly report on Form 10-Q of Rayonier Advanced Materials Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

* * *

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

121. Statements of fact made by Defendants on July 30 and August 5, 2014, as set forth in ¶116, 118 above, were materially false and misleading and omitted material facts for the following reasons:

(a) Growth of the Company's Specialties sales was slowing due to increases in manufacturing capacity and supply of Specialties (¶¶42-44);

(b) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (*id.*);

(c) The Company was facing pressure from its customers to lower prices as a result of such increased competition and an increased supply of Specialties on the market (¶¶43-48, 60-61);

(d) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166);

(e) The Company was engaged in an ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61); and

(f) The Company's Form 10-Q for 2Q14 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

122. In addition, opinion statements made by Defendants on July 30, 2014, as set forth in ¶¶113-116, 119 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions: Growth of Specialties sales was slowing due to increased manufacturing capacity and supply and the emergence of competitors offering comparable Specialties products, and therefore the Company's projections for increased sales volume growth as a result of the CSE had no reasonable basis (¶¶42-44).

**2. KeyBanc Capital Markets Basic Materials & Packaging Conference**

123. On September 9, 2014, Boynton attended the KeyBanc Capital Markets Basic Materials & Packaging Conference on behalf of the Company. Discussing the Specialties business, Boynton boasted that the Company's processes were "very unique in the market . . . it's a really nice, unique edge that we have. . . we just have some very unique things that we can do. And again, it gives us an edge in the market." He added that the market was "protected" and competitors had a

number of "barriers of entry . . . . And with that, almost across the board, we have a nice premium for our product relative to the competition."

124. Statements of fact made by Boynton on September 9, 2014, as set forth in ¶123 above, were materially false and misleading and omitted material facts in that the Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (¶¶42-44). Consequently, the Company was facing pressure from its customers to lower prices as a result of such increased competition, in addition to an increased supply of Specialties on the market (¶¶43-48, 60-61).

**3. Third Quarter 2014 Financial Results**

125. On October 29, 2014, the Company issued a press release announcing its financial results for 3Q14, including the following disappointing results and projections:

- 3Q14 net income of $19 million vs. third quarter 2013 net income of $40 million.
- "Year-to-date sales of $710 million were $55 million below the prior year primarily due to lower prices."
- FY14 Specialties sales were projected to be flat ("comparable to 2013").

126. On the same day, the Company held a conference call to discuss the fourth quarter ("4Q14") and fiscal year ("FY14") results. Boynton, Ruperto, and Woo participated in the call on behalf of the Company. In his opening remarks, Boynton discussed how the poor results were caused by "current challenges" in the market for Specialties products, "most significantly, oversupply," resulting from increased competition and manufacturing capacity:

> [B]eing the leader [in Specialties] does not insulate us from the realities of the current challenges in the market and, ***most significantly, oversupply***. . . . [T]his situation is being driven by several factors. First, is ***the expansion of capacity by current participants including our own expansion***. Second, we[a]k pricing in the commodity viscose market. As viscose prices drop, existing cellulose specialty

> players who also produce commodity viscose are enticed to shift some of their commodity production into more specialties. Third, the slower demand growth in certain end markets including cigarettes.

127. Boynton added that, in response to these issues, the Company was focusing on a number of action items, including cost reductions and "redirect[ing] a significant portion of our cellulose specialties expansion capacity to the commodity markets by entering into multiyear contracts for these commodities. This will limit our cellulose specialties capacity for a period of time and provide use with a price premium on our commodity sales."

128. In response to this news, the Company's stock price dropped again. After closing at $30.33 per share on October 28, 2014, the stock closed at $28.39 per share on October 29, 2014 (a decline of 6.4%), on unusually high trading volume of over two million shares.

129. The stock decline would have been greater, but Defendants continued to mislead the market. In his opening remarks, Boynton highlighted the fact that "[w]e are also working to actively extend contracts with existing customers as those opportunities present themselves." Referring to one of the Company's largest customers, Nantong, Boynton added: "For example, as we recently reported in an 8-K filing, we have extended a contract with a significant long-term customer. We are pleased to add another year onto an already multiyear contract [from the end of 2014 to the end of 2015]." An analyst questioned why the "long-term" contract was only extended for one year rather than three years and whether any volume was lost or gained. Boynton downplayed this as "nothing out of the ordinary," and deferred questions on renewed sales volume to the January 2015 call.

130. With respect to Specialties prices, Boynton assured analysts that discussions with customers were positive, without identifying any issues pertaining to the Eastman Agreement negotiations: "***Our discussions are good, they're healthy, they're ongoing. I really have no more flavor to add to it at this point***." Boynton also stated that the business was "steady state" with respect to losing or gaining share of Specialties acetate business to competitors.

131. Notwithstanding Defendants' attempts to put a positive spin on the disappointing results and projections, on October 30, 2014, RBC issued a report titled, "Getting Smoked by the Brazilians," which lowered its price target for RYAM (from $27 to $23 per share) and reasoned that "[w]e see further downside risk to CS prices in 2015 due to excess capacity, slower demand growth and increased competition in the [Specialties] high alpha pulp market." RBC further stated that "RYAM already lost its Celanese contract (likely to [Brazilian competitor Sateri]) at the end of 2013, and with our trade sources indicating [Sateri] is producing an acetatae pulp as good as RYAM, we expect further share gains for [Sateri] . . ." Finally, RBC noted that RYAM's second largest customer (Nantong) only renewed its contract for one year (as opposed to the prior norm of 3-5 years) which "may set a precedent" and "demonstrate[s] buyer[s] now have purchasing power."

132. On November 4, 2014, RYAM filed a Form 10-Q with the SEC reporting its financial results for 3Q14, which had been discussed in the Company's press release and during its earnings call on October 29, 2014. The Form 10-Q failed to fully disclose the material omitted facts with respect to the impact of oversupply and increased competition on the Company's Specialties business, including the Company's ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices.

133. The Company's Form 10-Q also contained SOX certifications by Boynton and Woo that were materially similar to those identified above in ¶120.

134. Statements of fact made by Defendants on October 29 and November 4, 2014, as set forth in ¶¶129-130, 132 above, were materially false and misleading and omitted material facts for the following reasons:

(a) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (¶¶42-44);

(b) The Company was facing pressure from its customers to lower prices as a result of such increased competition and an increased supply of Specialties on the market (¶¶43-48, 60-61);

(c) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166);

(d) The Company was engaged in an ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61); and

(e) The Company's Form 10-Q for 3Q14 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

**4. Fourth Quarter and Fiscal Year 2014 Financial Results**

135. On January 28, 2015, the Company issued a press release announcing its financial results for 4Q and FY14. In the press release, the Company announced a net loss of $23 million in 4Q14 attributable to partly to the oversupply of Specialties "throughout the year":

> "As expected, market conditions remained challenging in the fourth quarter of 2014," said Paul Boynton, Chairman, President and Chief Executive Officer. "***Throughout the year, cellulose specialties markets were oversupplied and global demand decelerated.*** To offset some of the impact from the resulting lower prices, we focused our efforts on reducing costs and improving our operating efficiencies. Consequently, in spite of experiencing higher than anticipated costs in the second half of the year, we were able to achieve the full year guidance provided in July."

136. As a result of these problems, the Company disclosed disappointing 4Q and FY14 financial results:

- 4Q14 sales of $248 million vs. 4Q13 sales of $282 million and FY14 sales of $958 million vs. fiscal year 2013 ("FY13") of $1,047 million, attributed primarily to declines in Specialties prices.
- An operating loss of $28 million for 4Q14.
- Specialties volumes of 479,000 tons in FY14 vs. 486,000 tons in FY13.

137. The press release also provided a poor outlook for 2015, with further price declines and a continued stagnation of sales volumes due to the struggling Specialties business: "The Company expects the 2015 cellulose specialties market to face a combination of industry oversupply and weaker end-market demand. The Company's cellulose specialties volumes in 2015 are forecasted to be comparable to the last couple years with prices 7 to 8 percent below 2014." The Company also cited "aggressive pricing offered by competitors" as a driver of the negative outlook.

138. The press release also stated that, as a result of the unfavorable Specialties market, the Company was forced to "implement[] actions that will lower our cost position, enhance cash flows and improve overall competitiveness. . . . [t]hese actions include $40 million in cost savings initiatives, a $15 million improvement to working capital, accelerating continuous improvement initiatives and leveraging productivity programs."

139. On the same day, the Company held a conference call to discuss the 4Q14 and FY14 results. Boynton and Ruperto participated in the call on behalf of the Company. In his opening remarks, Boynton provided the following additional commentary on the aggressive Specialties pricing by competitors and an oversupply of Specialties on the market:

> As you've seen from our guidance, there remains continued pressure on pricing of our products and our ability to grow cellulose specialty volumes.
>
> * * *
>
> These dynamics, coupled with currency movements, have driven aggressive pricing tactics by our competitors and negatively impacted our 2015 pricing. Although we

> have volume-based contracts, we can't dictate pricing and expect to remain strong partners with our customers. Hence, as noted, we expect pricing on average to be down 7% to 8% from 2014.
>
> * * *
>
> Although these competitors do not offer customers the same value equation that we do, their price-based competition does have an effect on the market and our customers. Right now, this dynamic is negatively impacting the market price for cellulose specialties.

140. The Company's stock price fell 4.9% as a result of these disclosures. After closing at $18.90 per share on January 27, 2015, the stock closed at $17.98 per share on January 28, 2015, on unusually high trading volume of nearly two million shares.

141. The stock decline would have been greater but Defendants continued to mislead the market regarding the depth of problems facing the Company with respect to Specialties pricing and sales volume growth, particularly with respect to its largest customer, Eastman. In response to an analyst's question about potential reductions in purchasing by the Company's customers, Boynton emphasized that "we feel confident in the CS volume being out there, and . . . we've actually increased our share of volume at each of our top 10 customers," but Boynton refused to answer a follow-up question about pricing beyond 2015 in light of the increasing competitiveness of the Company's peers.

142. Boynton also responded vaguely to questions regarding volume commitments and pricing dynamics of customer contracts, including whether there were limits on the ability to raise or lower prices. As to pricing, he claimed that "there's not a set pattern, formula, pricing floor, whatever, for anybody." Boynton also claimed that "[w]e don't know where our competitors are priced at" and said he did not know whether the Company was able to maintain a value premium as to pricing.

143. In addition to the Company's press release and during its earnings call, discussed above, RYAM filed a Form 10-K with the SEC reporting its financial results for FY14 after the market closed on January 27, 2015. The Form 10-K highlighted "sales to four significant customers which represented over 10 percent of total sales for the three years ended December 31[, 2014]": Eastman (21%, 21%, and 31% of total sales from 2012-1014); Nantong (17%, 19%, 18%); Daicel (14%, 13%, 15%); and Celanese (14%, 14%, 0%). The Form 10-K incorporated by reference the Company's Specialties purchase agreements with customers Eastman, Nantong, and Daicel, which were attached to the Registration Statement filed on May 29, 2014 in connection with the spin-off of RYAM. However, the Form 10-K failed to fully disclose the material omitted facts with respect to the impacts of supply, demand, and competition on the Company's Specialties business with such customers, including the Company's ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices.

144. In addition, the Form 10-K misleadingly touted the Company's unique abilities in the manufacturing of Specialties, the hurdles faced by potential Specialties competitors, and the Company's "significant competitive advantage, resulting in a premium price for our core products."

145. The Company's Form 10-K also contained SOX certifications by Boynton and Ruperto that were materially similar to those identified above in ¶120.

146. Despite Defendants' continued misleading statements and omissions, analysts reacted negatively to Defendants' statements on January 27-28, 2015:

(a) On January 29, 2015, RBC lowered its RYAM price target from $20 to $17, stating: "We rate [RYAM] Underperform as we see further downside risk to CS prices in 2016 due to excess capacity, slower demand growth and increased competition in the high alpha pulp market.

We expect these factors will also limit the company's ability to grow into complementary specialty chem businesses."

(b) On January 27, 2015, Macquarie Research issued a report initiating coverage of RYAM with only an $18.35 price target and stating that "we are concerned about pricing in the company's cellulose specialties business . . . over the near term." Macquarie also noted the excess CS capacity and that "RYAM's five largest customers account for approximately 70% of its sales. The loss of one of these customers would have a material impact on the company's results."

147. Statements of fact made by Defendants on January 27-28, 2015, as set forth in ¶¶141-144 above, were materially false and misleading and omitted material facts for the following reasons:

(a) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (¶¶42-44);

(b) The Company was facing pressure from its customers to lower prices as a result of such increased competition and an oversupply of Specialties on the market (¶¶43-48, 60-61);

(c) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166);

(d) The Company was engaged in an ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61); and

(e) The Company's Form 10-K for FY14 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

**5. First Quarter 2015 Financial Results**

148. On May 1, 2015, the Company issued a press release announcing its financial results for the first quarter 2015 ("1Q15"). In the press release, the Company reported results "in line with our expectations" according to Boynton, including 1Q15 net income of $11 million compared to $31 million for first quarter 2014 ("1Q14"). The Company also reported a $22 million decline in operating income "primarily due to lower [Specialties] prices." 1Q15 sales were reported as $221 million (compared to $243 million in 1Q14), a decline "primarily due to lower cellulose specialties sales prices and volumes. Cellulose specialties sales volumes declined in early 2015 due to timing of customer orders mainly related to acetate tow destocking as previously communicated."

149. On the same day, the Company held a conference call to discuss the 1Q15 results. Boynton and Ruperto participated in the call on behalf of the Company. In his prepared remarks, Ruperto stated that "[i]t is important to note that most of our estimated full-year 2015 cellulose specialty sales volume is contracted. Therefore, while the timing of our cellulose specialty sales may be impacted by seasonable order patterns and inventory destocking, our full-year sales volume is largely known and expected to be comparable to 2014 and 2013 levels as previously guided." Boynton also reiterated the long-term nature of the Company's Specialties volume commitments. Boynton failed to disclose, however, that much of this contracted volume was under threat due to the Company's toxic dispute with Eastman after pricing and volume terms.

150. On May 1, 2015, RYAM filed a Form 10-Q with the SEC reporting its financial results for 1Q15, as discussed in the Company's press release and during its earnings call on the same day. The Form 10-Q failed to fully disclose the material omitted facts with respect to the

impact of oversupply and increased competition on the Company's Specialties business, including the Company's ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices.

151. The Company's Form 10-Q also contained SOX certifications by Boynton and Ruperto that were materially similar to those identified above in ¶120.

152. Statements of fact made by Defendants on May 1, 2015, as set forth in ¶¶149-150 above, were materially false and misleading and omitted material facts for the following reasons:

(a) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (¶¶42-44);

(b) The Company was facing pressure from its customers to lower prices as a result of such increased competition and oversupply of Specialties on the market (¶¶43-48, 60-61);

(c) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166);

(d) The Company was engaged in an ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61); and

(e) The Company's Form 10-Q for 1Q15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

### 6. Announcement of Strategic Repositioning and Second Quarter 2015 Financial Results

153. On July 30, 2015, the Company issued a press release announcing a "strategic repositioning" whereby the Company would spend $25 million – and take a write off of $28 million – to reconfigure its Jesup facility to reduce Specialties capacity by 28% (190,000 tons) and replace it with Commodities capacity. In other words, the Company was permanently retreating from its costly ($385 million) Specialties expansion that concluded just two years earlier. The Company cited "the persistent imbalance of supply and demand in the [Specialties] market" as a reason for this strategic shift, but failed to disclose that the Eastman dispute, and the potential loss or diminishment of the Eastman business, was a driving factor in the repositioning.

154. Also on July 30, 2015, the Company issued a separate press release announcing financial results for second quarter 2015 ("2Q15"), including a net loss, lower sales, and lower operating income. Regarding Specialties prices and volumes, the press release disclosed that "[a]s expected, cellulose specialties prices were down 8 percent from the prior year periods reflecting the results of the 2015 price negotiations. Cellulose specialties sales volumes for the three and six months ended 2015 were slightly lower than prior year periods. . . ."

155. On the same day, the Company held a conference call to discuss the 2Q15 results. Boynton and Ruperto participated in the call on behalf of the Company. Boynton provided the additional details on the Company's strategic repositioning, a departure from the Specialties expansion concluded in 2013. Boynton explained that this dramatic reversal of strategy was driven by "lower than previously anticipated" Specialties sales volume growth and a Specialties "supply/demand imbalance" that dramatically reduced pricing power "***over the last two years***."

156. However, during the conference call, Defendants failed to disclose any threat to existing Specialties customer relationships such as Eastman or their purported Specialties volume

and pricing commitments, or that the dispute with and potential loss or diminishment of the Company's Eastman business was a driving force of the strategic repositioning. Rather, in the question-and-answer session that followed, Boynton and Ruperto assured analysts that, notwithstanding the strategic repositioning, the Company's Specialties volumes were predominantly contracted and that new pricing negotiations would take place "in the third and fourth quarter, principally in the fourth quarter" (without mentioning the pricing dispute with Eastman that was ongoing at the time).

157. On August 6, 2015, RYAM filed a Form 10-Q with the SEC reporting its financial results for 2Q15, which had been discussed in the Company's press release and during its earnings call on July 30, 2015. The Form 10-Q failed to fully disclose the material omitted facts with respect to the impact of oversupply and increased competition on the Company's Specialties business, including the Company's ongoing contractual dispute with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices.

158. The Company's Form 10-Q also contained SOX certifications by Boynton and Ruperto that were materially similar to those identified above in ¶120.

159. Statements of fact made by Defendants on July 30 and August 6, 2015, as set forth in ¶¶153, 155-157 above, were materially false and misleading and omitted material facts for the following reasons:

(a) The Company's competitive advantage and ability to charge premium prices for Specialties was eroding due to the emergence of competitors selling higher volumes of Specialties that were comparable in quality to the Company's Specialties (¶¶42-44);

(b) The Company was facing pressure from its customers to lower prices as a result of such increased competition and oversupply of Specialties on the market (¶¶43-48, 60-61);

(c) The Company's long-term Specialties volume contracts allowed customers to shift substantial amounts of contracted volume to competitors charging lower prices (¶¶46, 60, 66, 162, 166);

(d) The Company was engaged in an ongoing contractual dispute, which had deteriorated to the brink of litigation, with its largest customer, Eastman, over the Company's Specialties pricing and Eastman's ability to purchase Specialties from competitors of the Company charging lower prices (¶¶60-61); and

(e) The Company's Form 10-Q for 2Q15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

160. Regarding the "strategic backtrack" from Specialties back to Commodities, analyst Morningstar observed on July 30, 2015:

> Despite modest demand growth, Rayonier commenced a big project [in 2011] to convert its commodity grade production to CS, probably enticed by the far stronger margins it could enjoy on CS than on commodity-grade products. The project, completed in 2013, increased [RYAM]'s CS capacity to 675,000 tons from 485,000 tons. This project now looks like a waste of capital, as management recently announced it will swap the new CS capacity back to commodity grade at a cost of $25 million. As such, we expect CS volumes will be relatively flat over the next five years.

161. RBC also observed that the strategic shift "signals that CS markets are faring even worse than most expected. . . many investors will be questioning the track record of management after now having spent over $385MM to convert the [Jesup] mill to CS only to turn around two years after start-up and announce it will be converted back (which will also cost money) and result in them having 15K tonnes less commodity capacity than they had at the start."

### C. Defendants Reveal Litigation with Their Largest Customer, Eastman, over Contractual Terms Jeopardizing All of the Company's Eastman Business

162. After the market closed on August 18, 2015, the Company shocked investors by filing an SEC Form 8-K revealing that, nearly a week earlier, it had been sued by its largest customer, Eastman, over Specialties pricing and volume requirements, and that the Company had filed a separate action against Eastman in response. The dispute involved the meaning and extent of the Meet or Release Provision in the Eastman Agreement (effective 2012-2017), giving Eastman the option to buy lower-priced Specialties products from RYAM's competitors if the prices offered for those products were not met by RYAM. Eastman sought a declaration that the Meet or Release Provision applied to ***all of its business with RYAM*** or, alternatively, that ***its entire Eastman Agreement with RYAM was invalid***. Specifically, the Company's filing stated that:

> On August 13, 2015, Rayonier Advanced Materials Inc. (the "Company") filed a declaratory judgment action against Eastman Chemical Company ("Eastman") in the Superior Court of Gwinnett County, Georgia regarding the Company's chemical cellulose specialty products contract with Eastman. Eastman was served with this action on August 14, 2015. The Company filed its action in Georgia because the contract provides that it is governed by Georgia law, among other reasons.
>
> The Company's filing asks the court to confirm the meaning of certain "meet or release" pricing and volume provisions in the agreement that require the Company, under certain circumstances, to respond to offers made to Eastman by other suppliers. The Company seeks a declaration that these provisions apply to a maximum of 7,500 metric tons of product per year. In addition, the Company has asked the court to confirm the meaning of certain contract provisions relating to pricing in future contract years.
>
> On the evening of August 12, the Company learned that Eastman had filed a similar declaratory judgment action on August 4 in the Chancery Court for Sullivan County, Tennessee, concerning the same contract "meet or release" provisions. ***Eastman's filing seeks a declaration that all of its contracted volume is subject to the meet or release provision or, in the absence of such interpretation, that the contract is invalid.*** The Company was served with that action on August 13, 2015.
>
> The Company believes that the contract is valid and enforceable in accordance with its terms as to both price and volume requirements, and that the meet or release provisions should be enforced in accordance with the Company's position.

163. On the following day, August 19, 2015, the Company issued a press release with additional details regarding its dispute with Eastman:

> After the market close on August 18, 2015, Rayonier Advanced Materials (NYSE:RYAM) filed an 8-K with the SEC discussing a lawsuit filed in Georgia state court for a declaratory judgment confirming the meaning of certain language in its supply agreement with its largest customer, Eastman Chemical (the "Supply Agreement"). RYAM believes it would be helpful to investors and analysts to provide some additional detail relating to the dispute.
>
> ***Specifically, the action [by RYAM against Eastman] asks the court to confirm its interpretation of certain provisions of the Supply Agreement which impact the price and, in some cases, the volume required to be purchased by Eastman.*** The Supply Agreement was entered into by RYAM and Eastman effective January 1, 2012 and goes through calendar year 2018. This dispute relates to the 2016 and future contract years and should not impact either price or volume in 2015.
>
> The primary language at issue involves "meet or release" provisions of the Agreement. ***These provisions allow Eastman to obtain bona fide third party offers that meet the requirements of the Supply Agreement for similar cellulose specialties products, and would require RYAM to either meet such price or release the volume, thereby allowing Eastman to purchase the volume from the third party.*** RYAM strongly believes that the language of the Supply Agreement as well as past practices of the parties make clear that the volume subject to this meet or release provision is limited to 7,500 metric tons per year, which is less than 2% of its total expected cellulose specialties sales volume to all RYAM customers in 2015. RYAM is seeking expedited resolution of this matter with the court. Eastman filed an action in Tennessee in which it asserts that its entire annual purchase obligation under the Supply Agreement is subject to the aforementioned "meet or release" provision, rather than only 7,500 tons. In the unlikely event that Eastman were to prevail in this action, RYAM would have to either match the pricing of the bona fide offers that meet all requirements of the Supply Agreement, thereby retaining the Eastman volumes, or release a portion or all of the volumes should it deem the sale at such prices to be unattractive.
>
> RYAM Chairman, President and CEO Paul Boynton stated, "Pricing negotiations are always spirited debates around a number of factors and threatened or actual litigation is one tool that parties can employ. Although Rayonier Advanced Materials would have preferred to address any concerns or negotiations around pricing privately, Eastman's August 4 action required us to take the necessary steps to protect our contractual arrangement."

164. These announcements stunned investors by revealing that the Company was engaged in a significant dispute with Eastman, its largest and most important customer (31% of business in

2014), which had risen to the level of litigation threatening their relationship. This indicated that, at best, the Company would be forced to renegotiate the Eastman pricing and volume terms in a manner less favorable to the Company, which could spill over to other major customers. At worst, the Company would lose all or a substantial portion of its business with Eastman. Moreover, the announcements shed light on prior disclosures about the abandonment of the Eastman-driven CSE and the adverse conditions hurting the Specialties business from Eastman and other customers (oversupply, lower prices, and increased competition), which were far worse than the Company had previously disclosed.

165. On this news, the price of RYAM common stock dropped precipitously, losing over half of its value. After closing at $13.63 per share on August 18, 2015, the stock closed at $7.62 per share on August 19, 2015, on unusually high trading volume of over 18 million shares. As the market continued to digest the news, the stock continued to fall the following trading day, closing at $6.56 per share on August 20, 2015, on unusually high trading volume of nearly six million shares. The total stock price decline over this period was ***51.9%***, or $7.07 per share.

166. Analysts and commentators viewed Defendants' stunning revelation of the Eastman dispute as more bad news for the Company's faltering Specialties business, with negative outcomes affecting the Company's relationship with, not only Eastman, but other major customers as well. For example, on August 19, 2015, RBC issued a report stating:

> [I]t is hard to see how this is anything but bad news for RYAM. In the worst case scenario, [Eastman] gets its entire supply contract with RYAM declared invalid (effectively bringing forward the expiry from its original December 31, 2017 date), causing purchaser bargaining power to increase substantially as the Nantong contract is also coming up for renewal at the end of 2015 (and Daicel is next at the end of 2016). We suspect that RYAM has a similar "meet & release" provision with its other Top 3 customers - Daicel and Nantong - so a loss here could spill over to the majority of its CS volumes. In the best of bad cases, RYAM's interpretation is upheld, but CS and financial market perception lingers that [Eastman] may diversify

a portion (or even potentially all) of its CS supply when the agreement with RYAM comes up for renewal in two years' time.

167. Similarly, on August 19, 2015, Morningstar observed:

> This could end badly for [RYAM]. If Eastman wins the case, [RYAM] risks losing its largest customer or having to accept lower prices to retain the Eastman tons. We were expecting CS price declines of 7.5% in 2015 and flat pricing in 2016, with inflationlike gains thereafter. Having to renegotiate the Eastman tons would likely lead to price drops beyond our current expectations and could lead to spillover effects with other big customers, Nantong and Daicel. . . . We have lowered our CS pricing assumptions for [RYAM] to reflect a higher likelihood that prices will continue falling as a result of Eastman's actions. . . . [I]f the company loses the Eastman contract or has to substantially lower prices to hold onto that contract and others, its shares could be worthless.

168. The following day, on August 20, 2015, an article published on *Seeking Alpha* by financial commentator Jeremy Raper discussed the Eastman revelation in the context of the Company's deteriorating Specialties business:

> [I]t's rare to see a stock fall 50% in a day, even on horrible earnings – which is why the obliteration of Rayonier Advanced Materials (RYAM) yesterday more than piqued my interest. RYAM has had a short but tortured stock-market history. . . .
>
> The cellulose specialty segment – supposedly resistant to declining prices and cheaper competition due to its value-added, premium nature – has seen pricing collapse, driven by the advent of new supply from Brazilian and Chinese competitors and weak demand (partially a function of increased anti-smoking regulation in China, a major market for the company's cellulose product). Multi-year contracts with long-term customers have meant relatively little, as prices tend to be negotiated yearly and take account of the changing supply/demand mix. A key customer, Celanese (14% of sales in FY13), completely dropped the company in FY14 and could presage further customer losses (more on this later). As a result, EBITDA margins have cratered, falling from the aforementioned 37% in FY13, to 23% in 1H FY15. . . .
>
> [T]wo days ago . . . the company filed an 8-K explaining they had just launched legal action against their largest customer, Eastman Chemical (31% of sales in FY14), for breach of contract. . . . [A]ll the outcomes for RYAM are beyond bleak. Prices are generally negotiated yearly, in November/December, for the year ahead; as such, the timing of this move is strange (early-August), and begs a deeper explanation than 'spirited debates around a number of factors.' As the CEO [Boynton] mentioned, Eastman has an 85-year history with RYAM, and (to my knowledge) has not sought the courts to allow exit from contractual provisions with RYAM before; why do so now and risk the whole relationship?

> The obvious answer is either 1) pricing outside of the RYAM contract has absolutely collapsed, making RYAM's offering wildly uneconomic; or 2) Eastman is being offered large new supply (at cheaper levels) that meets their quality specs, and no longer needs RYAM in the long-term; or alternatively some combination of the two. It appears, in my view, that RYAM is becoming, or rather has become, the high-cost producer in a rapidly-commoditizing market. Ouch.

## VI. POST-CLASS PERIOD REVELATIONS

169. The fallout from the Company's Specialties problems continued after the Class Period. During the Company's conference call on October 29, 2015 to discuss third quarter 2015 ("3Q15") results, Defendants refused to answer multiple questions about the ongoing Eastman litigation, but Boynton opened his prepared remarks by admitting that the Specialties downturn began in late 2013, prior to the Class Period: "The industry has experienced softness ***over the past couple of years*** due to increased capacity and lower-than-expected demand side growth."

170. On December 1, 2015, the Company issued a brief press release reporting that "the Company and Eastman Chemical Company, its largest customer, have settled their legal dispute and entered into a new cellulose specialties purchase and sales agreement that extends through December 31, 2019." The Company did not disclose any of the critical renegotiated pricing and volume terms of the new contract, and the extent to which Eastman was able to extract more favorable pricing in volume terms as part of the settlement, stating only that "it expects to discuss aggregate pricing and volume estimates for the coming year [2016] on the Company's next earnings call in early February."

171. On December 4, 2015, securities analyst RBC downgraded the Company's stock and reduced its price target in a report titled, "Eastman contract extension [announced on December 1, 2015] likely to come at a high cost." The report stated: "While our pricing forecasts should be reasonable for the overall CS market, we believe RYAM will face steeper declines than its peers . . . We believe that RYAM's Eastman contract [originally signed in 2011] is priced significantly over

the current market. . . . We believe that Eastman wouldn't have signed a contract extension without the assurance that its contract price would move to the market average over the next two years [in 2016 and 2017]."

172. Consistent with RBC's observations, the Company's post-Class Period Specialties business continued to suffer as a result of the oversupply of Specialties and the emergence of lower-priced competitors selling comparable products, exacerbated by the renegotiated Eastman deal on terms less favorable to the Company. For example:

- On February 2, 2016, the Company reported its fourth quarter ("4Q15") and fiscal year ("FY15") financial results. The Company disclosed 4Q15 sales 2% below 4Q14 sales and FY15 sales 2% below FY15 sales, "primarily driven by lower pricing in cellulose specialties, with a modest impact from lower cellulose specialties volumes." The Company also reported that "[c]ellulose specialty prices were down 6% and 7% from the prior year, three-month, and full year periods, respectively reflecting 2015 pricing." Specialties sales volumes in FY15 were 467,000 tons vs. 478,000 tons in FY14. FY16 pricing was projected "to be down approximately 6% to 7%, with cellulose specialty volumes down 4% to 5% from 2015 levels." With respect to the impact of end user demand on Specialties volumes, Boynton stated that in 2016 "it's probably another repeat of 2015 amounts of [inventory] destocking."

- On May 3, 2016, the Company reported first quarter 2016 ("1Q16") results including: "Sales totaled $218 million . . . 2% below 2015. The decrease was largely driven by lower prices on cellulose specialties. . . . As expected cellulose specialty prices were down approximately $112 per ton, or 7% from the prior year. . . cellulose specialty sales volume declines 1,000 tons to 106,000 tons."

- On August 2, 2016, the Company reported second quarter 2016 results including sales down 3% vs. 2Q15 sales "primarily driven by 5% lower CS . . . prices, which were partially offset by modestly higher CS volumes." Boynton stated that "[a]s we look at markets for our cellulose specialties business, we see little change in the acetate segment, as we believe fundamental tow demand is relatively flat. . . . On the supply side, continued excess capacity, together with the relative strength of the US dollar, has allowed our competitors to be more aggressive in the market. These supply-and-demand dynamics have had a negative impact on our performance for the past several years."

- On January 31, 2017, the Company reported its fourth quarter 2016 ("4Q16) and fiscal year ("FY16") financial results. The Company reported 4Q16 sales 5% below 4Q15 sales and FY16 sales 8% below FY15 sales, "driven by a 7% decline in CS prices and a 2% decline in CS volumes" (467,000 tons in FY15 to 456,000 tons in FY16). In addition, Boynton stated that CS "pricing is expected to be down 3% to 4% in 2017" and that the Company's Specialties pricing and volumes continued to be pressured by Specialties competitors manufacturing increased quantities of Specialties. As a result of these disclosures of continued Specialties declines (actual and projected), the Company's stock fell 19.1% from a close of $16.78 on January 30, 2017 to a close of $13.57 per share on January 31, 2017, on unusually high trading volume of 1.7 million shares.

- According to the Company's FY16 Form 10-K filed on February 24, 2017, the Company's business with Eastman, as a percentage of total sales, fell from 31% in 2014 to 28% in 2015 to 25% in 2016. This represented declining Eastman sales of $269,980,000 in 2014 to $263,480,000 in 2015 to $217,250,000 in 2016.

- On May 2, 2017, the Company reported first quarter 2017 results including an 8% drop in sales (vs. 1Q16) "driven by contractually lower prices on cellulose specialties, a higher mix of lower value specialty cellulose products and lower commodity sales volume."

- On August 3, 2017 the Company disclosed its second quarter 2017 results, with a 6% quarterly decrease in sales "primarily driven by a 7% decline in CS prices. . . . As a reminder, based on our contractually committed CS volumes, we previously announced that we expected full year 2017 CS prices to be down 3% to 4% from 2016 and that expectation continues."

## VII. LOSS CAUSATION

173. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of RYAM's securities and operated as a fraud or deceit on Class Period purchasers of RYAM's securities. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the prices of RYAM's securities fell as the prior artificial inflation came out. The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of Defendants' Class Period statements. As a result of their purchases of RYAM's securities during the

Class Period, Lead Plaintiffs and the other members of the Class (defined in ¶198 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

174. On July 30, 2014, the Company surprised investors by announcing disappointing 2Q14 financial results and an inability to sell projected Specialties volumes, as detailed further in ¶¶108-112 above. As a result, the Company's common stock price fell 10.1% on unusually high trading volume of over four million shares.

175. On October 29, 2014, the Company revealed continued financial declines in 3Q14 driven in part by an oversupply and increased manufacturing capacity in the Specialties market, and also revealed that the Company was redirecting a significant portion of its Specialties expansion capacity back to Commodities, as detailed further in ¶¶125-128 above. As a result, the Company's common stock price fell 6.4% on unusually high trading volume of over two million shares.

176. On January 28, 2015, the Company disclosed poor 4Q14 and FY14 financial results driven by continued Specialties sales problems (including an industry oversupply and aggressive pricing by competitors), as detailed further in ¶¶135-140 above. The Company projected that the same issues would negatively impact the Specialties business in 2015, resulting in significantly lower sales volumes than previously projected. As a result, the Company's common stock price fell 4.9% on unusually high trading volume of nearly two million shares.

177. After the market closed on August 18, 2015, the Company shocked investors by filing a Form 8-K with the SEC disclosing litigation with its largest customer, Eastman, over the Specialties pricing and volume terms set forth in the Eastman Agreement, as detailed further in ¶¶67-69, 162-165 above. The Company issued a separate press release the next day, August 19, 2015 with additional details on the litigation, which threatened all of the Company's business with Eastman. As a result, the Company's common stock price plummeted 44% on August 19, 2015 unusually high

trading volume of over 18 million shares. The stock continued to fall 13.9% the following day, August 20, 2015, on unusually high trading volume of nearly six million shares, as investors continued to digest the news. The total stock price decline over this period was 51.9%.

178. As a result of their purchases of RYAM securities during the Class Period, Lead Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of RYAM's business and prospects. Defendants' false and misleading statements had the intended effect and caused RYAM securities to trade at artificially inflated levels throughout the Class Period.

179. When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of RYAM's securities declined. These declines removed the inflation from the prices of RYAM's securities, causing real economic loss to investors who had purchased RYAM's securities during the Class Period.

180. The declines in the prices of RYAM's securities after the revelations came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in RYAM securities negate any inference that the losses suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This is evidenced by the chart below, which demonstrates the clear divergence of the Company's common stock price from the Company's benchmark indices[23] as the revelations of the truth became known to the market:

---

[23] RYAM identified the S&P Small Cap 600 Index ("SML") and the S&P 500 Materials Index ("S5MATR") as benchmarks for its common stock performance in its 2014 and 2015 Forms 10-K, filed with the SEC on February 27, 2015 and February 26, 2016, respectively.




181. The economic losses, *i.e.*, damages, suffered by Lead Plaintiffs and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices of RYAM securities and the subsequent significant declines in the value of RYAM securities when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## VIII. PRESUMPTION OF RELIANCE

182. A class-wide presumption of reliance is appropriate with respect to the claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

183. A class-wide presumption of reliance is also appropriate with respect to the claims in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Lead Plaintiffs and other members of the Class (defined in ¶193 below) purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to RYAM, and have been damaged thereby.

184. At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a) As a regulated issuer, RYAM regularly made public filings with the SEC and related press releases;

(b) RYAM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c) RYAM was followed by several securities analysts employed by major brokerage firms, such as RBC, Bank of America Merrill Lynch, D.A. Davidson & Co., and Macquarie Research, among others, who wrote research reports concerning RYAM that were distributed to the brokerage firms' sales forces, entered the public marketplace, and were publicly available; and

(d) The Company's common stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

185. As a result of the foregoing, the market for the Company's securities promptly digested current information regarding RYAM from all publicly available sources and reflected such information in the prices of the Company's securities.

186. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

187. At the times they purchased or otherwise acquired the Company's securities, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

188. As a result of the above circumstances, the presumption of reliance applies.

189. In sum, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## IX. NO SAFE HARBOR

190. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were loudly absent from RYAM's Class Period filings.

191. The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein. These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize. Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless. Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability. The risk warnings were false and misleading because they did not disclose that Defendants were actually embroiled in the very circumstances about which they purportedly warned, and Defendants had actual knowledge of material adverse facts undermining such disclosures.

192. Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of RYAM who knew it was false or misleading when made.

## X. LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

193. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of RYAM between June 30, 2014 and August 18, 2015, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

194. Because RYAM has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable. According to the Company's Form 10-K for FY14, the Company had more than 42 million shares outstanding on February 20, 2015. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

195. Lead Plaintiffs' claims are typical of the claims of the members of the Class because Lead Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

196. Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class that Lead Plaintiffs seek to represent.

197. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

198. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f) whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

199. Lead Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

200. During the Class Period, RYAM and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiffs, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase the Company's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, RYAM and the Individual Defendants, and each of them, took the actions set forth herein.

201. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of RYAM, as alleged below.

202. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information

that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

203. RYAM and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

204. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's financial and operational strength, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

205. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their

responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's projections, and financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

206. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants and the misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

207. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period. In ignorance of the fact that market

prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

208. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their RYAM publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

209. By virtue of the foregoing, RYAM and the Individual Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

210. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was removed from the Company's stock.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

211. Lead Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein. This claim is asserted against the Individual Defendants.

212. The Individual Defendants acted as controlling persons of RYAM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

213. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

214. As set forth above, RYAM and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead

Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A. Declaring that this action is a proper class action and certifying Lead Plaintiffs as Class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D. Awarding rescission or a rescissionary measure of damages; and

E. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

DATED: January 12, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977

*s/ Christopher M. Wood*
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

SACHS WALDMAN, P.C.
DEREK L. WATKINS
1423 East Twelve Mile Road
Madison Heights, MI 48071
Telephone: 248/658-0800
248/658-0801 (fax)
dwatkins@sachswaldman.com

Additional Counsel for Lead Plaintiffs

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel for Lead Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977

*s/ Christopher M. Wood*
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com

Lead Counsel for Lead Plaintiffs