**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

MICHIGAN CARPENTERS' PENSION
FUND and LOCAL 295 IBT EMPLOYER
GROUP PENSION TRUST FUND,
Individually and on Behalf of All Others
Similarly Situated,

        Plaintiffs,

                             Case No. 3:18-cv-771-J-34JRK

vs.

RAYONIER ADVANCED MATERIALS,
INC., et al.,

        Defendants.

_____/

# O R D E R

      **THIS CAUSE** is before the Court on Defendants' Motion to Dismiss the Amended

Complaint and Incorporated Memorandum of Law (Doc. 69; Motion to Dismiss), filed on

July 16, 2018. In the Motion to Dismiss, Defendants request that the Court enter an order

dismissing both counts of the Amended Complaint for Violation of the Federal Securities

Laws (Doc. 27; Amended Complaint). Plaintiffs[1] filed a response in opposition to the

Motion to Dismiss on August 30, 2018. See Lead Plaintiffs' Opposition to Defendants'

Motion to Dismiss the Amended Class Action Complaint (Doc. 80; Plaintiffs' Response).

With leave of Court, see Order (Doc. 82), Defendants filed a reply in support of their Motion

to Dismiss on September 20, 2018. See Defendants' Reply Memorandum in Support of

Their Motions to Dismiss the Amended Complaint (Doc. 85; Defendants' Reply). In

---

[1] On November 13, 2017, the predecessor court appointed Michigan Carpenters' Pension Fund and Local 295 IBT Employer Group Pension Trust Fund as Lead Plaintiffs in this action. See Order (Doc. 22). The undersigned will direct the Clerk of the Court to update the caption of this case accordingly.

addition, on September 19, 2018, Plaintiffs filed a motion requesting that the Court either strike all of the exhibits attached to the Motion to Dismiss, as well as "Defendants' inferences," or convert the Motion to Dismiss into a motion for summary judgment and allow Plaintiffs to take discovery. <u>See</u> Lead Plaintiffs' Motion to Strike Extraneous Materials and References Thereto in Defendants' Motion to Dismiss the Amended Complaint (Doc. 83; Motion to Strike), filed on September 19, 2018. Defendants responded to the Motion to Strike on October 3, 2018.[2] <u>See</u> Defendants' Memorandum in Opposition to Lead Plaintiffs' Motion to Strike Extraneous Materials and References Thereto in Defendants' Motion to Dismiss the Amended Complaint (Doc. 86; Defendants' Response). With the Court's permission, Plaintiffs filed a reply in support of their Motion to Strike on October 17, 2018. <u>See</u> Lead Plaintiffs' Reply in Support of Their Motion to Strike Extraneous Materials and References Thereto in Defendants' Motion to Dismiss the Amended Complaint (Doc. 89; Plaintiffs' Reply). Accordingly, this matter is ripe for the Court's consideration.

## I.  Motion to Strike

In the Motion to Strike, Plaintiffs move to strike the fifteen exhibits attached to the Motion to Dismiss. Plaintiffs also request that the Court strike the two additional exhibits attached to Defendants' Reply. <u>See</u> Plaintiffs' Reply at 1 n.2. Those seventeen exhibits can be divided into three categories: 1) filings with the United States Securities and Exchange Commission (SEC), 2) conference call transcripts, press releases, and analyst reports, and 3) a timeline and charts prepared by Defendants. <u>See</u> Motion to Strike at 4-5. Although acknowledging Eleventh Circuit precedent stating that courts in securities

---

[2] In addition, on September 20, 2018, Defendants filed a notice withdrawing Exhibit 3 to the Motion to Dismiss and substituting a "Corrected Exhibit 3." <u>See</u> Defendants' Notice of Filing Corrected Exhibit (Doc. 84). Any references in this Order to Exhibit 3 to the Motion to Dismiss are to this corrected exhibit.

fraud cases may take judicial notice of SEC filings, Plaintiffs assert that the Court should decline to do so here because Defendants attempt to use the documents for an improper purpose. See Motion to Strike at 5, 9. In addition, Plaintiffs assert that judicial notice of Exhibit 9, an SEC Order Granting Confidential Treatment, is improper because the document was not "required" to be filed with the SEC. See id. at 9. As to the remainder of the Exhibits, Plaintiffs contend that the principle of incorporation by reference does not apply here because Defendants use the documents in an improper manner to support an affirmative defense. Id. at 12-14. Additionally, Plaintiffs argue that Exhibits 3 and 4 (Defendants' charts) and Exhibit 9 (SEC Confidential Treatment Order) cannot be considered because they "are not even referenced in the Complaint." See id. at 13. Plaintiffs also maintain that Defendants make certain "inferences" in the Motion to Dismiss which are improper because they are "contrary to Plaintiffs' allegations" and should be stricken. Id. at 15-16. Finally, Plaintiffs assert that if the Court considers these documents and inferences, the Court should convert the Motion to Dismiss to a motion for summary judgment and allow Plaintiffs to take discovery. Id. at 17-19.

Upon review, Plaintiffs' request to strike Defendants' Exhibits is due to be denied. This is a securities fraud class action in which Plaintiffs allege in Count I that Defendant Rayonier Advanced Materials, Inc. (RYAM), and three of its principal officers, made false or misleading statements to the public in violation of § 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Additionally, in Count II of the Amended Complaint, Plaintiffs allege that Defendants Paul G. Boynton, Frank A. Ruperto, and Benson K. Woo (the Individual Defendants) are subject to "control person" liability for RYAM's violations under § 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a).  Defendants move to dismiss both claims pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)).  The Eleventh Circuit Court of Appeals addressed the "proper scope of materials that a district court may consider in ruling on a motion to dismiss in a securities fraud case" in Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1275 (11th Cir. 1999).  The Bryant Court held that "a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." See Bryant, 187 F.3d at 1278.  Here, Plaintiffs do not dispute that Exhibits 1, 10, and 12 are reports required to be filed, and actually filed, with the SEC.  See Motion to Dismiss, Exs. 1, 10, and 12; Motion to Strike at 9.  Plaintiffs do not challenge the authenticity of these Exhibits, and indeed, appear to concede that the Court may properly consider these documents for the limited purpose identified in Bryant.  See Motion to Strike at 9.  Thus, in accordance with Bryant, the Court will consider Exhibits 1, 10, and 12 solely to determine what statements the documents contain, and not for the truth of the statements contained in those documents.  Bryant, 187 F.3d at 1280; see also FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1297 n.15 (11th Cir. 2011) ("[I]n securities fraud actions, a court may take judicial notice of the content of documents filed with the SEC."); Garfield v. NDC Health Corp., 466 F.3d 1255, 1260 n.2 (11th Cir. 2006).  Because the Court will only consider these documents for their proper purpose as set forth in Bryant, the Court finds it unnecessary to strike the documents, regardless of whether Defendants rely on them to raise any improper arguments.

Turning next to Exhibit 9, this document is an Order Granting Confidential Treatment Under the Securities Exchange Act of 1934 (Confidential Treatment Order) issued by the SEC.  See Motion to Dismiss, Ex. 9.  Plaintiffs contend that this document does not fall within the judicial notice rules of Bryant because it was not "required to be filed with the SEC," and is not otherwise incorporated by reference into the Amended Complaint because it is never referenced in the Amended Complaint.  See Motion to Strike at 9, 13. However, Plaintiffs fail to recognize that the Confidential Treatment Order is a public record and thus, "among the permissible facts that a district court may consider."  See Universal Express, Inc. v. U.S. S.E.C., 177 F. App'x 52, 53-54 (11th Cir. 2006).  The fact of the Confidential Treatment Order's existence is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  See Rule 201(b).  Indeed, Plaintiffs do not challenge the authenticity of the document attached to the Motion to Dismiss or otherwise dispute that the SEC issued the Confidential Treatment Order.  Accordingly, the Court may take judicial notice of the SEC's Confidential Treatment Order without converting the Motion to Dismiss into a motion for summary judgment.  See Rule 201(b); Universal Exp., Inc., 177 F. App'x at 53-54; Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010); Fulton Fin. Advisors, Nat'l Ass'n v. NatCity Invs., Inc., Civil Action No. 09-4855, 2013 WL 5635977, at *11 n. 12 (E.D. Pa. Oct. 15, 2013) (taking judicial notice of an SEC Order as a matter of public record).

As to the press releases, conference call transcripts and analyst reports (Exhibits 2, 5-8, 11, and 13-15) that are attached to the Motion to Dismiss, the Court finds that these documents are also properly considered at this stage of the proceedings.  In Harris v. Ivax Corp., 182 F.3d 799 (11th Cir. 1999), the Eleventh Circuit found it appropriate to consider

the contents of a press release in the context of a motion to dismiss a securities fraud claim. See Harris, 182 F.3d at 802 n.2. The Harris Court explained that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute." Id. Indeed, the PSLRA "contains a provision that directs the district court to consider not only 'any statement cited in the complaint' but also 'any cautionary statement accompanying the forward-looking statement, which are [sic] not subject to material dispute, cited by the defendant.'" Id. (quoting PSLRA § 102(b), codified in 15 U.S.C. § 78u-5(e)). Significantly, Plaintiffs do not contest the authenticity of any of these documents. Indeed, while Plaintiffs argue that the Confidential Treatment Order and Defendants' charts are not central to the Amended Complaint's allegations as they are "not even referenced in the [Amended] Complaint," see Motion to Strike at 12-13, Plaintiffs do not specifically address the remainder of the Exhibits. Upon review, the Court finds that the press releases, conference call transcripts, and analyst reports attached to the Motion to Dismiss are referenced and cited throughout the Amended Complaint and form the basis of Plaintiffs' claims, both as the documents which contain the purportedly misleading statements, and as documents which evidence the materiality of those purported misrepresentations. Accordingly, the Court may appropriately consider these documents in its analysis of the Motion to Dismiss as set forth in Harris. Once again, Plaintiffs contend that these documents should be stricken only because Plaintiffs disagree with the way Defendants use the documents in their Motion to Dismiss. Whether Defendants' arguments are legally viable and properly supported under the standards applicable at this stage of the proceedings goes to the merits of the arguments and does not warrant striking the Exhibits.

Next, the Court considers whether it appropriately may consider the timeline and charts which Defendants submit as attachments to their Motion to Dismiss and Reply. See Motion to Dismiss, Exs. 3-4; Defendants' Reply, Exs. A-B. According to Defendants, Exhibit 3 "is a summary of relevant disclosures during the Class Period compiled from analysts reports cited in the Amended Complaint," and Exhibit 4 is "a compilation of disclosures and risk warnings made by Defendants during the Class Period from documents that were also cited in the Amended Complaint." See Defendants' Response at 11.[3] With regard to the compilation of risk warnings in Exhibit 4, as noted above, the PSLRA requires the undersigned to "consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." See 15 U.S.C. § 78u-5(e). In addition, the Federal Rules of Evidence allow the use of "a summary [or] chart . . . to prove the content of voluminous writing . . . that cannot be conveniently examined in court." See Federal Rule of Evidence 1006. This Rule requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Id. Although Defendants did not file in the record all of the documents quoted in the chart, these are documents available in the public record and cited by Plaintiffs in the Amended Complaint. As such, Plaintiffs plainly have access to the documents cited and could have readily challenged any inaccurate statement. Notably, Plaintiffs do not dispute the substance of the risk warnings summarized in Exhibit 4. Accordingly, the Court finds Defendants' use of the summary chart as a means of

---

[3] The Court finds it unnecessary to consider the chart summarizing disclosures in the analyst reports in its analysis below, and as such, need not address Plaintiffs' challenge to Exhibit 3.

establishing the cautionary statements contained in the voluminous documents to which Plaintiffs cite in the Amended Complaint to be both helpful and permissible.

In addition, Plaintiffs move to strike Exhibit A to the Reply, which is a "timeline of key events and allegations from the Amended Complaint," <u>see</u> Reply at 2 n.2, and Exhibit B, which is a "chart listing the challenged statements in context and the reason(s) each statement is non-actionable," <u>id.</u> at 3 n.5. The Court does not find good cause for striking these Exhibits. The charts are not evidence in this case, but rather demonstrative exhibits intended as an aid to the Court. Notably, Plaintiffs point to no factual aspect of these charts that they contend is inaccurate. Thus, to the extent such charts are helpful in organizing the information before the Court, the Court may rely on them. However, the Court will not consider any portions of the charts that present new evidence, not otherwise in the record, or raise new arguments which were not presented in the briefs.

Last, Plaintiffs argue that the Court should strike Defendants' "improper inferences" as they are "contrary to Plaintiffs' allegations and improper on a motion to dismiss." <u>See</u> Motion to Strike at 15-17. Upon review, the Court finds this portion of the Motion to Strike merely constitutes further argument in opposition to the pending Motion to Dismiss. To the extent Plaintiffs believe that Defendants' arguments are unavailing at this stage of the proceedings the appropriate course of action is to respond to those arguments, not move to strike them. As Plaintiffs had an adequate opportunity to respond to the arguments and "inferences" raised in the Motion to Dismiss, and could have sought leave to file a sur-reply had they believed it warranted, the Court will reject the request to strike Defendants' "inferences" as an improper attempt to circumvent the restrictions of the Local Rules on

the method and manner of responding to the Motion to Dismiss.  Accordingly, Plaintiffs'
Motion to Strike is due to be denied in its entirety.

## II.    Factual Allegations

Plaintiffs are persons or entities that purchased or acquired the common stock of
RYAM between June 30, 2014, and August 18, 2015 (the Class Period).  <u>See</u> Amended
Complaint ¶ 1.  RYAM was formed in June 2014 when Rayonier, Inc. spun off the
"Performance Fibers" portion of its business.  <u>Id.</u> ¶ 3 n.2.  Rayonier, Inc. continues to
operate as a timber and real estate company, and RYAM continues the Performance
Fibers business—manufacturing products from cellulose, an organic compound found in
plants.  <u>Id.</u> ¶ 2 & nn.1-2.  Defendant Paul G. Boynton is Chairman, President, and Chief
Executive Officer (CEO) of RYAM.  <u>Id.</u> ¶ 17.  Defendant Benson K. Woo was a Senior Vice
President and the Chief Financial Officer (CFO) of RYAM until his resignation on November
30, 2014, and Defendant Frank A. Ruperto is the current CFO and Senior Vice President
Finance and Strategy.  <u>Id.</u> ¶¶ 18-19.  Prior to November 28, 2014, Ruperto served as the
Senior Vice President Human Resources, Corporate Development and Strategic Planning
of RYAM.  <u>Id.</u> ¶ 19.

Generally, RYAM produces two types of cellulose products: 1) fungible commodity
cellulose (Commodities), and 2) the more lucrative specialized cellulose products tailored
to a manufacturers' specific needs (Specialties).  <u>Id.</u> ¶ 2.  "Prior to and after its spin-off from
Rayonier, Inc., the vast majority of RYAM's business was Specialties."  <u>Id.</u> ¶ 3.  RYAM
described itself as the global leader in producing Specialties, stemming from its 80-plus
years in the business, and "its development of proprietary methods for creating a superior
product."  <u>Id.</u>  In addition, "significant barriers to entry in the Specialties market enabled

RYAM to obtain its status as the dominant player and to command a price premium." Id. Significantly, RYAM relies on "long-term relationships with a handful of key customers to provide the vast majority of its stable, profitable business." Id. ¶ 4. For example, in 2013, prior to the spin-off, sixty-seven percent of RYAM's net sales were to its four top customers—Eastman Chemical Company (Eastman), Nantong Cellulose Fibers Co., Ltd (Nantong), Celanese Acetate, LLC (Celanese), and Daicel Corporation (Daicel). Id. Of particular importance to this action, Eastman, RYAM's top customer, accounted for 21% of RYAM's net sales in 2013. Id. ¶ 5. RYAM and Eastman have done business together for over eighty years. Id. Typically, RYAM and its top customers enter three to five-year volume contracts, with annual negotiations for price. Id. ¶ 35. Generally, pricing negotiations for the upcoming year take place in the fourth quarter of the preceding year. Id. Thus, by January of each year, RYAM has a clear picture of its Specialties volumes and prices for the year. Id.

In May 2011, RYAM decided to phase-out all of its Commodities sales and transition to a Specialties-only business. Id. ¶ 37. To do so, RYAM converted the Commodities manufacturing line in RYAM's Jesup, Georgia facility to a Specialties manufacturing line. Id. ¶ 38. This expansion project, called the "cellulose specialties expansion" (CSE), added "190,000 metric tons of annual Specialties capacity, raising RYAM's total annual Specialties capacity by 39% from 485,000 to 675,000 metric tons." Id. Significantly, Eastman, RYAM's top customer, was a major driving force behind the CSE, and on June 15, 2011, RYAM and Eastman entered into a new contract which "set forth the parties' expectations for the CSE and established the associated volume and pricing structure." Id. ¶ 39, Ex. C at Ex. 1 (Eastman Agreement). In essence, the Eastman Agreement embodied

Eastman's promise to purchase a substantial portion of the additional volumes generated by the CSE, and thus, "make the CSE worth RYAM's investment." Id. RYAM completed the CSE in July 2013, at a substantial cost of $385 million. Id. ¶ 41.

Unfortunately for the parties to this action, the lofty goals of the CSE would not be realized. In 2013, two major market forces began negatively impacting demand and pricing for Specialties. Id. ¶ 42. First, global demand for Specialties end-products, such as cigarettes, began decreasing. Decreasing demand led Specialties customers to "destock," i.e., to use the Specialties they already had in stock, rather than purchase more, which created "a global excess of Specialties supply." Id. Second, some of RYAM's competitors had increased their capacity to produce Specialties, and due to lower production costs, were able to do so at a lower price. Id. These "headwinds"—namely competitors' increased capacity at lower cost and decreasing demand—caused "market level decreases in Specialties prices going into 2014." Id. According to Plaintiffs, although Defendants disclosed these market headwinds, Defendants nonetheless mislead investors by concealing the depth of the impact those headwinds were having on RYAM. Id. ¶ 43.

Specifically, Plaintiffs allege that these market headwinds negatively impacted RYAM's relationships with two key customers. First, in 2013, RYAM's contract with its number three customer, Celanese, expired. Id. ¶ 44. RYAM disclosed the expiration of this contract to the market. See Motion to Dismiss, Ex. 1 (Information Statement) at 64. However, according to Plaintiffs, Celanese declined to enter into a new agreement with RYAM because it had received a better deal with one of RYAM's competitors. See Amended Complaint ¶ 44. "Although Defendants disclosed to the market that a customer was backing off a commitment for approximately 50,000 metric tons of Specialties in 2014,

Defendants did not explicitly state that the customer was Celanese or otherwise disclose that all sales to Celanese would cease as of 2014." Id. ¶ 44 n.10. Indeed, in a market analyst report dated June 23, 2014, the analyst recited RYAM's disclosure that the Celanese contract had expired, but stated that "We understand Celanese is still a top-10 customer." See Amended Complaint ¶ 44 n.10; Motion to Dismiss, Ex. 2 at 27. According to Plaintiffs, the market learned that RYAM had lost all of Celanese's 2014 business when RYAM filed its Form 10-K with the SEC on February 27, 2015. See Amended Complaint ¶ 44 n.10; Motion to Dismiss, Ex. 15 at 4.[4]

Most significantly, Plaintiffs allege that the relationship between RYAM and its number one customer, Eastman, was deteriorating. According to Plaintiffs, in 2013, Eastman "'received multiple offers for competing products with essentially the same specifications and performance characteristics a[s] [RYAM]'s Chemical Cellulose from [RYAM]'s competitors.'" See Amended Complaint ¶ 45 (quoting id., Ex. C). Plaintiffs assert that Eastman informed RYAM of these competing prices and requested that RYAM "'respond to declines in market pricing.'" Id. (quoting id., Ex. C). Eastman made these demands pursuant to a "Meet or Release Provision" in the Eastman Agreement. Id. In Eastman's view, this provision allowed it to demand that RYAM meet the lower Specialties price offered by a competitor, or release Eastman from its purchasing obligations. Id., Ex C. Although Eastman began making these demands in 2013, the Amended Complaint

---

[4] However, Plaintiffs' allegations show that at some point in 2014 the market did understand that RYAM had lost the Celanese contract. Plaintiffs include the following quote from a July 31, 2014 analyst report: "To put this in perspective, a year ago Rayonier was hoping for a 90K tonne increase in 2014, it lowered that to up 25-40K [sic] tonnes in October (as it appeared to lose 25K tonnes of Celanese's business) and then went to a guide of 30K incremental tonnes earlier this year before the latest call for flat." See Amended Complaint ¶ 117 (emphasis added). In addition, Plaintiffs allege that on October 30, 2014, a market analyst issued a report which stated in part: "RYAM already lost its Celanese contract (likely to [Brazilian competitor Sateri] at the end of 2013 . . . ." See id. ¶ 131 (alteration in original).

reflects that Eastman continued to honor the Eastman Agreement for Specialties sales in 2013, 2014 and 2015.  See Amended Complaint ¶ 75 (alleging that Eastman accounted for 31% and 28% of RYAM's net sales in 2014 and 2015, respectively).  However, on August 4, 2015, faced with a breakdown in negotiations over 2016 prices, Eastman filed a lawsuit against RYAM seeking a declaratory judgment that the Meet or Release Provision allowed it to purchase the contracted-for volumes of Specialties from lower-priced competitors.  See Amended Complaint, Ex. C: Eastman Complaint.  Alternatively, if its interpretation of the Meet or Release Provision was incorrect, Eastman requested a declaration that there was no meeting of the minds at the time of contract formation such that the contract was void and unenforceable.  Id. ¶ 66, Ex. C.  RYAM filed a competing declaratory judgment action on August 13, 2015, and on August 18 and 19, 2015, filed two Forms 8-K with the SEC disclosing the lawsuits.  Id. ¶¶ 66-67.  According to Plaintiffs, these Forms 8-K were the first the market learned of the problems in the relationship between Eastman and RYAM, and the existence of the Meet or Release Provision.  Id. ¶ 67.  In response to the news of the lawsuit, RYAM's stock price plummeted and investors suffered millions of dollars of losses.  Id. ¶ 69.  As alleged in the Amended Complaint, the disclosure of the lawsuit on August 18, 2015, marks the end of the Class Period.[5]  With this background, Plaintiffs allege that Defendants made the following misleading statements during and just prior to the Class Period.

## A. Information Statement

The first purported material misrepresentations and omissions are alleged to have occurred in the June 18, 2014 Information Statement, signed by Boynton and filed with the

---

[5] A few months later, Eastman and RYAM settled their legal dispute, entering a new contract that expires on December 31, 2019.  See Amended Complaint ¶ 170.

SEC, just prior to RYAM's spin-off from Rayonier, Inc.  See Amended Complaint ¶¶ 99-105; Motion to Dismiss, Ex. 1 (Information Statement).  Generally, Plaintiffs contend that the Information Statement was misleading because it projected an increase in sales, boasted of RYAM's premium prices, competitive advantage, and long-term customer relationships, touted RYAM's ability to capitalize on the CSE, and down-played the impact of competitors' expansions in Specialties capacity.  Specifically, Plaintiffs cite to the following statements:[6]

- "As Cellulose specialties demand grows over the next several years, **[RYAM] expects to increase its sales of cellulose specialties and complete its transition to a dedicated cellulose specialties supplier.**"  See Information Statement at 58 (emphasis added); Amended Complaint ¶ 100.

- "[RYAM] expects the global demand for cellulose specialties to grow approximately 45,000 to 50,000 metric tons a year as customers' product needs continue to expand.  As demand for cellulose specialties grows, [RYAM] expects to increase sales of cellulose specialties and complete the transition to become a dedicated cellulose specialties supplier by 2017/2018.  As production of cellulose specialties increases, **[RYAM] anticipates an increase in total sales and operating income, assuming 2013 price levels, as higher prices received on the additional cellulose specialties volume more than offset expected cost increases and the net reduction in overall production capacity.**"  See Information Statement at 67-68 (emphasis added); Amended Complaint ¶ 100.

- "[RYAM] just completed 2014 price negotiations with its customers.  Because of the market conditions noted above,[7] [RYAM] expects 2014 cellulose specialties prices to decrease 7% to 8% in 2014.  Additionally, [RYAM] expects 2014 sales volumes of cellulose specialties of approximately 520,000 to 540,000 metric tons, which considers the reduced production of 35,000 to 40,000 metric tons discussed below.  **Overall this is an increase of approximately 30,000 to**

---

[6] The text in bold reflects Plaintiffs' use of bold text in the Amended Complaint.

[7] The market conditions to which this statement refers were described just prior to the quoted language as follows:

> However, in early 2013, certain end markets (particularly in Europe) such as tire cord and construction ethers weakened, and competitors began trying to place volumes into stronger end markets such as acetate tow.  Additionally, commodity viscose prices remain low, which provides incentive for swing producers to attempt to increase volumes into cellulose specialties.  Finally, additional cellulose specialties capacity is affecting the market.

See Information Statement at 68.

**50,000 metric tons above 2013.**" <u>See</u> Information Statement at 68 (emphasis added); Amended Complaint ¶ 100.

- "[RYAM] benefits from long-standing relationships with blue-chip, industry-leading companies in each of its key product lines, as well as from low customer turnover . . . . [RYAM's] five largest customers, who account for approximately 70% of sales, are all either well known global diversified specialty chemical companies or state owned enterprises. [RYAM] has long-term volume contracts with most of the world's cellulose specialties-based product manufacturers, representing a significant majority of [RYAM's] cellulose specialties production." <u>See</u> Information Statement at 11; Amended Complaint ¶ 101.

- "The quality and consistency of [RYAM's] cellulose specialties and its premier research and development capabilities create a significant competitive advantage, resulting in a premium price (a price greater than competitors) for [RYAM's] products and driving strong profitability." <u>See</u> Information Statement at 10; Amended Complaint ¶ 102.

- "Global production capacity for cellulose specialties has recently increased. In addition to [RYAM's] cellulose specialties expansion project which added approximately 190,000 metric tons of cellulose specialties capacity, a few competitors have announced capacity expansions. . . . These additional cellulose specialties capacities did not adversely affect [RYAM's] 2013 results." <u>See</u> Information Statement at 62; Amended Complaint ¶ 103.

Significantly, the Information Statement also warned of the following risk factors:

- "The industry in which [RYAM] operates is highly competitive. . . . [T]he entry of new competitors and the expansion of existing competitors could create excess capacity, which might cause [RYAM] to lose sales or result in price reductions. . . . [A] few competitors have announced expansions of their capacity. . . . As a result of the increased cellulose specialties capacity described above, [RYAM] expects 2014 specialties prices to decrease 7 percent to 8 percent. Although [RYAM] plans to gradually increase cellulose specialties production in line with demand, additional increases in cellulose specialties capacity could continue to adversely affect product pricing, which could result in a potential decline in [RYAM's] revenues and margins, thereby adversely affecting [RYAM's] financial condition and results of operations." <u>See</u> Information Statement at 19.

- "[RYAM] is dependent on a relatively few large customers for a majority of its sales. The loss of all or a substantial portion of its sales to any of these large customers could have a material adverse effect on [RYAM]. . . . Although [RYAM] strives to broaden and diversify its customer base, a significant portion of its revenue is derived from a relatively small number of large-volume customers, and the loss of all or a substantial portion of sales to any of these customers, or significant unfavorable changes to pricing or terms contained in [RYAM's]

contracts with them, could adversely affect [RYAM's] business, financial condition or results of operations." Id.

Plaintiffs allege that the factual portions of these representations are misleading because: (1) growth of Specialties sales was actually slowing due to the increases in manufacturing capacity and supply, (2) RYAM's competitive advantage and ability to charge premium prices was eroding due to the emergence of competitors with comparable products, (3) as a result, RYAM was facing pressure to lower prices, and (4) these factors prevented RYAM from being able to capitalize on its additional Specialties capacity such that the CSE was a commercial failure. See Amended Complaint ¶ 104. In addition, Plaintiffs maintain that the statements are misleading because RYAM did not disclose that its long-term volume contracts allowed customers to purchase from competitors offering lower prices, and that RYAM "was engaged in an ongoing contractual dispute" with Eastman over Specialties pricing. Id. For the same reasons, Plaintiffs allege that the opinions expressed are misleading because the projections for growth had no reasonable basis in light of the above factors. Id. ¶ 105.

## B. Second Quarter 2014 Financial Results

The next set of misrepresentations are alleged to have occurred when Defendants announced RYAM's financial results for the second quarter of 2014. RYAM issued a press release on July 30, 2014, announcing its financial results, at which time it revealed that it had been unable to sell the additional 30,000 tons of Specialties as projected in the Information Statement. Id. ¶ 108. The press release also revealed substantial declines in sales and earnings. Id. ¶¶ 108-09. The company held a conference call that same day in which Boynton, Ruperto and Woo participated. Id. ¶ 110. According to the Amended

Complaint, Boynton made the following misleading statements in the press release and during the conference call:

- "As the market remains in transition, we will continue to focus on operational excellence and build stronger partnerships with our customers. Going forward, as the market grows, our newly converted line positions us well to grow with future demand and diversify without additional investment." <u>See</u> Motion to Dismiss, Ex. 7 at 2; Amended Complaint ¶ 113.

- When asked about his "confidence level" and the "long-term placement of those [additional] volumes," Boynton answered: "Yes, I think it is still—we still <u>feel</u> very good about it. Again, we've said, and we've even said at the time, the near-term is going to be a little bit plus or minus here. But the midterm, the longer term, **we <u>feel</u> there's a great opportunity to place this volume out there**. And again, that guidance was based on 2013 margins essentially and obviously, those will change a bit over time. But we still <u>feel</u> very confident that the market is growing in that 2% to 3% range, that's up to 50,000 tons per year. There's an [sic] limited number of players to serve that market. And some point, and whether it's using our numbers or using folks who track the market like Hawkins Wright, **we <u>believe</u> that our capacity and others capacity will be absorbed into the marketplace. And we will achieve this—the [earnings] growth that we have put out there as part of our CSE expansion.**" <u>See</u> Motion to Dismiss, Ex. 6 at 14 (emphasis added); Amended Complaint ¶114.

- When asked about pricing, Boynton responded: "Yes, I think again, we used for math purposes the 2013 numbers that we had, because that's what's publicly available and that's what we have. We don't go up there and project pricing going forward and talk about that. And we've said that it could be plus or minus, it's just a matter of dialogues with our customers going forward. So, I can't give you any specifics on the pricing side of things going forward. All I can say is using the 2013 analysis that we provided, we <u>feel</u> good that the volume will get placed out there and will have an attractive term turn on that investment for our shareholders." <u>See</u> Motion to Dismiss, Ex. 6 at 15 (emphasis added); Amended Complaint ¶ 115.

- In addition, Woo reported that: "While Q2 2014 cellulose specialty sales volumes were consistent with first quarter of this year versus 2013 for the second quarter and year to date, 2014 volumes were unfavorably impacted by $7 million and $21 million respectively, due to the timing of customer shipments resulting from the Jesup plants' planned extended outage. As we have stated previously, we expect 2014 sales volumes to be back half-loaded." <u>See</u> Motion to Dismiss, Ex. 6 at 4; Amended Complaint ¶ 116.

Plaintiffs maintain that these statements were misleading for the same reasons set forth above regarding the Information Statement. <u>See</u> Amended Complaint ¶¶ 121-22. In addition, Plaintiffs allege that Defendants' Form 10-Q reporting the second quarter financial results, filed with the SEC on August 5, 2014, was misleading because it projected a gradual increase in Specialties production up to the full additional capacity of the CSE, and failed to "fully disclose" the "adverse impacts of increased supply and competitive pressures" on the Specialties business, namely, the ongoing dispute with Eastman. <u>Id.</u> ¶¶ 118-19.

The press release included warnings of declining earnings due to falling prices, as well as cautionary language regarding "forward-looking statements." <u>See</u> Motion to Dismiss, Ex. 7. The press release listed numerous risks, including competitive pressures in the markets and risks associated with customer concentration. <u>Id.</u>, Ex. 7 at 4. The press release also noted "the previously announced loss of volume from a 2013 customer." <u>Id.</u> During the conference call, Woo disclosed that 2014 prices were 7-8% below 2013 levels, and Boynton explained that RYAM likely would not be able to sell the projected 30,000 volume increase "at acceptable terms." <u>See</u> Motion to Dismiss, Ex. 6.

### C. KeyBanc Capital Markets Basic Materials & Packaging Conference

Next, Plaintiffs allege that "[o]n September 9, 2014, Boynton attended the KeyBanc Capital Markets Basic Materials & Packaging Conference on behalf of [RYAM]." <u>See</u> Amended Complaint ¶ 123. Plaintiffs allege that Boynton made the following misleading statements at this Conference:

- "What we have that is very unique in the market—there's two main processes used to purify a tree fiber. [Discussing the kraft and sulfite processes, and which competitors utilize them]. But we are the only company that has both kraft and sulfite. We're the only company that can use inputs from both hardwood and

softwood. And our ability to mix and match those combinations gives us the ability to make every product in this spectrum. . . . [Further expounding on their research & development efforts, technical support, and team of scientists . . . ] And it's a really nice, unique edge that we have. . . . And again, this part is really what we look at as what we have to protect quite a bit. We don't patent anything we do, we don't disclose anything we do, we lock up our people and our processes fairly securely. . . . It doesn't mean that the information is not out there somewhere, it doesn't mean other people can't do it, but we just have some very unique things that we can do. And again, it gives us an edge in the market." See Motion to Dismiss, Ex. 14 at 6; Amended Complaint ¶ 123.

- "The market is somewhat protected in a way that you really have to understand your customers. So, if you look at what are the barriers of entry here? Number one is customer intimacy. . . . [Explaining that you have to know the customer and what they're looking for,] then you got to know how to make it. . . . Everything we do is textbook available, but there's a lot of art to this science. . . . And with that, almost across the board, we have a nice premium for our product relative to the competition. It doesn't mean it's a premium that's always going to be there. It doesn't mean that it's a premium that is foolproof, but we have got a nice position in the marketplace." See Motion to Dismiss, Ex. 14 at 6; Amended Complaint ¶ 123.

According to Plaintiffs, these "statements of fact" were misleading because RYAM's competitive advantage and ability to charge premium prices was eroding due to emerging competitors, and RYAM was facing pressure from customers to lower prices. See Amended Complaint ¶ 124.

Notably, in addition to the foregoing statements, Boynton also commented on the recent emergence of a new competitor, Sateri, who they "understand less" about. See Motion to Dismiss, Ex. 14 at 5. Boynton commented that "they have managed to make what we understand is a pretty quality product and we believe mainly going into the acetate market. So, we are watching this carefully. What we don't know is what is the upper end of their capacity." Id., Ex. 14 at 5. Boynton also noted the existence of "market pressure out there," identifying "[n]ot only our own supply, some of the other supplies, some of the unknown from Sateri, that gives us a little bit of pause potentially in the near term of moving

this line [the CSE] forward in terms of filling it out, because we will be patient in the market with the pricing.  But we will feather this volume in when the market is right for it."  Id., Ex. 14 at 7.  Boynton also reminded investors that, as previously reported, RYAM lost a base customer who did not renew its contract for 2014, and as such RYAM lost a sizable amount, 50,000 tons, of volume.  Id., Ex. 14 at 10.  The transcript of Boynton's statements included warnings to investors about relying on forward-looking statements.  Id., Ex. 14 at 14-15.

### D.  Third Quarter Financial Results

On October 29, 2014, RYAM issued a press release announcing disappointing third quarter results and held a conference call that same day.  See Amended Complaint ¶¶ 125-26.  Boynton, Ruperto and Woo participated in the call.  Id. ¶ 126.  According to Plaintiffs, Boynton explained that "the poor results were caused by 'current challenges' in the market for Specialties products, 'most significantly, oversupply,' resulting from increased competition and manufacturing capacity."  Id.  Notably, Boynton explained that the company would be redirecting a "significant portion" of the expanded Specialties capacity into commodities.  Id. ¶ 127.  This news led to a decline in RYAM's stock price, but Plaintiffs maintain that Defendants were still misleading the market.  Id. ¶¶128-29. Specifically, Plaintiffs allege that Boynton made the following misleading statements:

- "We are also working to actively extend contracts with existing customers as those opportunities present themselves. . . . For example, as we recently reported in an 8-K Filing, we have extended a contract with a significant long-term customer [Nantong].  We are pleased to add another year onto an already multiyear contract [from the end of 2014 to the end of 2015]."  See Amended Complaint ¶ 129 (alterations in original).  When asked why the contract was extended for only one year, rather than three years, and whether there were any changes to volume, Boynton replied that it was "nothing out of the ordinary" and deferred the question on volume until the January 2015 sales call.  See id.

- Boynton also assured investors that discussions with customers as to Specialties pricing were positive, stating: "**Our discussions are good, they're**

**healthy, they're ongoing. I really have no more flavor to add to it at this point.**" Id. ¶ 130.

- "Boynton also stated that the business was 'steady-state' with respect to losing or gaining share of Specialties acetate business to competitors." Id. ¶ 130.

RYAM filed its Form 10-Q regarding the third quarter results on November 4, 2014. Id. ¶ 132. Although Plaintiffs do not identify any particular misleading statements in the document, Plaintiffs contend that the statements were misleading because they failed to "fully disclose" the "impact of oversupply and increased competition" on the Specialties business, namely, the ongoing dispute with Eastman. Id. Notably, this Form 10-Q disclosed that Specialties markets were over-supplied and end-market demand had slowed. See Motion to Dismiss, Ex. 12.

The October 29, 2014 press release disclosed a decline in revenues due to lower prices and included similar language to that in prior press releases regarding forward-looking statements and potential risks. Id., Ex. 4 at 9-10. During the conference call, Boynton cautioned investors that RYAM was not "insulate[d] from the realities of the current challenges in the market and most significantly, oversupply." Id., Ex. 4 at 10. Boynton attributed the oversupply to expansion in capacity, weak pricing in the commodities market causing competitors to shift to Specialties, and slower demand growth in end markets. Id. Notably, a RYAM vice-president specifically informed investors that RYAM would not comment on the specifics of any customer contract stating: "in order to maintain the confidentiality that our customers desire, as well as to safeguard competitively sensitive information, we will not provide any additional contract details." Id., Ex. 4 at 10-11.

## E. Fourth Quarter and Fiscal Year 2014 Financial Results

RYAM issued a press release on January 28, 2015, regarding its financial results for the fourth quarter of 2014 and the 2014 fiscal year. <u>See</u> Amended Complaint ¶ 135. The press release disclosed disappointing results for 2014 which Boynton attributed to an oversupply in the Specialties market and a decrease in global demand. <u>Id.</u> ¶¶ 135-36. In addition, the press release forecasted a poor outlook for 2015, partly attributable to industry oversupply, weaker end-market demand, and "aggressive pricing" from competitors. <u>Id.</u> ¶ 137. RYAM held a conference call the same day, in which Boynton and Ruperto participated. <u>Id.</u> Plaintiffs allege that the following statements were misleading for the same reasons previously stated:

- In response to a question about reductions in purchasing from RYAM's customers, Boynton stated: "'we feel confident in the [Specialties] volume being out there, and . . . we've actually increased our share of volume at each of our top 10 customers.'" Boynton refused to answer any follow-up questions on pricing about 2015, due to the "increasing competitiveness" of RYAM's peers. <u>See</u> Amended Complaint ¶ 141.

- According to Plaintiffs, Boynton gave vague answers to questions about the terms of the customer contracts, and as to pricing, "claimed that 'there's not a set pattern, formula, pricing floor, whatever, for anybody.'" He also stated that "'[w]e don't know where our competitors are priced at,'" and did not know whether RYAM would be able to maintain a value premium as to pricing. <u>Id.</u> ¶ 142

Notably, the press release disclosed that "market conditions remained challenging in the fourth quarter of 2014" and that throughout 2014 Specialties markets faced oversupply and decreased demand. Motion to Dismiss, Ex. 13. The press release reported an 8% decline in Specialties prices and cautioned investors that RYAM expects oversupply and weak demand to persist in 2015 with another 7-8% decline in prices. <u>Id.</u>, Ex. 13. The press release again cautioned readers about forward-looking statements and the risks facing RYAM. <u>Id.</u>, Ex. 13. In the conference call, Boynton reiterated the oversupply in the

Specialties market and its impact on prices.  Id., Ex. 4 at 12-13.  Boynton explained that

RYAM faced "continued pressure on pricing of our products and our ability to grow

[Specialties] volumes" including "aggressive pricing tactics" by competitors which

negatively impacted RYAM's 2015 prices.  Id., Ex. 4 at 13.  Boynton cautioned that "price-

based competition does have an effect on the market and our customers."  Id., Ex. 4 at 13-

14.

According to the Amended Complaint, on January 27, 2015, RYAM also filed a Form

10-K with the SEC reporting the financial results for the fiscal year 2014.  See Amended

Complaint ¶ 143.[8]  In this document, RYAM reported sales over the past few years to four

significant customers, specifically, Eastman, Nantong, Daicel and Celanese.  Id.  Notably,

this disclosure indicated that Celanese represented 0% of RYAM's sales in 2014.  Id.; see

also Motion to Dismiss, Ex. 10 at 67.  The Form 10-K also addressed RYAM's "unique

abilities in the manufacturing of Specialties, the hurdles faced by potential Specialties

competitors, and [RYAM's] 'significant competitive advantage, resulting in a premium price

for our core products.'"  See Amended Complaint ¶ 144.  Notably, the Form 10-K also

included a discussion of "Business and Operating Risks," including as follows:

- "[T]he entry of new competitors and the expansion of existing competitors could create excess capacity, which might cause us to lose sales or result in price reductions.  For example, over the past 24 months some manufacturers . . . have claimed to already commenced [sic] production of, high-purity cellulose specialties that may compete with our products. . . . As a result of the increased cellulose specialties capacity described above and reduced global demand, we expect 2015 cellulose specialties prices to decrease about 7 to 8 percent from 2014.  Additional increases in cellulose specialties capacity and weakness in global demand, as well as macroeconomic factors, could continue to adversely affect product pricing, which could result in a potential decline in our revenues

---

[8] The Form 10-K for fiscal year ending December 31, 2014, is dated February 27, 2015.  See Motion to Dismiss, Ex. 10.  It appears Plaintiffs' reference to a January 27, 2015 Form 10-K may be a typographical error as elsewhere in the Amended Complaint Plaintiffs indicate the Form 10-K was filed in February 2015. See Amended Complaint ¶ 44 n.10.

and margins, thereby adversely affecting our financial condition and results of operations." <u>See</u> Motion to Dismiss, Ex. 10 at 11.

The Form 10-K also disclosed the risks related to RYAM's reliance on a concentrated customer base, including the possibility that "loss of all or a substantial portion of sales to any of these customers, or significant, unfavorable changes to pricing or terms contained in contracts with them, could adversely affect our business, financial condition or results of operations." <u>Id.</u>, Ex. 10 at 13. Nonetheless, according to Plaintiffs, the statements in the Form 10-K were misleading for the same reasons set forth above with regard to the prior financial reports. <u>See</u> Amended Complaint ¶ 147.

### F. First Quarter 2015 Financial Results

On May 1, 2015, RYAM issued a press release announcing the financial results for the first quarter of 2015 and held a conference call in which Boynton and Ruperto participated. <u>See</u> Amended Complaint ¶¶ 148-49. Plaintiffs allege the following statements were misleading:

- From Ruperto, "'[i]t is important to note that most of our estimated full-year 2015 cellulose specialty sales volume is contracted. Therefore, while the timing of our cellulose specialty sales may be impacted by seasonable order patterns and inventory destocking, our full-year sales volume is largely known and expected to be comparable to 2014 and 2013 levels as previously guided.'" <u>See</u> Amended Complaint ¶ 149.

- Boynton "reiterated the long-term nature of [RYAM's] Specialties volume commitments." <u>Id.</u>

According to Plaintiffs, these statements were misleading because Defendants did not disclose that "much of this contracted volume was under threat due to [RYAM's] toxic dispute with Eastman [about] pricing and volume terms." <u>Id.</u> In addition, RYAM filed a Form 10-Q with the SEC that same day reporting its first quarter 2015 financial results. <u>Id.</u> ¶ 150. Plaintiffs do not allege that any particular statements in the Form 10-Q were

misleading, but maintain that this Form and Defendants' statements during the conference call were misleading for the same reasons set forth above regarding the prior financial reports.  Id. ¶ 152.

The press release disclosed lower Specialties prices and volumes, and included cautionary language regarding forward-looking statements and the risks in RYAM's industry.  Motion to Dismiss, Ex. 4 at 16.  In addition, during the conference call, Ruperto reported that Specialties prices were down, and were expected to be 7-8% below 2014 levels "reflecting the full impact of 2015 price negotiations."  Id., Ex. 4 at 15.

### G.  Second Quarter 2015 Financial Results

On July 30, 2015, RYAM announced that it would reconfigure its Jesup facility to reduce Specialties capacity and replace it with Commodities capacity, essentially, undoing the recently completed CSE.  See Amended Complaint ¶ 153.  RYAM explained that this "strategic repositioning" was needed due to the "'persistent imbalance of supply and demand in the [Specialties] market.'"  Id.  Plaintiffs allege this statement was misleading because RYAM did not mention the dispute with Eastman as a driving factor.  Id.  RYAM also issued a separate press release that day announcing its financial results for the second quarter of 2015, "including a net loss, lower sales, and lower operating income." Id. ¶ 154.  RYAM held a conference call that day in which Boynton and Ruperto participated.  Id. ¶ 155.  Plaintiffs allege that Boynton made the following misleading statements:

- Boynton explained that the reversal of the CSE was driven by "lower than previously anticipated" growth in the Specialties market, and a Specialties "supply/demand imbalance" that reduced pricing power "over the last two years." Id.

- According to Plaintiffs, Boynton and Ruperto assured analysts that "notwithstanding the strategic repositioning, [RYAM's] Specialties volumes were predominately contracted and that new pricing negotiations would take place 'in the third and fourth quarter, principally in the fourth quarter' . . . ." Id. ¶ 156.

Defendants did not mention the ongoing dispute with Eastman.  During this conference call, Boynton reiterated that the global supply and demand imbalance over the past two years had adversely impacted Specialties prices and RYAM's overall profitability.  See Motion to Dismiss, Ex. 4 at 18.  Boynton also expressed his belief that growth in the Specialties end-markets would be "lower than previously anticipated."  Id., Ex. 4 at 18.  According to Boynton, Defendants "did not perceive the subsequent increase in supply nor the slowdown in the broader [Specialties] end markets."  Id., Ex. 4 at 19-20.

Plaintiffs allege that the Form 10-Q, filed on August 6, 2015 and reporting the second quarter financial results, was also misleading, but do not identify any particular misleading statements.  See Amended Complaint ¶ 157.  This filing also included disclosures regarding the supply and demand imbalance and the resulting impact on prices.  See Motion to Dismiss, Ex. 4 at 20.  According to Plaintiffs, the second quarter 2015 financial reports were misleading for the same reasons stated above regarding the prior reports.  In addition, Plaintiffs fault Defendants for failing to disclose that the "ongoing contractual dispute" with Eastman had "deteriorated to the brink of litigation . . . ."  See Amended Complaint ¶ 159.  Indeed, on August 4, 2015, Eastman filed the lawsuit against RYAM regarding the Meet or Release Provision.  Id. ¶ 66.

### H.  Scienter

Plaintiffs allege that Defendants acted with knowledge, or at least severe recklessness, as to the materially false and misleading nature of their statements and omissions.  Id. ¶ 72.  In support, Plaintiffs allege that the statements of the Individual

Defendants evidence their knowledge of the Specialties business, in particular as to pricing trends, volumes, the CSE, and customer relationships. Id. ¶ 73. According to Plaintiffs, given that Specialties constituted a major component of RYAM's sales, the CEO, CFO and Senior Vice Presidents of the company would be intimately involved and knowledgeable on the negative trends and material challenges impacting this area of the business. Id. ¶ 74. Plaintiffs maintain that this would be particularly true as to RYAM's relationship with its top customers, who formed a substantial portion of RYAM's net sales, the most significant of which was Eastman. Id. ¶ 75. Indeed, Boynton "traveled on occasion to Tennessee to meet with representatives from Eastman," before, during and after the contract dispute. Id. ¶ 84.

Plaintiffs also rely on the timing of RYAM's contractual agreements as evidence that Defendants knew that Specialties volume would decrease, rather than increase in 2014 and 2015. Id. ¶ 79. Specifically, RYAM entered long-term contracts with its top customers concerning volume, and negotiated pricing for the upcoming year during the third or fourth quarter of the prior year. Id. According to Plaintiffs, this timeline demonstrates that "by December of each year, Defendants knew the exact volumes and prices RYAM would receive from top customers such as Eastman, Nantong, and Daicel (which collectively accounted for 64% of net sales in 2014 and 60% of net sales in 2015)." Id. ¶ 81.

In addition, Plaintiffs cite to the allegations in the Eastman Complaint as evidence that "Defendants were aware throughout the Class Period of Eastman's receipt of competing offers for comparable Specialties at lower prices, and Defendants were aware of Eastman's demands that RYAM meet those prices." Id. ¶ 83. Specifically, Plaintiffs point to Eastman's allegation that it had frequently met with RYAM "over the past decades"

to discuss the supply of goods and the Eastman Agreement. Id. According to the Eastman Complaint, Eastman had informed RYAM in 2013 of offers from competitors for comparable goods and lower prices, and asked RYAM to respond to the pricing declines. Id. In addition, Eastman had negotiated with RYAM about the Meet or Release Provision prior to the filing of the lawsuit. Id.

Finally, Plaintiffs allege that Defendants were "motivated to provide a positive perception of their newly spun-off company." Id. ¶ 86. Plaintiffs assert that Boynton made a "well-timed exit" from Rayonier, Inc. because in the months leading up to his move to RYAM, a "massive fraud" relating to overharvesting and inflated financials at Rayonier, Inc. was "beginning to unravel." Id. Thus, according to Plaintiffs, Boynton was able to leave Rayonier on "positive terms," and avoided any fall-out from the revelation of the fraud. Id. ¶ 87. As a result of his move to RYAM, Boynton received higher compensation and a substantial transfer bonus. Id. ¶ 88. Notably, Plaintiffs do not include any motive allegations as to Woo or Ruperto, nor do Plaintiffs include any allegations of suspicious stock transfers by any of the Individual Defendants.[9]

## III.    Summary of the Arguments

In the Motion to Dismiss, Defendants argue that Plaintiffs' claims are premised on two categories of misrepresentations: a failure to disclose the Eastman dispute, and understatement of the competitive pressures in the market. See Motion to Dismiss at 1. Defendants contend, however, that they had "no duty to provide updates on the status of ongoing discussions relating to the Eastman Agreement, characterize the negotiations in

---

[9] Plaintiffs include a brief conclusory allegation that Woo resigned from RYAM "under highly suspicious circumstances" in December of 2014, but lacking in any additional detail, this vague allegation has no persuasive value, and is due to be disregarded. Id. ¶ 88 n.22.

a negative light, or attempt to predict the outcome of those negotiations." Id. at 9. According to Defendants, "[u]nless and until Eastman terminated its agreement with [RYAM], there was no requirement to give investors a real-time, 'blow-by-blow' description of even tense negotiations." Id. at 10-11. To the extent Plaintiffs contend that Defendants had a duty to disclose the Eastman dispute based on Item 303 of Regulation S-K,[10] Defendants contend that this provision does not create a duty to disclose for purposes of section 10(b) and Rule 10b-5 and regardless, "[g]iven the speculative nature of the outcome of the Eastman negotiations, any 'uncertainty' was not 'reasonably likely.'" Id. at 11-12. Defendants also maintain that they had no duty to disclose the Meet or Release Provision, and note that the SEC approved its request to redact that provision from the publicly-filed Eastman Agreement. Id. at 12-13.

Next, Defendants argue that any claims premised on "competitive pressures" misrepresentations are barred by the statute of limitations as Plaintiffs failed to file a lawsuit within two years of learning the facts supporting those claims. Id. at 13-14 (citing 28 U.S.C. § 1658(b)). Alternatively, Defendants contend that the challenged statements are forward-looking statements, accompanied by meaningful cautionary language, and as such, are protected by the PSLRA's safe-harbor provision. Id. at 15-19. Defendants contend that even if such statements were not accompanied by meaningful cautionary language, Plaintiffs fail to plead facts giving rise to a strong inference that Defendants had "actual knowledge" that their predictions were false. Id. at 20. Defendants also contend that many of the challenged statements set forth in the Amended Complaint are merely statements

---

[10] Pursuant to Item 303, a registrant must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." See 17 C.F.R. § 229.303(a)(3)(ii).

of opinion.  Id.  According to Defendants, these opinion statements are not actionable because Plaintiffs fail to identify any omitted facts which made the opinion statements misleading when read fairly and in context.  Id. at 20-22.  Defendants maintain that RYAM did disclose competitive pressures in the Specialties market, and a mere failure to disclose some facts that cut against their optimistic outlook does not render the opinion statements actionable.  Id. at 22.  Defendants also contend that several of the statements described in the Amended Complaint are immaterial puffery, and thus insufficient as a matter of law to support a section 10(b) claim.  Id. at 22-23.  In addition, to the extent Plaintiffs argue that Defendants' statements were misleading based on a failure to disclose the competitive pressures in the marketplace and the loss of Celanese as a customer, Defendants argue that they repeatedly disclosed the very information Plaintiffs allege they omitted.  Id. at 23-25.

Last, Defendants contend that Plaintiffs' claims should be dismissed for failure to adequately allege facts giving rise to a strong inference that Defendants acted with scienter.  Id. at 25.  Defendants argue that Plaintiffs' reliance on Defendants' high level positions and knowledge of RYAM's Specialties business as a "core operation" of the business are insufficient because Plaintiffs fail to identify any specific information known within the company that undermined Defendants' sales projections.  Id. at 26-27.  Specifically, Defendants assert that Plaintiffs fail to include any factual allegations indicating that Defendants knew they would not meet their sales projections or be able to capitalize on the CSE.  Id. at 27.  In addition, Defendants maintain that Plaintiffs' reliance on the existence of Defendants' long-term volume contracts and the timing of its price negotiations does not demonstrate that Defendants must have known that they would be

unable to sell the increased volumes projected. Defendants assert that while they had contractual commitments from 64% of their customers, they never claimed to have such commitments from the customers that made up the other 36% of their sales. Thus, Defendants maintain that the more plausible inference is that Defendants were optimistic about expanding their sales to new customers and increasing overall Specialties sales. Defendants further contend that Defendants' knowledge of the ongoing negotiations with Eastman does not suggest scienter because given the fluid and speculative nature of contract negotiations, Defendants had no duty to disclose this information and no reason to believe Eastman would terminate the contract or file a lawsuit. Id. at 28-29. Defendants argue that the lawsuit does not show that Defendants had any reason to believe that the outcome of the 2014-15 negotiations with Eastman would impact their projections as it involved only 2016 prices. Id. at 29. As to Defendants' purported motive to commit fraud, Defendants contend that Boynton's "well-timed" exit from Rayonier and lucrative compensation package at RYAM does not give rise to an inference of scienter.

In their Response, Plaintiffs contend that Defendants' statements regarding RYAM's unique products of superior quality, significant competitive advantage, and the willingness of its long-term customers to pay premium prices for those superior products were misleading because Defendants failed to disclose the loss of Celanese as a customer and the demands it had received from Eastman. Likewise, Plaintiffs argue that Defendants' statements promoting the CSE and projecting increased sales of Specialties and its plan to become a Specialties-only supplier were misleading because "Celanese would not purchase a single ton of Specialties in 2014, and Eastman had found comparable Specialties and was objecting to the 'premium' prices required by RYAM for the CSE

volumes." Plaintiffs' Response at 10. In addition, Plaintiffs maintain that even after RYAM announced the failure of the CSE and "strategic repositioning," it continued to mislead investors because it did not mention the dispute with Eastman, instead relying on generalized explanations of changes in the market. Id. at 10-11.

In response to Defendants' assertion that they had no duty to disclose the Eastman negotiations, Plaintiffs' contention appears to be that Defendants were obligated to disclose the status of RYAM's relationship with Eastman in order to render the previously identified statements regarding RYAM's "operational condition, pricing premiums, market position, and key customer relationships" not misleading. See id. at 11-12. Because Defendants "continued to hype" their price premiums and ability to place the CSE volumes, Plaintiffs maintain that Defendants had a duty to disclose all material information related to those topics—including their loss of market dominance, bargaining power, and price premiums, as evidenced by the loss of Celanese and the dispute with Eastman. Plaintiffs also contend that Defendants' misleading statements were not mere puffery because RYAM's "chasm with Eastman, loss of a superior product, eroding pricing premiums, and waning market dominance" were material omissions and important to investors as reflected in the massive decline in RYAM's stock price the day the market learned of the Eastman lawsuit. Id. at 13-15. For the same reason, Plaintiffs argue that Defendants' statements of opinion are actionable because Defendants knew, but did not disclose, material facts going to the basis for their opinions that rendered the opinions misleading. Id. at 15.

Next, Plaintiffs contend that Defendants are not entitled to safe-harbor protection. Id. at 15-18. According to Plaintiffs, Defendants' omissions "cannot be forward-looking and, therefore, do not qualify for safe harbor protection." Id. Plaintiffs' argument appears

to be that Defendants' statements were false or misleading because Defendants failed to disclose material past or present problems, i.e., events that had already occurred.  Id. Plaintiffs also maintain that Defendants made misstatements of "historical or current facts." Id.  Moreover, Plaintiffs contend that to the extent Defendants made "forward-looking statements," Defendants failed to include meaningful cautionary language.  Id. at 16-17. According to Plaintiffs, Defendants provided only "generalized warnings" which were not meaningful because the purportedly potential risks had already materialized.  Id. at 17. Thus, Plaintiffs argue that warning investors that RYAM "could" lose one of its top customers was deficient given that Defendants knew, but did not disclose, that it had lost Celanese and was facing demands for price concessions from Eastman.  Id.

To the extent Defendants argue that they adequately disclosed the competitive pressures facing RYAM, Plaintiffs characterize this as a "truth-on-the-market" affirmative defense inappropriate for resolution at this stage of the proceedings.  Id. at 18.  Regardless, Plaintiffs maintain that Defendants' purported "disclosures" failed to reveal the "full truth," which Plaintiffs describe as the loss of RYAM's "superiority and price premiums" in the Specialties market and the lack of any "prospects for selling the CSE volumes or converting to a Specialties-only business."  Id. at 19.  Plaintiffs dispute Defendants' contention that Defendants disclosed the loss of Celanese as a customer in the Information Statement. Id. at 20.  In Plaintiffs' view, Defendants disclosure of the December 31, 2013 expiration of the Celanese contract was insufficient because it did not identify Celanese as a "former" customer, or "indicate that Celanese had ceased all future purchases from (or contractual negotiations with) RYAM as of January 1, 2014."  Id.

As to scienter, Plaintiffs maintain that the Amended Complaint sufficiently alleges particularized facts giving rise to a strong inference that Defendants acted with the requisite intent. Id. at 21. In support, Plaintiffs cite Boynton, Ruperto, and Woo's public discussion of the Specialties business, "including trends in pricing, expected volumes, the status of the CSE, and customer relationships," which, according to Plaintiffs, demonstrate their knowledge of the "material facts" affecting RYAM's business. Id. at 22. In addition, Plaintiffs rely on allegations in the Eastman Complaint that the parties frequently met to discuss the Eastman Agreement and that Eastman first informed RYAM about competitors with comparable goods at lower prices in 2013. Id. Plaintiffs point to statements from Boynton that he participated in meetings related to the Eastman litigation. Plaintiffs assert that this demonstrates Defendants' knowledge of "all aspects of the Eastman dispute" throughout the Class Period. Id. at 22-23. Plaintiffs also contend that the long-term volume contracts and timing of pricing negotiations indicate that Defendants knew in 2014 and 2015 that "increased volumes were not forthcoming and that the CSE was failing." Id. at 23. Additionally, Plaintiffs assert that Defendants knew of the "material contracts, volumes, and sales prices" surrounding its top customers given the significant role those customer relationships played in RYAM's overall business. Id. at 24.

Finally, Plaintiffs maintain that Defendants' statute of limitations defense is unavailing because, contrary to Defendants' characterization, the Amended Complaint only alleges "one cohesive fraud." Id. at 29. Plaintiffs describe this fraud as "the undisclosed erosion of RYAM's competitive advantage and ability to charge premium prices—as well as the additional undisclosed circumstances surrounding Eastman" which rendered the June 2014 Information Statement and subsequent financial disclosures misleading. Id.

According to Plaintiffs, this fraud was not fully revealed until the disclosure of the Eastman lawsuit on August 18 and 19, 2015, rendering the claims in this lawsuit timely filed.  Id.

## IV.  Standard of Review

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).  Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face."  Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted).  Indeed, "the tenet

that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . [and] protects defendants from harm to their goodwill and reputation.'" Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in Wagner). Although "'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by specific allegations as to "'date, time or place.'" See Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting Durham, 847 F.2d at 1511). Thus, a complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

Id. at 972 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus, for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

## V. Pleading Standards of the Private Securities Litigation Reform Act (PSLRA)

Pursuant to § 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In accordance with this section, the Securities and Exchange Commission (SEC) promulgated Rule 10b-5 which provides in relevant part: "It shall be unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5(b). Accordingly, the elements of a claim under § 10(b) and Rule 10b-5 are:

> "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"

FindWhat Investor Grp., 658 F.3d at 1295 (alteration in original) (quoting Mizzaro, 544 F.3d at 1236-37). Significantly, to state a claim for relief under § 10(b), a plaintiff must not only satisfy the federal notice pleading requirements and the Rule 9(b) fraud pleading requirements set forth above, but also the additional heightened pleading standards imposed by the PSLRA. See FindWhat Investor Grp., 658 F.3d at 1296.

The PSLRA requires that for Rule 10b-5 claims based on allegedly false or misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, where a Rule 10b-5 action requires proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." 15 U.S.C. § 78u-4(b)(2). As such, in a private securities fraud action such as this, "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." See Mizzaro, 544 F.3d at 1238. Moreover, while a court may aggregate the factual allegations to infer scienter, "scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute." FindWhat Investor Grp., 658 F.3d at 1296. The PSLRA provides that if these requirements are not met, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

"Although the PSLRA substantially raised the pleading standard for scienter, it did not change any substantive intent requirements." Mizzaro, 544 F.3d at 1238. Thus, to

demonstrate scienter for purposes of § 10(b) and Rule 10b-5, a plaintiff must show "either an 'intent to deceive, manipulate or defraud,' or 'severe recklessness.'" Id. (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)). The Eleventh Circuit defines "severe recklessness" as:

> "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Id. (quoting Bryant, 187 F.3d at 1282 n.18). The heightened pleading requirements of the PSLRA and the substantive scienter case law together yield a "stringent standard" that Plaintiffs must satisfy in order to survive Defendants' Motion to Dismiss. Id. Specifically, Plaintiffs "must (in addition to pleading all of the other elements of a § 10(b) claim) plead 'with particularity facts giving rise to a strong inference' that [Defendants] either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." Id.

Significantly, "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). The Supreme Court has prescribed a three step analysis for determining whether a pleading raises a "strong inference" of scienter at the motion to dismiss stage of the proceedings. See id. at 322-23. First, courts must "accept all factual allegations in the complaint as true." Id. at 322. Second, "courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint

by reference, and matters of which a court may take judicial notice." Id. Indeed, the strong-inference inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. Notably, however, "omissions and ambiguities count against inferring scienter." Id. at 326. Finally, the Supreme Court instructs that courts "must take into account plausible opposing inferences." Id. at 323. Specifically, the Supreme Court explains that:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences," . . . . Yet, the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

Id. at 323-24 (internal citations omitted). In sum, the question before this Court is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326.

## VI. Count I – Section 10(b) and Rule 10b-5

As stated above, Defendants contend that Plaintiffs fail to allege sufficient facts to satisfy two elements of a § 10(b) claim—a material misrepresentation or omission, and scienter. The Court will consider each element in turn. To establish "a violation of Rule 10b-5(b), a plaintiff must identify a misrepresentation or an omission of a material fact." See Fried v. Stiefel Labs., Inc., 814 F.3d 1288, 1294 (11th Cir. 2016) (emphasis added). Here, Plaintiffs identify purportedly misleading statements which fall into four general categories: 1) positive statements about RYAM's business such as its "specialized" products, premium prices, and competitive advantage, 2) statements highlighting RYAM's

long-term customer relationships, 3) projections that RYAM would increase the volume of its Specialties sales, capitalize on the CSE, and transition to a Specialties-only business, and 4) the reasons given for the "strategic repositioning" announced on July 30, 2015. <u>See</u> Plaintiffs' Response at 8-11; <u>see also</u> Amended Complaint ¶¶ 52-54. Significantly, Plaintiffs do not identify any factual statement of present or historical fact that was empirically false when made. Rather, Plaintiffs maintain that Defendants' statements were misleading because Defendants omitted material facts. <u>See</u> Plaintiffs' Response at 8-11. Specifically, Plaintiffs assert that Defendants "knew of, but did not disclose" the following information:

- Competitors had created comparable Specialties and were offering those Specialties for lower prices;
- RYAM's #3 customer, Celanese, had moved to a competitor and ceased all purchases from RYAM beginning in 2014, further increasing RYAM's dependence on Eastman;
- RYAM's #1 customer, Eastman, had received multiple offers from competitors with comparable Specialties at lower prices and was demanding price concessions;
- RYAM knew that volumes would decrease, and not increase, compared to 2013 volumes; and
- As a result, the CSE's 190,000 tons of additional capacity was useless and RYAM could not convert to selling Specialties only.

<u>See</u> Plaintiffs' Response at 5.[11]

As an initial matter, the Court must clarify what the precise fraud at issue here actually is. Defendants view the Amended Complaint as alleging two separate fraudulent omissions: 1) the dispute with Eastman, and 2) the significance of the competitive

---

[11] In their Response, Plaintiffs do not argue that Defendants' failure to disclose the Meet or Release provision of the Eastman Agreement was a material omission. <u>See</u> Response at 5. Indeed, Plaintiffs affirmatively state that they "do not premise Defendants' liability on a failure to disclose the existence of a Meet or Release Provision." <u>Id.</u> at 15 n.8. Accordingly, to the extent this theory was alleged in the Amended Complaint, it is abandoned.

pressures facing RYAM.  <u>See</u> Motion to Dismiss at 8.  In their Response, Plaintiffs insist that this is incorrect and maintain that they have alleged only "one cohesive fraud."  <u>See</u> Plaintiffs' Response at 11.  Nonetheless, Plaintiffs maintain that the fraud is not limited to Defendants' failure to disclose the Eastman dispute.  <u>See</u> <u>id.</u> at 11-13 & n.6.  Instead, Plaintiffs describe the "one cohesive fraud" in two parts: "the undisclosed erosion of RYAM's competitive advantage and ability to charge premium prices—<u>as well as</u> the <u>additional</u> undisclosed circumstances surrounding Eastman . . . ."  <u>See</u> Plaintiffs' Response at 29 (emphasis added).  In an attempt to characterize the fraud as something more than Eastman, but perhaps recognizing that Defendants repeatedly disclosed the falling prices, increased competition, and low demand plaguing RYAM, Plaintiffs argue that the critical information which Defendants failed to disclose was that "RYAM's Specialties had lost their superiority and price premiums [and] that RYAM had no long-term prospects for selling the CSE volumes or converting to a Specialties-only business."  <u>See</u> <u>id.</u> at 19.  However, these alleged omissions are merely Plaintiffs' conclusion drawn from the existence of the Eastman lawsuit, with the benefit of 20/20 hindsight.  Plaintiffs include no factual allegations as to the quality or prices of RYAM's Specialties products as compared to its competitors in 2014 or 2015, much less the existence of any internal reports withheld from the market that demonstrate Defendants' awareness that RYAM's edge in the market was eroding. Based on the allegations of the Amended Complaint, the only specific facts which Defendants allegedly <u>knew</u> within the Class Period and failed to disclose are: (1) the total loss of Celanese as a client, which was disclosed at the latest in February 2015, and (2) the demands for lower prices from Eastman.  <u>See</u> Amended Complaint ¶¶ 43-48.

Based on these facts, Plaintiffs appear to contend that Defendants were obligated to disclose that "RYAM's market dominance, bargaining power, and price premiums were eroding." See Plaintiffs' Response at 12. However, "'[a] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock.'" See In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 181 (D.D.C. 2007) (quoting In re N.Y. Cmty. Bancorp, Inc. Sec. Litig., 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006)); In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7 F.3d 357, 375 (3d Cir. 1993) ("The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably . . . ."); OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 504 (3d Cir. 2016) ("[Plaintiff] also complains that [defendant] did not describe the merger as 'imperiled' or in danger in its communication. But [defendant] was under no obligation to use any adjective, let alone a pejorative one, to describe the state of the deal." (internal citation omitted)); Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003) ("[Defendant] was under no duty to cast its business in a pejorative, rather than a positive, light."); Romine v. Acxiom Corp., 296 F.3d 701, 708 (8th Cir. 2002); see also Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enters., Inc., 572 F. App'x 713, 717 (11th Cir. 2014) (rejecting an omissions claim where "the information that the plaintiffs contend was omitted does not rest upon specific facts, but only upon generalized opinions that the practices at [the company] were 'slipshod' and 'chaotic'"). Here, the only specific facts Defendants are alleged to have concealed are the total loss of Celanese's business and Eastman's request that RYAM meet the lower-priced offers of its competitors pursuant to

the terms of the Eastman Agreement. Thus, the Court will determine whether these purported omissions support an actionable securities fraud claim.

Significantly, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." See In re Galectin Therapeutics, Inc. Securities Litig., 843 F.3d 1257, 1274 (11th Cir. 2016). Indeed, "[s]ection 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." See In re Galectin, 843 F.3d at 1274. Thus, the omission of a fact, even a material fact, is actionable only if Defendants had a duty to disclose the information. See Fried, 814 F.3d at 1294 ("[T]his Court has never held that a failure to disclose material information is an omission under subsection (b) absent a statement made misleading by that failure."); Oran v. Stafford, 226 F.3d 275, 286 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."); Nasyrova v. Immunomedics, Inc., No. 14-1269 (SRC), 2015 WL 382846, at *6 (D.N.J. Jan. 28, 2015). As relevant here, "[t]he omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the 'reasonable investor in the exercise of due care.'" In re Galectin, 843 F.3d at 1275 (quoting FindWhat Investor Grp., 658 F.3d at 1305).

Thus, while Rule 10b-5 does not create an affirmative duty of disclosure, it does prohibit "any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" See FindWhat Investor Grp., 658 F.3d at 1305 (quoting 17 C.F.R. § 240.10b-5(b)). In FindWhat Investor Group, the Eleventh Circuit explained this duty to disclose as follows:

> By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as necessary to ensure that

what was revealed is not "so incomplete as to mislead." "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." In sum, "a defendant may not deal in half-truths."

Id. (internal citations omitted). To determine whether a statement is misleading, "the 'appropriate inquiry' is 'into the meaning of the statement to the reasonable investor and its relationship to the truth.'" Id. (quoting Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968)). Specifically, a statement is misleading if "'[a] reasonable investor, in the exercise of due care, would have been misled by it,'" in light of "'the facts existing at the time of the [statement].'" Id. (quoting Texas Gulf Sulphur, 401 F.2d at 863). Here, Plaintiffs contend that Defendants had a duty to disclose the omitted information in order to ensure that the information they did reveal was not misleading. See Plaintiffs' Response at 9-10, 12-13. Accordingly, the Court will consider each category of challenged statements and determine whether Plaintiffs have sufficiently alleged material omissions.[12]

---

[12] In the Amended Complaint, Plaintiffs also allege that Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) (Item 303) obligated Defendants to disclose the "materially adverse conditions" described in the Amended Complaint. See Amended Complaint at 43, 47, 52, 53, 56. Pursuant to Item 303, a company must include in its SEC filings a discussion of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." See 17 C.F.R. § 229.303(a)(3)(ii). Although courts have held that Item 303 itself does not give rise to a private cause of action, see Oran, 226 F.3d at 287, the circuits appear to be split on whether the failure to comply with a duty to disclose under Item 303 can give rise to an actionable omission under section 10(b). Compare Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (holding that "a failure to make a required Item 303 disclosure in a 10-Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim," so long as the omission satisfies the materiality requirements for section 10(b) claims) with In re NVIDIA Corp. Sec Litig., 768 F.3d 1046, 1054 (9th Cir. 2014) ("We have never directly decided whether Item 303's disclosure duty is actionable under Section 10(b) and Rule 10b-5. We now hold that it is not."). Although the Eleventh Circuit has not directly addressed the issue, one member of the court expressed skepticism toward the argument in Thompson v. RelationServe Media, Inc., 610 F.3d 628, 682 n.78 (11th Cir. 2010) (Tjoflat, J., concurring in the appeal, and dissenting in the cross-appeal) ("The assumption that Item 303 of Regulation S-B would impose an actionable duty to speak under Rule 10b-5 is generous."). Regardless, to the extent Plaintiffs alleged such a theory in the Amended Complaint, they have effectively abandoned that theory by failing to respond to Defendants' argument that Item 303 does not give rise to a duty to disclose the ongoing negotiations with Eastman. See Motion at 11-12. In the Response, Plaintiffs cite to Item 303 only once, in a footnote, in support of their scienter argument. See Response at 23 n.15. Plaintiffs appear to contend that Defendants were required to disclose "various risks regarding comparable Specialties, price premiums, the CSE, and Eastman" pursuant to Item 303 but include no argument or authority demonstrating that these "risks," or more precisely, the actual facts known to Defendants at that time, constituted "known trends or uncertainties" warranting disclosure under Item 303.

## A. Statements Describing RYAM's Business

The first category of statements which Plaintiffs allege to be misleading are those related to RYAM's purported "competitive advantage." <u>See</u> Plaintiffs' Response at 8-9. Plaintiffs cite to an assertion in the Information Statement that RYAM enjoys a "significant competitive advantage, resulting in a premium price" due to the quality and consistency of its Specialties products and its premier research and development capabilities. <u>See</u> Amended Complaint ¶ 102; Information Statement at 10. Plaintiffs also point to Boynton's statements at the KeyBanc Conference that RYAM's capabilities give it a "unique edge" in the market that, along with the barriers to entry into the Specialties market, allow RYAM to charge "premium" prices. <u>See</u> Amended Complaint ¶ 123; Motion to Dismiss, Ex. 14 at 6. Defendants repeated these statements about RYAM's unique abilities, the barriers to entry into the market, RYAM's competitive advantage, and the resulting premium prices in the February 27, 2015 Form 10-K. <u>See</u> Amended Complaint ¶ 144. To the extent these statements rely on underlying facts, Plaintiffs do not include any allegations to suggest that those underlying factual statements are not true. For example, Plaintiffs do not contend that RYAM does not actually charge prices higher than its competitors or engage in the research and development or purification processes which Defendants cited as the basis

---

<u>Id.</u> Indeed, the one case which Plaintiffs cite in support of their Item 303 argument does not actually address Item 303 in any substantive manner. <u>See id.</u> (citing <u>In re: Ebix, Inc. Sec. Litig.</u>, 898 F. Supp. 2d 1325, 1333 (N.D. Ga. 2012)). The language which Plaintiffs quote from <u>In re Ebix</u> which references Item 303 is merely the portion of the decision outlining the claims raised in the complaint. <u>See In re Ebix</u>, 898 F. Supp. 2d at 1333. In its analysis, the court does not rely on Item 303 to find a duty to disclose, and indeed, never addresses the regulation thereafter. <u>See In re Ebix</u>, 898 F. Supp. 2d at 1341-47. As Plaintiffs have entirely failed to support their Item 303 theory of relief with any developed argument or citation to authority, the Court declines to make Plaintiffs' arguments for them. Accordingly, the Court need not determine whether Defendants violated Item 303, nor whether such a violation could give rise to an actionable omission under section 10(b). Regardless, even if Item 303 could give rise to an actionable omission in this case, for the reasons set forth below, Plaintiffs fail to allege particularized facts sufficient to give rise to a strong inference that Defendants acted with the requisite scienter.

for their "competitive advantage" and "unique edge." Nonetheless, Plaintiffs maintain that these statements are misleading because RYAM knew it was losing its competitive advantage in the market and ability to charge premium prices.

However, statements touting Defendants' "competitive advantage," and "unique edge" which allow it to charge "premium prices" are the type of "generalized, non-verifiable, vaguely optimistic statements" which courts consider immaterial "puffery." See Mogensen v. Body Cent. Corp., 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014) (collecting cases); Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (collecting cases); Rosenzweig, 332 F.3d at 869 ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."); In re XM Satellite Radio, 479 F. Supp. 2d at 179-80. These statements "do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell [RYAM's] securities." See DJSP Enters., Inc., 572 F. App'x at 716 (finding statements "about the 'rigor' of [the company's] processes, the 'efficiency' and 'accuracy' of its operations, and its 'effective' staff training were not material"); see also IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp., 660 F. App'x 850, 857 (11th Cir. 2016) (finding defendants' statements that a plan was "'thoughtful,' 'effective,' and 'optimal,' among other descriptors," to be nonactionable puffery); City of Monroe Emps. Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 670-71 (6th Cir. 2005) ("[S]uch statements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.") (collecting cases). Accordingly, such

statements are immaterial and cannot form the basis of a securities fraud claim.  See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 795-96 (11th Cir. 2010) ("The anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker.");[13] see also DJSP Enters., Inc., 572 F. App'x at 717.

## B. Customer Relations

The next category of statements on which Plaintiffs rely are those referring to RYAM's customer relationships.  For example, Plaintiffs cite to statements in the Information Statement where Defendants explained that RYAM benefits from "long-standing" customer relationships, "long-term volume contracts," and "low customer turnover," with its "five largest customers" making up "70% of sales."  See Amended Complaint ¶ 101; Information Statement at 11.  Plaintiffs also point to Boynton's vague statements in an October 29, 2014 conference call that discussions with customers were "good, they're healthy, they're ongoing."  See Amended Complaint ¶ 130.  Boynton also stated during that conference call that RYAM was "working to actively extend contracts with existing customers as those opportunities present themselves," and had recently extended a contract with a "significant long-term customer" for an additional year.  Boynton refused to comment on the volume amounts and stated that the addition of only one year was "nothing out of the ordinary."  Id. ¶ 129.  In the January 28, 2015 conference call, Boynton only vaguely responded to questions regarding the terms of its customer

---

[13] Although the court in Edward J. Goodman Life Income Trust was faced with statements deemed to be immaterial because they were forward-looking statements accompanied by cautionary language, the quoted language is equally applicable to statements immaterial because they are mere puffery.  Regardless, as discussed below, Plaintiffs have not alleged sufficient facts to give rise to a strong inference that Defendants acted with the requisite state of mind.

contracts, and explained that "there's not a set pattern" as to pricing for anybody.  Id. ¶ 142.  He also explained that he did not know where competitors were priced and did not know if RYAM would be able to maintain its pricing premium, and refused to elaborate on pricing due to increased competition.  Id. ¶¶ 141-42.

To the extent these statements include any verifiable facts, Plaintiffs set forth no specific allegations showing that such statements were false.  Plaintiffs do not allege that RYAM did not have "long-term volume contracts" with "long-standing" customers, that RYAM was not actually engaged in negotiations with clients, or that extending a contract by only one year was, in fact, highly unusual.  Rather, Plaintiffs contend that the statements were misleading because Defendants omitted material information.  According to Plaintiffs, Defendants' statements about RYAM's long-term customers were misleading because Defendants did not reveal to the market that Celanese had moved to a competitor and would not purchase any Specialties in 2014, and Eastman had received offers for comparable products from competitors and requested that RYAM respond to declines in market pricing.  As with the previous category of statements, Defendants' generalized positive statements about its long-standing customers and healthy negotiations also fall in the realm of immaterial puffery.  See In re Ferrellgas Partners L.P., Securities Litigation, No. 16 Civ 7840 (RJS), 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018); Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co., 15 Civ. 5999, 2017 WL 4403314, at *16 (S.D.N.Y. Sept. 30, 2017).  Regardless, even if such statements are not immaterial, the omissions do not render the alleged statements so incomplete as to be misleading.

"Requiring that disclosures be 'complete and accurate . . . does not mean that by revealing one fact about a product, one must reveal all others that, too, would be

interesting, market-wise.'" See FindWhat Investor Grp., 658 F.3d at 1305; see also Am. Express Co., 2017 WL 4403314, at *14 ("'[T]here is no duty to disclose a fact . . . merely because a reasonable investor [or analyst] would very much like to know that fact . . . .'" (alteration in original) (quoting Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014))). Rather, "[a] corporation has a duty to neutralize only the 'natural and normal implication' of its statements." FindWhat Investor Grp., 658 F.3d at 1305. The statements identified by Plaintiffs would be misleading only if they "'conveyed to the public a false impression'" of the status of RYAM's relationships with Celanese and Eastman. Id. at 1306 (quoting Texas Gulf Sulphur Co., 401 F.2d at 862). Significantly, the Court must examine these representations in context and consider the total mix of available information. See Am. Express Co., 2017 WL 4403314, at *13; see also Meyer, 761 F.3d at 250 ("'[T]he proper inquiry requires an examination of defendants' representations, taken together and in context.'" (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010))).

Here, the vague and generalized statements above—that the company benefits from long-term contracts with long-standing customers, was engaged in healthy, ongoing negotiations with those customers, was working to extend its contracts, and had no set formula for pricing—conveys no message regarding the particular status of RYAM's relationship with Celanese and Eastman. Significantly, other than reporting accurate, historical, statistical data regarding the proportion of RYAM's sales that went to these customers, Defendants never touted or hyped their relationship to either Eastman or Celanese specifically. No reasonable investor would believe these vague statements were intended to imply that RYAM's customer relationships were impervious to the (fully

disclosed) decline in Specialties prices.  Indeed, in the Information Statement, Defendants disclosed that RYAM negotiated pricing under its long-term contracts annually, Specialties prices were falling, the Specialties market was "highly competitive," the Celanese contract had expired, and unfavorable changes to pricing or terms contained in RYAM's contracts with its customers could adversely affect RYAM's business.  See Information Statement at 13, 19, 22, and 80.  Likewise, Plaintiffs' own allegations show that during the October 29, 2014 press conference when Boynton stated that negotiations were good and ongoing, he also disclosed that RYAM was facing "increased competition" in the Specialties market.  See Amended Complaint ¶ 126.  And, in January 28, 2015, Boynton conceded that he did not know whether RYAM would be able to maintain its premium pricing, and cautioned that the price-based competition does have an impact on RYAM's customers.  Id. ¶ 142; Motion to Dismiss, Ex. 4 at 13-14.  Thus, when reviewed in context, no reasonable investor would have understood Defendants' statements to mean that it was not facing increased competition in the form of pressure from customers to lower prices.  While investors may have been interested to learn the specific details of that pressure, Defendants had no obligation to reveal those details absent misleading statements to the contrary.

The Court acknowledges that under some circumstances "'a company could have a duty to disclose a breach of contract that puts an important, publicly-touted business relationship at great risk," see In re Hi-Crush Partners L.P. Sec. Litig., No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *9 (S.D.N.Y. Dec. 2, 2013), but the facts alleged in the Amended Complaint do not present such circumstances.  As to Eastman, in 2014 and early 2015, when the challenged statements were made, the only information of which Defendants were aware, as alleged in the Amended Complaint, is that Eastman had

received competing offers from competitors and sought pricing concessions. Plaintiffs do not include any allegations that Eastman threatened to terminate the contract, or even that 2013 and 2014 negotiations had gone poorly. With all the conviction of 20/20 hindsight, Plaintiffs see Eastman's demand as an obvious sign of the coming lawsuit, but they allege no facts suggesting that Defendants saw an inevitable breakdown in the relationship or imminent litigation. Indeed, Plaintiffs do not contend that Eastman and RYAM were unable to reach an agreement on 2014 prices, when Eastman purportedly made this demand in 2013, nor do Plaintiffs allege that Eastman and RYAM could not agree in 2014, when Defendants issued the Information Statement, as to prices for the 2015 fiscal year. Other than the initial request that RYAM meet the prices of its competitors in 2013, ongoing negotiations, and the lawsuit filed in August 2015, the Amended Complaint contains no factual allegations regarding when negotiations between Eastman and RYAM broke-down. As such, absent any allegation of an actual change in the contractual relationship, any prediction as to the outcome of its ongoing negotiations with Eastman would have been purely speculative. See In re Express Scripts Holding Co. Securities Litig., 16 Civ. 3338 (ER), 2017 WL 3278930, at *11-13 (S.D.N.Y. Aug. 1, 2017) ("When an outcome is merely speculative, the duty to disclose does not attach."); Am. Express Co., 2017 WL 4403314, at *15-16; Nasyrova, 2015 WL 382846, at *6-8; compare Hi-Crush Partners L.P. Sec. Litig., 2013 WL 6233561, at *13 ("This Court cannot conclude that, as a matter of law, [defendant] satisfied its disclosure duties with respect to its contract dispute with [major client] once that dispute ripened—which is to say, from and after [the date of the letter terminating the agreement]." (emphasis added)).[14]

---

[14] For the same reason, Plaintiffs' reliance on Hutchins v. NBTY, Inc., No. CV 10-2159(LDW)(WDW), 2012 WL 1078823, at *5-6 (E.D.N.Y. Mar. 30, 2012) is unavailing. See Plaintiffs' Response at 13. In Hutchins,

Likewise, Plaintiffs fail to point to any statements that gave investors a misleading impression of RYAM's relationship with Celanese, especially in light of the total mix of information available.  Other than identifying the percentage of RYAM's sales that went to Celanese each year and disclosing that the Celanese contract had expired on December 31, 2013, Defendants never made any specific statements regarding the status of its relationship with Celanese.   Notably, Plaintiffs concede that Defendants previously disclosed to the market that a customer had backed off a commitment to purchase 50,000 metric tons of Specialties business in 2014.  See Amended Complaint ¶ 44 n.10.  As previously discussed, the Amended Complaint contains contradictory allegations as to whether the market knew that it was Celanese who left RYAM for a competitor at the end of 2013.  See supra n.4.  Regardless, nothing about Defendants' vague statements

---

the defendants made positive statements about NBTY, asserting that the gross margins from its most recent fiscal quarters were indicative of its ongoing performance, without disclosing that a major customer, Wal-Mart, had informed them that it would put out for competitive bids the products which it had purchased from NBTY for the last ten years.  See id. at *1-2.  Thus, the defendants' representations that NBTY's current results were indicative of future performance were misleading because they knew that NBTY's gross margins would be decreasing as it would be forced to lower prices or lose Wal-Mart as a customer. Id. at *5.  In this case, at the time of Defendants' statements, all that Defendants are alleged to have known is that Eastman had informed RYAM of offers from competitors and asked RYAM to respond to declines in market pricing. Significantly, Plaintiffs do not identify any statement in which Defendants misled investors into believing that RYAM was not impacted by declining prices.  Defendants fully disclosed to the market that it renegotiated prices with its long-term customers every year, and anticipated declines in Specialties prices.  Moreover, despite Eastman's alleged demand in 2013, RYAM and Eastman were able to reach an agreement as to 2014 prices and indeed, Eastman increased its share of RYAM's Specialties volume.  Because Defendants did not make any statements which gave the market a misleading impression of its relationship with Eastman based on the knowledge that Defendants had at the time, this case is distinguishable from Hutchins.  See FindWhat Investor Grp., 658 F.3d at 1306.

Likewise, Plaintiffs' reliance on Basic, Inc. v. Levinson, 485 U.S. 224 (1988) is inapposite.  The Basic decision addresses the materiality of withheld or misrepresented information.  See Basic, 485 U.S. at 240.  The Supreme Court expressly did not consider an issuer's "duty to disclose," and noted that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  Id. at 235, 239 n.17.  Indeed, in Basic, the company had made "three public statements denying that it was engaged in merger negotiations," when in fact company representatives had engaged in discussions on the possibility of a merger.  Id. at 227.  Plainly, the statements made were misleading in light of the information known to the company, and the question before the Court was whether the failure to disclose merger negotiations was a material omission.  Here, the issue is whether the statements made gave investors a false impression giving rise to a duty to disclose, and the Court finds that they did not.

regarding its long-term customers and ongoing negotiations would have given any reasonable investor a misleading impression as to RYAM's relationship with Celanese, in light of the total mix of information available.[15] Accordingly, the Court finds that Plaintiffs fail to state a section 10(b) claim based on Defendants' statements regarding its long-term customers and ongoing negotiations because they fail to allege any material, misleading statements or omissions.

### C. Growth Projections

The next category of statements which Plaintiffs challenge are Defendants' projections regarding the growth of RYAM's Specialties volumes. In the Information Statement, RYAM informed investors that it <u>expected</u> to increase its sales of Specialties and transition to an exclusively Specialties provider. The Information Statement also indicated that RYAM expected to increase the volume of its 2014 Specialties sales by approximately 30,000 to 50,000 metric tons above the 2013 levels. RYAM explained that while "global capacity" for Specialties production had increased, based on RYAM's capacity expansion as well as that of its competitors, those expansions had not adversely affected RYAM's 2013 results. On July 30, 2014, Defendants disclosed that they did not expect RYAM to meet the 30,000 to 50,000 volume increase projection. Plaintiffs contend that Boynton made misleading statements during the conference call on that date when he expressed his opinion that the CSE positioned RYAM well to grow with future demand, and

---

[15] Notably, even if Defendants did have a duty to explicitly disclose the loss of Celanese as a customer, Plaintiffs allege that Defendants made this disclosure in February 2015, at the latest. <u>See</u> Amended Complaint ¶ 44 n.10. As Plaintiffs did not file a lawsuit within two years after discovery of the facts constituting the purported violation, a claim that the aforementioned statements were misleading solely because Defendants failed to disclose the loss of Celanese as a customer is barred by the statute of limitations. <u>See</u> 28 U.S.C. § 1658(b); <u>see also</u> <u>Merck & Co., Inc. v. Reynolds</u>, 559 U.S. 633, 637 (2010). Aside from the revelation of the Eastman dispute, Plaintiffs do not identify any facts, including those relevant to scienter, of which they were unaware by February of 2015. Plaintiffs did not initiate this lawsuit until August 17, 2017. <u>See</u> Complaint for Violation of the Federal Securities Laws (Doc. 1).

that in the midterm or longer term he felt there was still "a great opportunity to place this volume out there."  Amended Complaint ¶¶ 113-14; see also id. ¶ 115 ("[W]e feel good that the volume will get placed out there and will have an attractive term turn on that investment for our shareholders.").  Plaintiffs also allege that Woo's explanation for the low Specialties sales volumes was misleading.  Id. ¶ 116.  Specifically, Woo explained that 2014 volumes were unfavorably impacted "due to the timing of customer shipments resulting from the Jesup plants' planned extended outage" and that "we expect 2014 sales volumes to be back half-loaded."  Id.  In addition, on October 29, 2014, Boynton stated that the business was in a "steady-state" with respect to gaining or losing shares of the Specialties business to competitors, and on January 28, 2015, Boynton also stated that "we feel confident in the [Specialties] volume being out there, and . . . we've actually increased our share of volume at each of our top 10 customers."  Id. ¶¶ 130, 141.  On May 1, 2015, Ruperto noted in a conference call that most of the 2015 Specialties sales volumes were contracted, and that the full-year sales volume is largely known and expected to be comparable to 2014 and 2013 levels.  Id. ¶ 149.  On that same call, Boynton reiterated the "long-term nature" of RYAM's Specialties volume contracts.  Id.

Plaintiffs do not allege that any of the factual information stated above was empirically false.  For example, Plaintiffs do not assert that: the global expansion in Specialties capacity did in fact adversely impact RYAM in 2013, the Jesup outage did not impact the timing of customer shipments, RYAM had not actually increased its share of volume with each of its top ten customers as of January 2015, or in May of 2015 most of the 2015 volumes were not actually contracted and comparable to 2014 and 2013 levels. As with the above categories, Plaintiffs maintain that Defendants' projections as to

increased volumes were misleading because Defendants knew of, but did not disclose, countervailing information regarding Eastman and Celanese.

Once again, a number of the purported misstatements recounted in the Amended Complaint are mere corporate puffery and thus, cannot form the basis of a section 10(b) claim. For example, Boynton's statements that he felt good or confident that RYAM would eventually be able to place its additional volumes in the marketplace or the generalized statement that Boynton believed there was a "great opportunity" to place the additional volumes in the market are precisely the type of vague, corporate optimism on which no reasonable investor would rely. See Mogensen, 15 F. Supp. 3d at 1213 ("These vague and generalized statements—several of which are expressly based on the opinions, 'feel[ings],' 'belie[fs], 'hope[s],' and 'want[s]' of management—cannot give rise to a securities fraud claim."). Accordingly, Plaintiffs' reliance on these statements to support their claim is unavailing.

Regardless, Defendants' projections that the volume of RYAM's Specialties sales would grow and RYAM would be able to capitalize on the CSE are not actionable. Plaintiffs argue that these projections were misleading because Defendants failed to disclose the impact of competitive pressures on RYAM. However, these projections are unequivocally forward-looking statements as they are composed of statements of future economic performance, as well as the assumptions underlying the expected future performance. See 15 U.S.C. § 78u-5(i)(1)(C), (D); see also Harris, 182 F.3d at 804-06. And, while Plaintiffs rely on the purported omissions from those statements as the basis for Defendants' liability, the Eleventh Circuit has explained that "there is no question under the statute that a material and misleading omission can fall within the forward-looking safe harbor." Id; see

also Ehlert v. Singer, 245 F.3d 1313, 1317-20 (11th Cir. 2001).  Accordingly, the Court must determine whether these allegedly misleading statements and omissions are protected under the PSLRA's safe harbor.  See Harris, 182 F.3d at 803; 15 U.S.C. § 78u-5(c)(1).

The safe harbor protects corporations and individual defendants from liability for forward-looking statements that ultimately prove false "if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'"  Harris, 182 F.3d at 803 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  A cautionary statement need not list all factors in order to satisfy the statutory safe-harbor requirements, nor must it "explicitly mention the factor that ultimately belies a forward-looking statement."  Id. at 807.  Rather, so long as "an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  Id.  Significantly, even absent adequate cautionary language, forward-looking statements are protected unless the plaintiff can "prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'"  Id. (quoting 15 U.S.C. § 78u-5(c)(1)(B)); see also Bryant, 187 F.3d at 1284 (observing that Congress raised the "quantum of scienter required" in the statutory safe-harbor provision).  As set forth at length above, and summarized below, Defendants gave numerous cautionary statements throughout the Class Period.

In the Information Statement, Defendants explained that any statements concerning matters that Defendants "expect" to happen were forward-looking.  See Information

Statement at 34. In addition, Defendants included a lengthy section on the risk factors facing RYAM. Id. at 19-33. Notably, the discussion of risk factors included the risk of new competitors and the expansion of capacity among existing competitors which could "cause [RYAM] to lose sales or result in price reductions." Id. at 19. Defendants also warned that Specialties prices were expected to decrease in 2014, and that if prices continued to fall, it could lead to a decline in revenues and margins and adversely affect RYAM's financial condition. Id. The Information Statement also identified RYAM's reliance on a few large customers for the majority of its sales as a risk factor because "the loss of all or a substantial portion of sales to any of these customers, or significant unfavorable changes to pricing or terms contained in [RYAM]'s contracts with them, could adversely affect [RYAM's] business, financial condition or results of operations." Id.

As Specialties prices continued to fall, Defendants repeated these warnings in the press releases, conference calls, and SEC filings that followed. On July 30, 2014, Defendants reminded investors of the "previously announced loss of volume from a 2013 customer," as well as the "previously announced lower cellulose specialties prices . . . ." See Motion to Dismiss, Ex. 7. Although Defendants expressed an intention to meet the targeted 30,000 tons of increased volume, they cautioned that RYAM would "feather this into the market only as it is ready to be absorbed." Id. This press release also included a warning that statements regarding future developments or performance are forward-looking statements and listed a variety of factors that could impact those results, including "competitive pressures in the markets in which we operate" and "risks associated with customer concentration." Id. The conference call included similar warnings regarding forward-looking statements and lower prices, as well as disclosures from Boynton that

because the previously projected 30,000 ton volume increase was "still not contracted, it seems less likely that we will be able to sell this volume at acceptable terms." Id., Ex. 6 at 4.

Similarly, in the October 29, 2014 press release and conference call, Defendants warned of oversupply resulting from increased competition and manufacturing capacity, as well as slower demand growth in certain end markets. See Amended Complaint ¶ 126; see also Motion to Dismiss, Ex. 4 at 10. One of RYAM's vice-presidents expressly informed investors during the conference call that they would not comment on the specific terms of any customer contracts. See id., Ex. 4 at 10-11. The Form 10-Q filed on November 4, 2014, also warned of oversupply and slowing demand in the Specialties markets. See Motion to Dismiss, Ex. 12 at 24. In January of 2015, Defendants again warned of oversupply in the Specialties markets and a decrease in global demand, as well as "aggressive pricing" from competitors. See Amended Complaint ¶¶ 135-36. During the conference call that same day, Defendants again spoke of "continuing headwinds," and "aggressive pricing tactics by our competitors" which "negatively impacted" 2015 pricing. Boynton explained that "price-based competition does have an effect on the market and our customers," and that "pricing didn't work out in our favor this year or last year . . . ." See Motion to Dismiss, Ex. 4 at 13-14. The Form 10-K filed on February 27, 2015, included many of the same warnings set forth in the Information Statement, and cautioned investors that Defendants expected "the 2015 cellulose specialties market to face a combination of industry oversupply and weaker end-market demand," with volumes comparable to prior years and prices declining. See id., Ex. 4 at 15. Although Defendants indicated that they expected to maintain their share of volume with their top ten customers, they warned of a

"difficult environment and aggressive pricing offered by competitors . . . ." Id., Ex. 4 at 15-16.  The May 2015 press releases and conference calls also noted continuing declines and falling prices and volumes.  See id., Ex. 4 at 16.

The risk warnings outlined above amply satisfy Defendants' burden under the statute.  These warnings are detailed and informative—they tell the reader "in detail what kind of misfortunes could befall the company and what the effect could be."  See Harris, 182 F.3d at 807.  Investors knew that investing in RYAM subjected them to the risk that Specialties prices would continue to fall due to oversupply and weak demand.  Investors were told that RYAM was facing increased competition over prices and that while RYAM had long-term volume contracts with its top customers, those contracts provided for annual negotiations on price.  Indeed, falling prices, low demand and increased competition from competitors in the Specialties markets are the exact factors which are alleged to have caused the downfall of the CSE, the dispute with Eastman, and the declines in RYAM's stock price.

Nonetheless, Plaintiffs contend that Defendants' cautionary statements were insufficient because they failed to disclose unfavorable events that had already occurred.  Plaintiffs are correct that "when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the non-disclosure."  See Mogensen, 15 F. Supp. 3d at 1216.  Indeed "to warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  See FindWhat Investor Grp., 658 F.3d at 1299 (quoting S.E.C. v. Merchant Capital, LLC, 483 F.3d 747, 769 (11th Cir. 2007)).  Plaintiffs' reliance on this principle,

however, is misplaced.  The particularized facts alleged in the Amended Complaint do not show that Defendants were aware of any <u>realized</u> risks that they failed to disclose, i.e., Plaintiffs do not identify any "specific adverse historical facts" that were omitted.  <u>See</u> <u>Merchant Capital, LLC</u>, 483 F.3d at 768 ("[G]eneral cautionary language does not render omission of <u>specific adverse historical facts</u> immaterial." (emphasis added)).  Rather, Plaintiffs rely on the purportedly undisclosed information that: (1) Celanese had left RYAM for a competitor, and (2) Eastman was demanding price concessions based on offers from competitors.  <u>See</u> Response at 17-18.

Plaintiffs' reliance on the loss of Celanese is unavailing because Defendants did disclose to the market the relevant information necessary to assess the risk.  As stated above, the market knew RYAM had lost a previous commitment to purchase 50,000 tons of Specialties in 2014, and the market knew that Celanese was no longer under contract with RYAM.  Thus, the market had the information necessary to assess Defendants' projections for growth in 2014.  Indeed, Plaintiffs' own allegations in the Amended Complaint demonstrate that the market understood that Defendants' projections for growth in 2014 were impacted by the loss of Celanese.  <u>See</u> Amended Complaint ¶ 117 ("'[RYAM's] prior goal of 30K incremental [Specialties] tonnes this year has been largely (if not entirely) pushed out to 2015.  To put this in perspective, a year ago Rayonier was hoping for a 90K tonne increase in 2014, it lowered that to up 25-40K [sic] tonnes in October (as it appeared to lose 25K tonnes of Celanese's business) and then went to a guide of 30K incremental tonnes earlier this year before the latest call for flat.'" (quoting a July 31, 2014 analyst report from RBC)).  Plaintiffs argue that these disclosures were insufficient because Defendants did "not identify Celanese as a 'former' customer or indicate that

Celanese had ceased all future purchases from (or contractual negotiations with) RYAM as of January 1, 2014." <u>See</u> Plaintiffs' Response at 20. However, Plaintiffs fail to allege any facts to support the contention that Defendants knew this information at the time they made the various statements. For example, Plaintiffs do not allege if or when Celanese ceased <u>all</u> negotiations with RYAM, or <u>when</u> Defendants knew they would be unable to sell <u>any</u> Specialties to Celanese in 2014. Defendants knew that RYAM had lost 50,000 tons of business, and that the Celanese contract had expired. Defendants informed the market of this information. The fact that RYAM ultimately sold no Specialties to Celanese in 2014, as disclosed in the Form 10-K filed in February 2015, does not demonstrate that Defendants <u>knew</u> of this outcome earlier. Thus, having disclosed the relevant information in its possession and absent any allegations regarding when Defendants knew RYAM would be unable to sell any Specialties to Celanese in 2014, Defendants were not required to speculate to the market about its relationship with Celanese. Notably, Plaintiffs do not allege that Defendants ever made any specific statement about its relationship with Celanese that gave the market a false impression of the status of that client. Defendants touted RYAM's long-term contracts with longstanding clients, listed its top clients in recent years and informed the market of when those contracts expired. Accordingly, Plaintiffs' contention that the market was misled by Defendants' growth projections because it did not know that RYAM had lost Celanese's business is not supported by factual allegations of the Amended Complaint.

Likewise, the failure to disclose the purported dispute with Eastman does not render Defendants' cautionary statements inadequate. Significantly, Plaintiffs include no factual allegations to suggest that Eastman's demands in 2013 were in any way responsible for

RYAM's failure to meet its projected volume sales growth. Indeed, in the Amended Complaint Plaintiffs allege that RYAM expanded its Specialties volume sales to Eastman in 2014. See Amended Complaint ¶ 143 (quoting the February 27, 2015 Form 10-K which reported that Eastman represented "21%, 21%, and 31% of total sales from 2012-[2]014"). While Eastman's demand likely impacted RYAM's prices, Defendants consistently disclosed that Specialties prices were declining. In retrospect, perhaps Eastman's demands to RYAM in 2013 were a sign of things to come, but simply because Eastman sought to negotiate a lower price with RYAM in 2013 based on offers it had received from competitors did not require RYAM to speculate to the market about the potential loss of Eastman as a customer. See In re Express Scripts Holding Co. Sec. Litig., 2017 WL 3278930, at *11-13 ("Where an outcome is merely speculative, the duty to disclose does not attach."); In re Hi-Crush Partners L.P. Sec. Litig., 2013 WL 6233561, at *8 ("[Defendant] was not required to describe in detail any 'preliminary discussions' it had with [major client.] Such a requirement would impose 'substantial burdens' on businesses." (internal citations omitted)); see also Miller v. Champion Enters. Inc., 346 F.3d 660, 678 (6th Cir. 2003) ("[Defendant] disclosed the exact risk that occurred in this situation . . . . [Defendant] is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk."). The risk that Eastman would repudiate the Eastman Agreement and move to a competitor had not "already occurred" when Defendants made their projections and issued the warnings.[16] Indeed, as alleged in the Amended Complaint, it was not until

---

[16] Plaintiffs also appear to contend that Defendants "knew" they would not reach the sales goals projected and that the CSE would be a failure for various reasons—the timing of their contracts, the loss of Celanese, and the dispute with Eastman. But, so long as Defendants' forward-looking statements were accompanied by meaningful cautionary language sufficient to satisfy the statutory safe harbor, Defendants' knowledge of the truth or falsity of their statements is irrelevant. See Harris, 182 F.3d at 803 ("[I]f a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."); see also id. at 807 n.10 (explaining that for purposes of the safe harbor, actual knowledge is relevant "only when there is

negotiating 2016 prices that the relationship between Eastman and RYAM broke-down. Notably, Plaintiffs do not include any allegations regarding the progress of negotiations between Eastman and RYAM, much less whether or when Defendants knew that Eastman intended to file a lawsuit. Because Defendants' cautionary statements warned of the important factors that could cause results to differ from those projected, and Plaintiffs have not shown that Defendants failed to disclose any <u>actualized</u> adverse events, the Court finds Defendants' warnings were sufficient to bring Defendants' forward-looking statements within the safe harbor. <u>See</u> <u>Harris</u>, 182 F.3d at 807.

### D. Strategic Repositioning

Last, Plaintiffs cite to Defendants' statements on July 30, 2015, that RYAM would reconfigure the Jesup facility to reduce Specialties capacity and increase Commodities capacity, reversing the CSE. <u>See</u> Amended Complaint ¶ 153. Defendants blamed the failure of the CSE on the "persistent imbalance of supply and demand in the [Specialties] market." <u>Id.</u> During a conference call that day, Boynton explained that this change in "strategic direction" was the result of the "global supply and demand imbalance" over the last two years that "adversely impacted the prices for our [Specialties] and in turn, our overall profitability." <u>See</u> Motion to Dismiss, Ex. 4 at 18. According to Boynton, in moving forward with the CSE in 2011, Defendants did not anticipate the "subsequent increase in supply nor the slowdown in the broader [Specialties] end markets," which now necessitates the shift in strategy to "deemphasize volume growth in [Specialties]." <u>Id.</u>, Ex. 4 at 19-20.

---

inadequate cautionary language"); <u>Edward J. Goodman Life Income Trust</u>, 594 F.3d at 795 ("[A]n allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language."). Regardless, for the reasons set forth below, the Court finds these allegations are insufficient to demonstrate a "cogent and compelling" inference of severe recklessness, much less the actual knowledge required to avoid the safe harbor.

The Form 10-Q filed on August 5, 2015, also disclosed "industry oversupply and weaker end-market demand" as well as declining Specialties prices.  See id., Ex. 4 at 20. Nonetheless, Plaintiffs identify two purportedly misleading statements in the July 30, 2015 conference call: Boynton's explanation that low growth and a "supply/demand imbalance" which reduced pricing power "over the last two years" were the cause of the shift in strategy, and Defendants' assurances that Specialties volumes were "predominately contracted" and new pricing negotiations would take place in the third and fourth quarter. See Amended Complaint ¶¶ 155-56.

Significantly, Plaintiffs do not assert that these statements were false as a factual matter.[17]  Instead, Plaintiffs contend that these statements, as well as the Form 10-Q were misleading because Defendants failed to disclose that the dispute with Eastman had "deteriorated to the brink of litigation."  Id.  However, as explained above, silence is not misleading absent a duty to disclose.  Defendants' explanation of the decision to transition back to Commodities "would be misleading only if it 'conveyed to the public a false impression'" of the status of RYAM's relationship with Eastman.  See FindWhat Investor Grp., 658 F.3d at 1306.  However, Defendants' broad statements regarding market conditions and pricing negotiations did not purport to suggest anything about RYAM's business dealings with Eastman.  "No reasonable investor would believe that a conclusory, but apparently accurate, report" of Defendants' financial earnings for the quarter and decision to reposition itself in the market in response to current conditions "implied that all

---

[17] To the extent Plaintiffs contend that Defendants' assurances that volumes were largely contracted and new pricing negotiations would take place in the coming months were misleading because Eastman was about to file a lawsuit, Plaintiffs fail to include any allegations demonstrating that Defendants knew or must have known of Eastman's impending suit at the time they made these statements.  For example, Plaintiffs do not allege that Eastman had ceased negotiations with Defendants or had informed Defendants that it was terminating the agreement.

was well within every component of the company that could possibly affect revenue in the future." Id.  Indeed, if anything, Defendants' announcement that it was reversing course on the CSE implied that all was <u>not</u> well in its relationship with customers, including Eastman.  As such, Defendants' failure to discuss specifically the status of its relationship with Eastman does not render misleading any of the statements identified by Plaintiffs.  Because Defendants had no duty to disclose the purported Eastman dispute at the time they made the strategic repositioning statements they were not materially false or misleading and thus, do not support Plaintiffs' securities fraud claim.

### E. Scienter

Alternatively, to the extent any of the aforementioned statements were materially misleading within the meaning of section 10(b) and Rule 10b-5, Plaintiffs' securities fraud claim is still due to be dismissed for failure to adequately allege scienter.  In the Eleventh Circuit, "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner."  <u>See</u> <u>Bryant</u>, 187 F.3d at 1287.  "'To establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors.'"  <u>See</u> <u>In re Pegasus Wireless Corp. Sec. Litig.</u> (<u>In re Pegasus</u>), 657 F. Supp. 2d 1320, 1327-28 (S.D. Fla. 2009) (quoting <u>City of Philadelphia v. Fleming Cos.,Inc.</u>, 264 F.3d 1245, 1261 (10th Cir. 2001)).  Generally, the knowledge requirement may be satisfied under the severe recklessness standard where a defendant has "'knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead

investors.'" In re Pegasus, 657 F. Supp. 2d at 1327-28.  Significantly, as to the forward-looking statements, Plaintiffs must allege facts which if proven would establish that "the defendant made the statement with actual knowledge that it was false or misleading."  See Theoharous v. Fong, 256 F.3d 1219, 1224-25, 1226 (11th Cir. 2001) abrogated on other grounds in Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 643 (2010); Edward J. Goodman Life Income Trust, 594 F.3d at 795.

Plaintiffs' scienter allegations fall far short of both the actual knowledge and severe recklessness standards.  Plaintiffs rely on the Individual Defendants' executive positions at RYAM, as well as the significance of Eastman as a client and the Specialties segment of the business overall, to demonstrate that Boynton, Ruperto and Woo must have known about RYAM's declining advantage in the market and the status of RYAM's relationship with Eastman. Plaintiffs allege that Boynton attended meetings with Eastman before, during and after the lawsuit was filed.  And, because these Defendants made public statements about the Specialties business, Plaintiffs allege that the Individual Defendants were intimately familiar with the status of RYAM's Specialties business throughout the Class Period.   However, establishing the Individual Defendants' knowledge of the Specialties market and the Eastman relationship does not show that these Defendants acted intentionally or recklessly in failing to make the disclosures at issue in this case. Conspicuously absent from the Amended Complaint are any particularized factual allegations "that would require one to rule out an innocent explanation for the alleged behavior,"  see Kadel v. Flood, 427 F. App'x 778, 780 (11th Cir. 2011) (internal quotation omitted), namely, that the Individual Defendants honestly but mistakenly believed that global demand for Specialties would increase, prices would rebound, RYAM's relationship

with Eastman would remain intact, and the CSE would prove successful. Indeed, the more cogent and compelling inference from the facts set forth in the Amended Complaint is one of poor business judgment—the Individual Defendants remained optimistic because they failed to appreciate the extent of the global decline in demand for Specialties products, the increased capacity of RYAM's competitors, and the degree to which prices would fall. See In re Ferrellgas Partners, L.P., Sec. Litig., 2018 WL 2081859, at *20; see also Kadel, 427 F. App'x at 780 ("[T]he stronger inference is that appellees simply failed to predict the eventual collapse of the housing and subprime mortgage market, and, as a result, were ill-prepared to respond when those markets crashed.").

Significantly, there are no allegations based on confidential witnesses or internal memos suggesting that the Individual Defendants did not actually believe their positive statements about the company and optimistic projections for growth. Instead, Plaintiffs allege that the Individual Defendants must have known in June 2014 that they would not meet their projection for an increase in Specialties volumes in 2014 because the volumes sold to top customers for the year were already set by contract. But the fact that RYAM had contractual commitments from its top customers does not mean that the Individual Defendants knew they would not be able to reach their goals by expanding sales to other customers, obtaining new customers, or reaching new markets. Notably, despite the substantial loss of the Celanese volumes, RYAM's contractual commitments for 2014 had only declined by 7,000 tons. See Amended Complaint ¶ 81. And, even assuming the Individual Defendants were aware of Eastman's demand in 2013 for lower prices, such demand had not undermined RYAM's ability to expand the volume of its sales to Eastman and reach an agreement on 2014 prices. As such, these allegations do not raise a

compelling inference that the Individual Defendants were severely reckless in projecting increased volumes in 2014, much less that these Defendants had actual knowledge that RYAM would not meet those goals. The more plausible inference from the Amended Complaint is that the Individual Defendants simply underestimated the decline in global demand for Specialties. Notably, as events progressed, and prices continued to decline, the Individual Defendants disclosed these conditions to the market throughout the Class Period, "which significantly undermines any inference that [these Defendants] intended to mislead [RYAM's] investors." See Kadel, 427 F. App'x at 780-81.

Moreover, the failure to more specifically disclose the loss of Celanese or reveal the demands from Eastman under the circumstances alleged do not amount to "highly unreasonable" omissions involving "an extreme departure from the standards of ordinary care," which "present a danger of misleading" investors so obvious that the Individual Defendants "must have been aware of it." See Mizzaro, 544 F.3d at 1238 (quoting Bryant, 187 F.3d at 1282 n.18). The more plausible inference is that the Individual Defendants did not believe they had any duty to disclose this information given that these Defendants never made any specific representations as to the status of a particular client or pricing negotiations, they disclosed the expiration of the Celanese contract, as well as the significant loss of volume from a customer as relevant to RYAM's 2014 projections, and believed that they would be able to successfully negotiate with Eastman and reach an agreement on price as they had been able to do for the past eighty years. See In re Express Scripts Holding Co. Sec. Litig., 2017 WL 3278930, at *18-19. Thus, while Plaintiffs' allegations support the inference that the Individual Defendants were aware of the status of the Celanese and Eastman relationships, they do not give rise to a strong

inference that these Defendants were "severely reckless by not being aware their statements could be perceived as false or misleading . . . ." See Durgin v. Mon, 415 F. App'x 161, 167 (11th Cir. 2011).

In addition, Plaintiffs contend that Boynton had a motive to falsely portray RYAM in a positive light in order to leave Rayonier before fraud at that company was revealed, and secure lucrative compensation with RYAM. However, such motive allegations, without more, are insufficient to demonstrate scienter. See Bryant, 187 F.3d at 1285-86; see also DJSP Enters., Inc., 572 F. App'x at 718 ("[A] personal financial incentive, standing alone, is insufficient to establish a strong inference of actual fraud."). Indeed, the Court finds any inference of fraudulent intent from these allegations to be particularly weak. Plaintiffs' allegations of the "unravel[ing]" of a fraud at Rayonier are exceedingly vague, and nothing in the Amended Complaint connects the timing of the decision to separate RYAM from Rayonier to that fraud. Notably, there are no allegations that the Individual Defendants were engaged in suspicious stock transactions before the market learned of the Eastman lawsuit. The lack of such allegations, while not dispositive, "weighs against inferring scienter." See Mizzaro, 544 F.3d at 1253 & n.3.

In light of the foregoing, even considering all of these allegations in the aggregate, the only plausible inference is that the Individual Defendants were optimistic that global demand would increase, the Specialties market would rebound, and their 80-year relationship with Eastman would remain intact. Unfortunately for all concerned, the Individual Defendants were wrong in their projections, but on the facts alleged in the Amended Complaint, one cannot infer that they were reckless or deceitful.[18]

---

[18] The Court notes that "[c]orporations have no state of mind of their own, rather, the scienter of their agents must be imputed to them." See Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635 (11th Cir. 2010).

## VII.    Count II - Control Person Liability

In Count II of the Amended Complaint, Plaintiffs allege control person liability against the Individual Defendants under § 20 of the Exchange Act.  Pursuant to § 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  However, "[b]ecause a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635-36 (11th Cir. 2010).  Because Plaintiffs fail to properly allege their § 10(b) claim for securities fraud against all Defendants, Plaintiffs' derivative § 20(a) claim against the Individual Defendants must also fail.  Id.; see also Mizzaro, 544 F.3d at 1255; Garfield, 466 F.3d at 1261.  As such, the Court determines that the Defendants' Motion to Dismiss is due to be granted in its entirety.  See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.").

---

Although Plaintiffs fail to adequately allege scienter as to any of the Individual Defendants, Plaintiffs could theoretically create a strong inference of scienter as to RYAM.  Id.  However, in this case, there are no other allegations that could give rise to an inference of scienter with respect to RYAM separate from that of the Individual Defendants, and as such, Plaintiffs' securities fraud claim as to Defendant RYAM fails as well.

## VIII.   Sanctions

Finally, the PSLRA mandates that:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1) (emphasis added).  Moreover, "[i]f the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions . . . ."  15 U.S.C. § 78u-4(c)(2) (emphasis added).  Accordingly, "the PSLRA's provisions eliminate a district court's discretion on two fronts: (1) in choosing whether to conduct the Rule 11(b) inquiry and (2) in determining whether to impose sanctions following a finding of a Rule 11(b) violation."  See Thompson, 610 F.3d at 636; see also Ehlert v. Singer, 245 F.3d at 1320 (remanding case where district court failed to make the Rule 11 findings expressly required by the PSLRA).  Notably, in Thompson, the Eleventh Circuit instructs that a district court may not dispense with this obligation in a perfunctory manner, but rather, a court must make the "extensive" sanctions findings mandated by the PSLRA.  Id. at 639 ("It is not until this case, however, that we emphasize just how extensive the district court's sanctions findings must be in the PSLRA context.").  For example, the Thompson court noted that on remand, the district court should "further develop the record" on issues such as: whether the parties, as opposed to their attorneys, violated Rule 11, "whether the lawyers violated Rule 11(b)(1) by filing the complaints for improper purposes (a subjective

analysis that will likely require testimony), or whether the [party to be sanctioned] can rebut the PSLRA's presumptive award of attorneys' fees.[19]" Id. at 639.

Significantly, neither party has filed a motion requesting sanctions, or otherwise addressed this Court's obligation to conduct a sanctions review. Accordingly, absent further development of the record and briefing by the parties, the Court is unable to make these mandatory findings at this time. However, rather than further delay the resolution of this case, the Court will proceed with the dismissal of this action and entry of judgment but reserve jurisdiction to conduct the mandatory sanctions review.

In light of the foregoing, it is

**ORDERED**:

1. The Clerk of the Court is directed to correct the caption of the case to be consistent with the caption of this Order.

2. Lead Plaintiffs' Motion to Strike Extraneous Materials and References Thereto in Defendants' Motion to Dismiss the Amended Complaint (Doc. 83) is **DENIED**.

3. Defendants' Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law (Doc. 69) is **GRANTED.**

4. The Clerk of the Court is **directed** to enter Judgment in favor of Defendants Rayonier Advanced Materials, Inc., Paul G. Boynton, Frank A. Ruperto, and

---

[19] Specifically, the PSLRA requires a court to "adopt a presumption" that if Rule 11 is violated, the appropriate sanction is an award to the opposing party of the reasonable attorneys' fees and other expenses. 15 U.S.C. § 78u-4(c)(3)(A). This presumption may be rebutted if the sanctioned party can show that an award of attorneys' fees and expenses will impose "an unreasonable burden" or would be "unjust," and that the failure to make the award would not "impose a greater burden on the party in whose favor sanctions are to be imposed . . . ." 15 U.S.C. § 78u-4(c)(3)(B). Alternatively, the presumption may be rebutted if the Rule 11(b) violation was "de minimis." Id. If the presumption is rebutted, "the court shall award the sanctions that the court deems appropriate . . . ." 15 U.S.C. § 78u-4(c)(3)(C).

Benson K. Woo, and against Plaintiffs Michigan Carpenters' Pension Fund and Local 295 IBT Employer Group Pension Trust Fund.

5. The Court reserves jurisdiction to determine whether sanctions are appropriate against any of the parties, or their attorneys.

6. The Clerk of the Court is further **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 29th day of March, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties